RONALD J. SCHUTZ (admitted *pro hac vice*)
Email: rschutz@robinskaplan.com
PATRICK M. ARENZ (admitted *pro hac vice*)
Email: parenz@robinskaplan.com
RUTH L. OKEDIJI (admitted pro *hac vice*)
Email: rokediji@robinskaplan.com
EUGENIA C. SRODOSKI (admitted pro *hac vice*)
Email: nchungsrodoski@robinskaplan.com
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  612–349–8500
Facsimile:   612–339–4181

MICHAEL A. GEIBELSON (STATE BAR NO. 179970)
Email: mgeibelson@robinskaplan.com
**ROBINS KAPLAN LLP**
2049 Century Park E., Suite 3400
Los Angeles, CA 90067
Telephone:  310-552-0130
Facsimile:   310-229-5800

Attorneys for Plaintiffs Denise Daniels and
The Moodsters Company

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Denise Daniels and The Moodsters Company; | Case No. 2:17–cv–04527–PSG–SK |
| Plaintiffs, | **First Amended Complaint** |
| v. | **Jury Trial Demanded** |
| The Walt Disney Company; Disney Enterprises, Inc.; Disney Consumer Products and Interactive Media, Inc.; Disney Interactive Studios, Inc.; Disney Shopping, Inc.; and Pixar | |
| Defendants. | |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Introduction**

1.  Disney·Pixar released *Inside Out* in 2015 to rave reviews. *Inside Out* was later nominated for two Academy Awards and won the Academy Award for Best Original Screenplay. Critics continue to applaud Disney·Pixar for the inventiveness, creativity, and novelty in the fundamental premise of *Inside Out*: the use of anthropomorphized emotions Joy, Sadness, Anger, Fear, and Disgust as individual characters within an 11-year old girl.

2.  In June 2017, in fact, the *New York Times* ranked *Inside Out* as the seventh best movie in the 21st century so far. The article explained, "The personification of abstract concepts and the visual rendering of human consciousness from the inside are astonishing feats, executed with unparalleled inventiveness."

3.  But Disney·Pixar was not the first to conceive of the idea of anthropomorphized, color-coded characters inside a child each of which represents a single emotion, as depicted in *Inside Out*.

4.  Denise Daniels has dedicated her career over the last four decades to help children better recognize, understand, and manage their emotions. As part of her distinguished efforts, Daniels conceived of—and developed—a children's program called *The Moodsters*.

5.  *The Moodsters* live "deep down inside every child," and features five main characters. Each character is an animated, anthropomorphized figure representing a single emotion with a single corresponding color, specifically, happiness (yellow), sadness (blue), anger (red), fear (green), and love (pink).

6.  From 2005 through 2009, and every year in between, Daniels, along with her industry-leading team, approached and pitched Disney·Pixar to partner on a project relating to *The Moodsters*.

7.  The individuals at Disney·Pixar who had access to materials and descriptions of *The Moodsters* include Thomas Staggs, then CFO of The Walt

FIRST AMENDED COMPLAINT

Disney Corporation; Pete Docter, of Pixar; Rich Ross, then President of Disney Channels Worldwide, and later Chairman of Walt Disney Studios; Nancy Kanter, of Playhouse Disney (now referred to as Disney Junior); Paula Rosenthal, of Playhouse Disney; and Roy E. Disney, who was the son and nephew of the founders of The Walt Disney Company.

8.    Daniels and her team pitched and disclosed the idea underlying the *The Moodsters* to Disney·Pixar with the understanding, as is custom in the entertainment and motion picture industry, that Daniels would be compensated if Disney·Pixar used the idea. Disney·Pixar accepted these disclosures under these circumstances.

9.    Disney·Pixar has used Daniels' idea in the animated motion picture *Inside Out* and its related merchandise. Disney·Pixar has not compensated Daniels.

10.    Disney·Pixar has also infringed copyrights owned by Daniels' company, The Moodsters Company, through the release and sales associated with *Inside Out*.

11.    This suit seeks to hold Disney·Pixar accountable for its unauthorized use of Daniels' and The Moodsters Company's intellectual property. In fact, such unauthorized use in the entertainment industry is a problem that Disney·Pixar recently expressed concern to its inventors about: "The unauthorized use of intellectual property in the entertainment industry generally continues to be a significant challenge for intellectual property rights holders." The Walt Disney Co., Annual Report (Form 10-K) (Nov. 23, 2016). As set forth below, Disney·Pixar is part of this problem, and should compensate Daniels and The Moodsters Company for its infringement.

### The Parties

12.    Plaintiff Denise Daniels is a citizen and resident of the State of Minnesota.

13.     Plaintiff The Moodsters Company is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Daniels is the sole shareholder and CEO of The Moodsters Company.

14.     Defendant The Walt Disney Company is a Delaware corporation with its principal place of business in Burbank, California.

15.     Defendant Disney Enterprises, Inc. is a Delaware corporation with its principal place of business in Burbank, California.

16.     Defendant Disney Consumer Products and Interactive Media, Inc. is a California corporation with its principal place of business in Burbank, California. Disney Consumer Products and Interactive Media, Inc. is a subsdiary of Disney Enterprises, Inc.

17.     Defendant Disney Interactive Studios, Inc. is a California corporation with its principal place of business in Burbank, California. Disney Interactive Studios, Inc. is a subsidiary of Disney Enterprises, Inc.

18.     Defendant Disney Shopping, Inc. is a Delaware corporation with its principal place of business in Burbank, California. Disney Shopping, Inc. is a subsidiary of Disney Enterprises Inc.

19.     Defendant Pixar is a California corporation with its principal place of business in Emeryville, CA 94608.

20.     The Defendants are collectively referred to in this Complaint as Disney·Pixar.

### Jurisdiction and Venue

21.     This action arises under the copyright laws of the United States and California law.

22.     This Court has original subject matter jurisdiction over the claims for copyright infringement (Counts 2-6) under 17 U.S.C. §501, 28 U.S.C. §1331, and 28 U.S.C. §1338(a); and supplemental jurisdiction over the related state law claim (Count 1) under 28 U.S.C. §1367.

FIRST AMENDED COMPLAINT

23.     This Court also has diversity jurisdiction over the state law claim (Count 1) under 28 U.S.C. §1332. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Daniels and The Moodsters Company, on one hand, and Disney·Pixar, on the other hand, are citizens of different states within the meaning of 28 U.S.C. §1332.

24.     This Court has personal jurisdiction over Disney·Pixar because all Defendants reside in the State of California.

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because The Walt Disney Company, Disney Enterprises, Inc., Disney Consumer Products and Interactive Media, Inc., Disney Interactive Studios, Inc., Disney Shopping, Inc., reside in this District, and Pixar is a resident of California; and a substantial part of the events and omissions giving rise to Daniels' and The Moodsters Company's claims occurred in this District.

### Factual Background

### Denise Daniels is a nationally recognized child development expert

26.     Daniels has over 40 years of experience in promoting children's social and emotional development.

27.     In 1986, with a background in Pediatric Oncology Nursing, Childhood Bereavement, and Crisis Intervention, Daniels co-founded the national non-profit National Childhood Grief Institute.

28.     In Daniels' role as Executive Director, she traveled across the U.S. and around the globe providing direct services for schools, Minnesota's judicial system, and for children in refugee camps who had experienced grief and loss. During Operation Desert Storm, she had the distinction of working with military families at the request of Four Star General William Vessey, Chairman of the Joint Chiefs of Staff for the U.S. Pentagon. At the request of the U.S. State Department, Daniels and her team traveled to devastated areas to provide grief counseling and crisis intervention for young victims, such as in the

FIRST AMENDED COMPLAINT

aftermath of Hurricane Katrina, and the 2004 tsunami in Southeast Asia. She was called upon to help children and families cope with the Oklahoma City Bombing, the shooting at Columbine High School, and the terror attacks on September 11 in New York City. In the aftermath of September 11, Daniels authored a children's grief workbook called *First Aid for Feelings*. Ex. 1. Fifteen million copies were distributed to school children across the country.

29.     Daniels shared her expertise through broadcast television as the first parenting expert for NBC's Today show in 1991. In 1995, she co-hosted her own daily, nationally syndicated, parenting show on NBC's America's Talking Network.

30.     Daniels and her team won a Peabody Award for her work on a PBS television special helping children understand and cope with war.

31.     Daniels has also appeared on Oprah, Dateline, The View, CNN, NBC's Nightly News, Larry King Live, Good Morning America, and Fox News. Daniels has also been featured in the *Wall Street Journal*, the *New York Times*, the *Washington Post*, *Inc.*, *Redbook*, *U.S. News & World Report*, and *Parents*, *Parenting*, *People*, and *Newsweek* magazines.

32.     Fortune 500 companies have recognized Daniels as a leader in the area of children's social and emotional development. In 1998, for instance, Pfizer Pediatrics retained Daniels as a consultant to develop a program to help pediatric residents better communicate and emotionally connect with their young pediatric patients. The *First Aid for Feelings* Health Care Initiative included the creation of a children's Feeling Thermometer. Pfizer Pediatrics distributed this thermometer to 40,000 children undergoing counseling at Ground Zero and throughout New York City. Research has since shown that pediatric patients whose physicians implemented Daniels' *First Aid for Feelings* program required less pain medication and sustained shorter hospitalizations.

33.     Also through her partnership with Pfizer, Daniels developed a

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

1  program to help pediatric patients cope with emotional issues surrounding

2  hospitalization. This program has been used in over 200 pediatric units across

3  the country, and integrated into ten U.S. medical school training programs.

4       34.    While consulting for Pfizer Pediatrics, Daniels had the privilege of

5  collaborating with the late Dr. Candace Pert of the National Institutes of

6  Health and Georgetown University School of Medicine. Dr. Pert was an

7  internationally recognized neuroscientist and pharmacologist. She served as a

8  mentor to Daniels, and influenced Daniels' strong belief in implementing

9  integrative medicine to improve patient outcomes.

10      35.    In total, Daniels is a published author of nine children's self-help

11  books.

12              **The Conception and Development of *The Moodsters***

13      36.    Daniels wanted to expand on her idea of using color-coded

14  illustrations to help children with their social and emotional development.

15      37.    Daniels conceived of *The Moodsters*, a children's animated

16  television pilot ("*The Moodsters* Pilot") starring five color-coded

17  anthropomorphic characters, each individually representing a single emotion:

18  happiness, sadness, anger, fear, and love. Ex. 2.

19      38.    These characters live in an abstract world inside a child. For

20  instance, early materials about *The Moodsters* explain that "[s]omewhere deep

21  down inside every child is a wonderous world where The Moodsters[TM] live."

22  Ex. 3 at 1.

23      39.    Daniels recruited a high-profile and accomplished team to execute

24  on her vision for *The Moodsters* and formed The Moodsters Company. This

25  team included, among others, Lisa Simon, Louise Gikow, Marc Brackett,

26  Ph.D., and A.J. Dewey.

27  //

28  //

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Lisa Simon**

40.     The late Lisa Simon served as co-executive producer for *The Moodsters*. Simon was a former Assistant Vice President of Sesame Street. She was a producer and director of "Sesame Street" for over fourteen years, where she brought new life and direction to what had already become a benchmark for quality educational television for pre-school children. She won 15 Emmy Awards, as well as a Peabody Award, for her work as a producer and director. She worked on several animation projects for Little Airplane Productions, Nick Jr., and PBS. Simon also operated her own company, simon-sez productions, and worked with major corporate, film, and video production companies. Among Simon's clients were PBS, the Discovery Network, Sony, and Disney.

**Louise Gikow**

41.     Louise Gikow served as co-executive producer for *The Moodsters*, along with Simon. Gikow is an Emmy Award-winning author and composer of over 150 scripts, books, and songs. She was a consulting producer and staff writer for the PBS series "Between the Lions." She was the co-creator and head writer of Playhouse Disney's hit show, "Johnny and the Sprites." And Gikow was the co-creator of "Lomax: The Hound of Music," a music education show for children on PBS Kids. Gikow was head writer for numerous international projects, including the Middle Eastern co-production of "Sesame Stories."

**A.J. Dewey**

42.     A.J. Dewey served as the creative director for *The Moodsters*. Dewey is an award-winning illustrator and designer whose work spans a broad range of mediums and whose clients include Sesame Street, Disney, IBM, AT&T, Marvel, Nascar and Pepsi Cola. His illustrations can be seen in several children's book series and hundreds of retail products. Dewey's television work includes "Animal Planet," "Video Buddy," "Once Upon a Tree" and "Dr. Seuss's My Many Colored Days," a symphonic animated version of the

popular children's book. From 2004 to 2007, Dewey was the Senior Designer at Manhattan Toy, where he designed a broad list of toy products, including the 2006 launches of Groovy Girls' Petrageous and Cirque du Soleil's premier line of children's products and textiles.

### Marc Brackett

43.   Marc Brackett, Ph.D. served as a curriculum advisor on *The Moodsters*. He is currently Director of the Yale Center for Emotional Intelligence and a professor in the Child Study Center at Yale University. He has published over 100 scholarly articles and is the recipient of numerous awards, including the Joseph E. Zins Award for his research on emotional intelligence in schools. His research has been featured in the *New York Times*, *Time* Magazine, and National Public Radio. He co-developed the RULER model of emotional literacy, which stands for five skills of emotional intelligence: **R**ecognizing, **U**nderstanding, **L**abeling, **E**xpressing, and **R**egulating emotions. This model was adopted by over 1,000 public, charter, and private schools across the United States and in other countries.

\*\*\*

44.   Emotional intelligence played a preeminent role in the creation and development of *The Moodsters*. *The Moodsters'* mission is to help children recognize, understand, and regulate their emotions in a healthy and socially acceptable manner.

45.   The role of emotional intelligence skills in children is of paramount importance in their growth and development. Research shows that children who learn emotional intelligence skills have less anxiety and depression; have fewer attention, learning, and behavior problems; are better problem-solvers; display greater social and leadership skills; and perform better academically.

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

46.     Dr. Brackett, as an advisor on *The Moodsters*, co-wrote the *Emotional Literary Currriculum* with Dr. Susan E. Rivers, which laid out the educational objectives needed to develop episodes of *The Moodsters*. *The Moodsters*' animated show was designed to provide children with an opportunity to learn "emotional literacy" using the RULER method. Daniels and her team, therefore, designed *The Moodsters* to help children "acquire the critical emotional knowledge and important life skills to succeed."

47.     In particular, *The Moodsters* teaches children to recognize and understand their emotions; develop the vocabulary to express those feelings; and practice simple strategies that help them manage their emotions and tackle the everyday challenges of growing up.

48.     Daniels and her team created pitch materials, along with an evidence-based curriculum, to substantiate particularized expressions of her idea behind *The Moodsters*. Specifically, they prepared "a bible" for *The Moodsters*, which is commonly referred to in the entertainment industry as an outline of a television series' characters, settings, and other elements ("*The Moodsters* Bible"). Ex. 3.

49.     Daniels and her team completed the animated pilot episode for *The Moodsters*, titled "The Amoodsment Mixup," in 2007. Ex. 2, 4.

50.     Both *The Moodsters* Bible and Pilot revolve around five color-coded main characters, each of which represents a single emotion. Because emotions are an abstract concept with no known physical features or visual qualities, these individual single-emotion characters are visually represented as anthropomorphous figures with human characteristics, including expressive body language, vocal characteristics, and facial expressions.

51.     *The Moodsters* was designed and developed to foster emotional intelligence in children.

//

FIRST AMENDED COMPLAINT

1        52.    These five characters each individually represent one of the

2  following single emotions: happiness, sadness, anger, fear, and love.

3        53.    Each of the five characters is designed with a core color: (from top

4  to bottom, left to right) happiness (yellow), sadness (blue), anger (red), fear

5  (green), and love (pink).



        FIRST AMENDED COMPLAINT

54.    The Happy character of the Moodsters is Zazz.[1] The Happy character is an anthropomorphized animated character that represents the single emotion of happiness, designated by the core color of yellow. The Happy character in the Moodsters is "quite optimistic and enthusiastic," and the leader of the Moodsters. Ex. 3 at 3. The other Moodsters depend on the Happy character "whenever the going gets tough." *Id.*



//
//
//
//
//
//
//
//
//

---

[1]    The initial version of *The Moodsters* Bible listed the Happy character as Zip.

FIRST AMENDED COMPLAINT

55.     The Sadness character is Snorf.[2] The Sadness character is an anthropomorphized animated character that represents the single emotion of sadness, and is designated by the core color of blue. The Sadness character is melancholy, and known to "weep copiously." *Id.* at  6. "But that's okay, because he knows that it sometimes takes courage to cry." *Id.*



//
//
//
//
//
//
//
//
//

―――――――――――――
[2]     The initial version of *The Moodsters* Bible listed the Sadness character as Sniff.

FIRST AMENDED COMPLAINT

56.     The Anger character is Rizzi.[3] The Anger character is an anthropomorphized animated character that represents the emotion of anger, and is designated by the core color of red. The Anger character is the Moodster "most likely to blow her top." *Id.* at  4. In fact, when she becomes furious, lightening bolts appear and explode with sparks from her head. *Id.*



//
//
//
//
//
//
//
//
//
//

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[3]     The initial version of *The Moodsters* Bible listed the Anger character as Roary.

57.     The Fear character is Scootz.[4] The Fear character is an anthropomorphized animated character that represents the single emotion of fear, and is designated by the core color of green. The Fear character is a nervous nellie. "Everything frightens him." *Id.* at 7.



//
//
//
//
//
//
//
//
//
//
//

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[4]     The initial version of *The Moodsters* Bible listed the Fear character as Shake.

FIRST AMENDED COMPLAINT

58.    Love is represented by the character Oola.[5] The Love character is an anthropomorphized animated character that represents the single emotion of love, and is designated by the core color of pink. The Love character "is full of love for the world." *Id.* at 5. "She is patient and nurturing and a very good listener." *Id.*



59.    These five characters live in a world deep inside every child.

**Denise Daniels and her team pitched *The Moodsters* to Disney·Pixar from 2005 through 2009**

60.    Daniels and her team sought to partner with a network or studio to produce *The Moodsters* on a national and international platform. Disney·Pixar, Nickelodeon Jr., and PBS were entertainment companies that Daniels wanted to partner with.

61.    Daniels and her team first contacted Disney·Pixar about *The Moodsters* in 2005. They then again contacted Disney·Pixar in 2006, 2007, 2008, and 2009 about *The Moodsters*.

62.    Daniels and her team contacted a number of different individuals

---

[5]    The initial version of *The Moodsters* Bible listed the Love character as Oolvia.

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

at Disney·Pixar about *The Moodsters*.

63.     The following individuals at Disney·Pixar who received information about *The Moodsters* include Pete Docter, Thomas Staggs, Nancy Kanter, Paula Rosenthal, and Beth Gardiner.

64.     In addition to the individuals listed in paragraph 63, Roy E. Disney and Rich Ross had access to *The Moodsters*.

65.     In 2005, Gikow and Simon shared creative materials about *The Moodsters* with Paula Rosenthal, who worked for Playhouse Disney. Rosenthal then provided those materials about *The Moodsters* to Nancy Kanter, also of Playhouse Disney. Rosenthal requested an additional copy of *The Moodsters* materials for herself.

66.     Rosenthal and Kanter at Disney, and Gikow and Simon, at The Moodsters Company, continued to discuss and share materials about *The Moodsters* in 2006 and 2007.

67.     In 2008, a mutual friend put Daniels in touch with Staggs. Staggs was the CFO of The Walt Disney Company at the time. Daniels shared materials about *The Moodsters* with Staggs.

68.     In May 2008, Staggs informed Daniels that he would share materials about *The Moodsters* with Roy E. Disney. Roy E. Disney was the son and nephew of the founders of The Walt Disney Corporation.

69.     In June 2008, Staggs informed Daniels that he shared materials about *The Moodsters* with Rich Ross. At the time, Ross was the President of Disney Channels Worldwide. In 2009, Ross became Chairman of Walt Disney Studios.

70.     Walt Disney Studios distributes films under various banners, which include Walt Disney Pictures and Pixar.

71.     Daniels also called Docter to discuss *The Moodsters*. The two spoke on the phone for an extended period of time, and Daniels walked Docter

FIRST AMENDED COMPLAINT

1  through in detail the characters, curriculum, and concept underlying *The*
2  *Moodsters*.

3      72.    In short, Disney·Pixar had access to *The Moodsters* well before 2010.

4              **Disney·Pixar Started Working on *Inside Out* in 2010**

5      73.    Disney·Pixar started working on *Inside Out* in 2010.

6      74.    Docter has explained that his motivation for the movie started

7  when his daughter, who was 11 at the time, went through changes in her

8  demeanor and how she managed her emotions.

9      75.    Also during his initial stage of work, he reportedly reflected and

10  wondered "what would be fun to see in animation, you know - what have I not

11  seen?," recognizing that Disney·Pixar had never before featured

12  anthropomorphic emotions as characters inside a child before. This thought

13  process purportedly led him "to have characters that represent emotions."

14      76.    Docter has explained the difficulty in taking *the idea* of characters

15  that represent emotions, and actually *expressing* that idea. For instance, Docter

16  has conceded that Disney·Pixar had never before expressed the idea of single

17  emotions as characters:

18      The idea [for Inside Out] was rather abstract, but in my enthusiasm
19      *I didn't realize just how **difficult** it would be to make it concrete*. Most of
       our films had somewhere to start: bugs, fish, robots . . . even our
20      monsters were based on some combination of animals. *But what do*
       ***emotions look** like*? Or abstract thought? Or the subconscious? Here
21      we had *nothing to measure against*, *nothing **concrete*** to tell us when
       we'd got it right.
22

23  Daniels, however, had solved the problem of how to take the abstract idea of

24  emotions and make them concrete when she created *The Moodsters*. And she

25  shared that idea with Disney·Pixar.

26      77.    Docter, and his team at Disney·Pixar, also struggled to identify

27  which emotions to include as characters, and how many emotions to feature.

28      78.    For example, Docter and Disney·Pixar have maintained that they

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   researched the issue of how many emotions exist, and determined that there is

2   no consensus in the scientific community on that issue. Some scientists told

3   Docter and Disney·Pixar that there were only three basic main emotions.

4   Others maintained there were 16 emotions.

5       79.     At various points in the development of the script, Disney·Pixar

6   included more than five emotions. For instance, Disney·Pixar considered using

7   at least pride, hope, envy, ennui, schadenfreude, awe, surprise, amusement,

8   and compassion. At one point, Disney·Pixar considered having 27 different

9   emotions.

10      80.     Disney·Pixar ultimately settled on five emotions as characters—the

11   same number of emotions as characters in *The Moodsters*.

12      81.     Four of the five emotions as characters in *Inside Out* are identical to

13   the characters in *The Moodsters*: Happy/Joy, Sadness, Fear, and Anger.

### Disney·Pixar Released *Inside Out* in 2015

15      82.      Disney·Pixar released *Inside Out* in the United States on June 19,

16   2015.

17      83.     *Inside Out* is a movie that primarily takes place deep down inside an

18   11-year old girl, named Riley.

19      84.     The five main characters in *Inside Out* are based on the following

20   single emotions: joy/happiness; sadness, anger; fear; and disgust.

21      85.     Each of these main characters is an anthropomorphic, color-coded

22   animated character representing a single emotion.

23   //

24   //

25   //

26   //

27   //

28   //

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

86.    The Joy character is reflected in the color yellow. "Hope and optimism dictate all of her decisions."



87.    The Sadness character is reflected in the color blue. "Sometimes it seems like the best thing to do is just lie on the floor and have a good cry."



88.    The Anger character is reflected in the color red."He has a fiery spirit and tends to explode (literally) when things don't go as planned." He is quick to overreact and has little patience for life's imperfections.



FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

89.    The Fear character is reflected in the color purple. "He is constantly on the lookout for potential disasters." "There are very few activities and events that Fear does not find to be dangerous and possibly fatal."



90.    The Disgust character is reflected in the color green. "Her job is to keep Riley from being poisoned, physically or socially."



91.    Disney·Pixar invested significant resources into the development of *Inside Out*. The production budget for *Inside Out* was over $170,000,000.

92.    This investment has paid off for Disney·Pixar. *Inside Out* was a huge success at the box office.

93.    Disney·Pixar generated gross revenue at the box office for *Inside Out* of over $350,000,000 domestically and over $850,000,000 worldwide. Total domestic and international ticket and DVD sales exceed $950 million.

94.    *Inside Out* was also lauded by critics. Some film critics praised *Inside*

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

*Out* for its novelty and originality. Anthony Lane of the *New Yorker*, for instance, wrote "On the scale of inventiveness, 'Inside Out' will be hard to top this year."

95.  Disney·Pixar continues to promote *Inside Out* as an "inventive" and "groundbreaking" animated film.

96.  One reason *Inside Out* is considered so novel, creative, and inventive is because Disney·Pixar had never before released an animated feature that anthropomorphized emotions as individual characters.

97.  None of the three *Toy Story* movies, for instance, incorporate anthropomorphized emotions. Nor do any characters in that trilogy represent a single emotion which corresponds to a single color.

98.  *Cars* and *Cars 2* are the same in this regard. None of the characters in these movies feature anthropomorphized emotions. And none of the characters represents a single emotion which corresponds to a single color.

99.  *Monsters Inc.* was the first major motion picture that Docter directed. The characters in that movie, along with *Monsters University*, do not include anthropomorphized emotions. Nor does any single character represent a single emotion which corresponds to a single color.

100.  The remainder of Pixar's movies that pre-date *Inside Out* are no different. *A Bug's Life*, *Finding Nemo*, *The Incredibles*, *Ratatouille*, *WALL-E*, *Brave*, and *Up*, are movies that do not include anthropomorphized emotions, nor characters that represent a single emotion which correspond to a single color.

101.  The Walt Disney Company, including through Walt Disney Studios, has released over 75 animated films since *Snow White and the Seven Dwarfs* in 1938.

102.  The Walt Disney Company, including through Walt Disney Studios, has never released an animated feature film that anthropomorphized emotions as characters.

FIRST AMENDED COMPLAINT

103.   The Walt Disney Company, including through Walt Disney Studios, has never distributed a film with a main character that represented a single emotion which corresponds to a single color.

104.   Disney·Pixar's single-emotion characters diverged from what made The Walt Disney Company so acclaimed. In its beginning, The Walt Disney Company established a new form of art through its early efforts at animation, which focused on bringing to life cartoon characters. As explained in Disney's *The Illusions of Life, Disney Animation*, by Frank Thomas and Ollie Johnson, "this new art of animation had the power to make the audience actually feel *the emotions* of a cartoon figure," with each character "thinking his own thoughts, and *experiencing his own emotions*." The well-rounded and multi-dimensional nature of Disney's characters was foundational to what made Disney so famous and successful: "From the beginning, it was obvious that *the feelings of the characters* would be the heart and soul of the Disney pictures."

105.   Disney·Pixar's single-emotion, color-coded characters in *Inside Out*, therefore, was not something that Disney·Pixar had done before.

106.   Disney·Pixar continues to enjoy the success of *Inside Out*.

107.   For instance, Disney·Pixar has generated gross revenue in excess of $100,000,000 for DVD and Blu-ray sales of *Inside Out*. And *Inside Out* was the fourth most downloaded film on iTunes in 2015. Disney·Pixar has distributed, and continues to distribute, *Inside Out* by DVD, Blu-ray, and Internet-based downloads and streams.

108.   Disney·Pixar also generates significant revenue from *Inside Out* toys, books, and other merchandise.

//
//
//
//

FIRST AMENDED COMPLAINT

109.   Some of this merchandise attempts to capitalize on the perception that *Inside Out* teaches kids about emotional intelligence. For example:

  

110.   Disney·Pixar would not have enjoyed the extreme success it has had from *Inside Out* without its use of anthropomorphized emotions as its main characters. Specifically, as is the case with *Inside Out*, characters are the most valuable part of an animation property, as they drive the story and become merchandisable entities.

### Count 1

### Breach of Implied-in-Fact Contract

111.   Daniels repeats and reallege all allegations set forth above in paragraphs 1-110 as if they were stated in full and incorporated herein.

112.   Daniels is the exclusive owner of the original idea underlying *The Moodsters*.

113.   Daniels was aware and relied on customs and practices in the entertainment industry when she approached Disney·Pixar about a partnership. Specifically, it is common and custom in the entertainment industry for creators to provide ideas and materials to producers and studios in exchange for compensation and credit if such ideas or materials are later used.

114.   Under the circumstances, Daniels disclosed her ideas regarding *The*

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

*Moodsters* to Disney·Pixar, as is custom and common in the entertainment industry, with a reasonable expectation that Disney·Pixar would compensate Daniels if Disney·Pixar used their ideas. Thus, Daniels, individually and through her team at The Moodsters Company, provided ideas and materials to Disney·Pixar for sale in exchange for compensation and credit if Disney·Pixar used such ideas or materials.

115.   Under the circumstances, and consistent with the custom and common practice in the entertainment industry, Disney·Pixar accepted the disclosure of the ideas in *The Moodsters* with an expectation that it would have to compensate Daniels and The Moodsters Company if Disney·Pixar used this idea in any television, motion picture, merchandise, or otherwise.

116.   Neither before nor after any disclosure of ideas and materials did Disney·Pixar ever tell Daniels, or anyone with her team at The Moodsters Company, that it may use the ideas and materials provided to Disney·Pixar without compensation to Daniels and The Moodsters Company.

117.   Nor did Disney·Pixar ask or require Daniels or her team at The Moodsters Company to sign a release before accepting the disclosure of ideas and materials about *The Moodsters*. And yet Disney·Pixar does so in other circumstances. For instance, Disney hosts a writing program that solicits original pilot scripts from aspiring writers. One of the requirements for the program includes a release form that the applicant must sign and attest that "I waive any right I may have to assert against [Program Writers on Disney |ABC Television Group (DATG)] and/or the DATG Entities any claim based on *copyright*, trademark, infringement, confidential relationship, *implied contract*, unfair competition, *idea theft* or otherwise arising out of any alleged use by DATG and/or the DATG Entities of the Project, or any element thereof." Daniels and her team at The Moodsters Company were not asked to sign such a release, and would not have signed such a release (or any comparable one) as

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

a precondition for the disclosure of ideas and materials about *The Moodsters*.

118.   Based on the circumstances described above, Daniels, and Disney·Pixar have an implied-in-fact contract that requires Disney·Pixar to compensate and credit Daniels and The Moodsters Company for the use of any ideas or materials that Daniels and her team disclosed to Disney·Pixar.

119.   Disney·Pixar has used Daniels' ideas as shown in *The Moodsters*, which includes a collection of anthropomorphized, color-coded, single-emotion characters through the release and sale of *Inside Out*, and the sale of *Inside Out* merchandise. Disney·Pixar has not compensated Daniels for this use.

120.   As a result, Disney·Pixar has materially breached, and continues to materially breach, this implied-in-fact contract.

121.   Daniels has sustained, and continues to sustain, damages as a result of Disney·Pixar's material breach. Damages for this harm will be in an amount proven at trial.

### Count 2

### Copyright Infringement (Ensemble of Characters)

122.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-121 as if they were stated in full and incorporated herein.

123.   Congress enacted the Copyright Act to stimulate artistic creativity for the general public good. To achieve this goal, the Copyright Act grants artists the exclusive right to the original expression in their works, which provides them a financial incentive to create works that enrich our culture.

124.   Disney·Pixar recognizes the importance of copyrights to its business. In its 2016 Annual Report to investors, for instance, Disney·Pixar explains that "[t]he success of our businesses is highly dependent on the existence and maintenance of intellectual property rights in the entertainment products and services we create."

FIRST AMENDED COMPLAINT

125.   Disney·Pixar is famous for aggressively protecting its works—and specifically its animated characters—by copyright.

126.   In 1998, for instance, Disney lobbied heavily for an act—which is often referred to as the Mickey Mouse Protection Act—that extends the term of copyright protection. Professor Thomas Bell's chart shows "the Mickey Mouse curve," which reflects Disney's efforts to extend the duration of copyright terms every time Disney's copyright on Mickey Mouse is near expiration:



127.   Disney·Pixar has also sought to protect the five-color coded, single emotion characters in *Inside Out* by copyright.

//
//
//
//
//
//
//

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

128.   Disney·Pixar, for example, sells merchandise with the *Inside Out* characters, and provides notice to the world that these characters are protected by copyright:

 

 

129.   But the Copyright Act does not discriminate between large and small artists. Copyright law applies equally to large companies like, Disney·Pixar, and smaller ones, like The Moodsters Company.

130.   The Moodsters Company, therefore, brings this Count 2, along with Counts 3-6, to hold Disney·Pixar accountable for its copyright infringement of *The Moodsters'* characters.

**The Moodsters Company's Ownership of the Copyrights in *The Moodsters***

131.   The Moodsters Company registered the pilot episode of *The Moodsters* with the United States Copyright Office on July 27, 2007 (registration number PA 1-394-057). *See* Ex. 4.

132.   The Moodsters Company registered an initial version of *The Moodsters'* Bible with the United States Copyright Office (registration number TX 8-389-829) as well.[6]

---

[6]   The Moodsters Company revised and updated *The Moodsters* Bible from 2005-2008. *See, e.g.,* Exs. 5-7.

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

133.   *The Moodsters*, as reflected in *The Moodsters'* Bible and Pilot, is an original work of authorship fixed in a tangible means of expression that is subject to copyright protection under the Copyright Act.

134.   The Moodsters Company is the exclusive owner to all copyrights in *The Moodsters* Bible and *The Moodsters* Pilot.

135.   The Moodsters Company's exclusive rights extend to all protectable components of *The Moodsters*, which includes the characters (and the ensemble of characters) in *The Moodsters*.

136.   The Moodsters Company's exclusive rights in *The Moodsters* includes the right to create derivative works.

### Disney·Pixar Had Access to *The Moodsters*

137.   Disney·Pixar had access to *The Moodsters* before it started working on the movie *Inside Out* in 2010.

138.   Nancy Kanter had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

139.   Paula Rosenthal had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

140.   Rich Ross had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

141.   Thomas Staggs had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

142.   Roy E. Disney had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

143.   Pete Docter had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

144.   Disney·Pixar's *Inside Out* infringes protectable components of *The Moodsters*, including the expression of a collection of five, anthropomorphized, color-coded, single emotion characters as represented in *The Moodsters*,

FIRST AMENDED COMPLAINT

1  specifically, the ensemble of the Happy character, the Sadness character, the
2  Anger character, the Fear character, and the Love character.

3      145.  The characters in *The Moodsters* express the idea of using single
4  emotions as characters in an entertainment program.

5      146.  The expressive elements of the ensemble of characters in *The*
6  *Moodsters* include but are not limited to: anthropomorphized single-emotion
7  animated characters that are not human but have traits and characteristics that
8  are not androgynous, and which are not animals or objects; the application of
9  the emotions, including happiness, sadness, anger, and fear as characters; the
10  number of emotions identified as characters (5); the application of a core color
11  for each character; the use of yellow for happiness, blue for sadness, and red for
12  anger; and that these characters reside inside a child.

13      147.  These elements, individually and as a selection, coordination, and
14  arrangement, are protectable elements of The Moodsters Company's copyright
15  in *The Moodsters*. Specifically, these elements establish that the characters
16  themselves, as well as the ensemble of characters, are protectable by copyright.
17  For instance, the characters in *The Moodsters* both describe and reflect
18  conceptual characteristics, as set forth in paragraphs above, and are depicted
19  graphically, which demonstrate physical as well as conceptual qualities. The
20  characters in *The Moodsters* are also sufficiently delineated, as described for
21  example by the elements in paragraphs 144–46, such that each individual
22  character in the ensemble is recognized at each appearance in print and
23  animation. Those elements above further make the characters especially
24  distinctive. And these elements in totality establish agency for *The Moodsters*
25  characters to engage and drive a narrative or story.

26      148.  To be sure, neither these elements in paragraphs 144–46—
27  individually or as a combination—nor the ensemble of characters in full can be
28  considered *scènes à faire*. *Scènes à faire* is a doctrine in copyright law that refers to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

the notion that less copyright protection is afforded to expressions that are practically indispensable or standard in the treatment of a topic. *Scènes à faire* is literally translated to "scenes which must be done."

### Anthropomorphic Emotions as Characters

149.   As a threshold matter, Disney·Pixar has never before anthropomorphized emotions as an ensemble of characters in any of its major motion pictures.

150.   Nor do Disney's short films serve as an example of anthropomorphizing emotions as characters. Disney's short film *Reason and Emotion* (1943) demonstrates an attempt at personifying abstractions, like the ability to think and feel, but it does not portray single emotions as characters. In this short film, the Reason character is defined as the ability to think, and the Emotion character is defined as the ability to feel.



Neither of the main characters represents a singular emotion. To the contrary, as the short film depicts Hitler in Nazi Germany, the Emotion character expresses at least the emotions of fear, pride, hate, and sympathy. Thus, while *Reason and Emotion* does not feature single emotion characters, it confirms that a variety of approaches and options exist to personify abstractions, as set forth further below.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

151.   More fundamentally, however, that Disney·Pixar, the world's most recognized and successful company that makes and distributes animated films for children, had never before expressed the idea of an ensemble of single emotions as characters supports the conclusion that there is no indispensable or standard treatment of how these characters should be grouped, colored, located, or depicted.

152.   It was not indispensable or standard for an entertainment program about emotions as characters to make *The Moodsters* anthropomorphic figures with human traits and characteristics. For instance, other artists had previously attempted to portray abstract concepts (although not emotions) through live-action (as opposed to animation) human characters inside a person's head. The television show *Herman's Head* (four human characters represented different aspects of the main character's personality); the 2015 Japanese movie, *Poison Berry in my Brain* (a 30-year-old woman had five different human characters in her head that governed her actions); and, Disney's *Cranium Command* ride at Epcot Theme Park (different parts of the body were represented by human characters) are examples:




153.   Nor was *The Moodsters* or Disney·Pixar limited to live-action characters as a means to personify emotions. For instance, the characters representing emotions could have been depicted as animals:

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



| Happy | Sadness | Anger | Fear | Love |

Alternatively, *The Moodsters* or *Inside Out* characters could have been expressed as inanimate objects brought to life, as Disney·Pixar is famous for in its *Toy Story* and *Cars* series of movies. And yet another option would have been to express the emotions as some real-world phenomena or occurrence:



| Happy | Sadness | Anger | Fear | Love |

Emotions, as abstract concepts, are neither male nor female. Even Disney·Pixar's own consultant for *Inside Out*, Professor Dacher Keltner, acknowledged that Disney·Pixar considered androgynous characters, which Keltner considered more realistic. But Disney·Pixar decided to use male and female characters, as with *The Moodsters* characters.

154.   Docter's admission that expressing abstract emotions was challenging for him confirms that anthropomorphizing emotions as animated characters in *The Moodsters* was not standard or generic in any way.

### Selection and Expression of Particular Emotions

155.   It was not indispensable or standard to an entertainment program with emotions as characters to use happiness, sadness, anger, fear, and love as

FIRST AMENDED COMPLAINT

the emotions to serve as characters, as in *The Moodsters*. For instance, Disney·Pixar considered a number of other emotions to select in *Inside Out*, including pride, hope, envy, ennui, schadenfreude, awe, surprise, confusion, among others.

156.   The scientific community, as acknowledged by Disney·Pixar, lacks a consensus on the identification of emotions. By way of example, Professors Andrew Ortony and Terence Turner compiled several different theorists' lists of emotions in their article *What's Basic About Basic Emotions*?, published in PSYCHOLOGICAL REVIEW in 1990. These lists varied widely. One theorist, for instance, identified only happiness and sadness. Another theorist listed anger, aversion, courage, dejection, desire, despair, fear, hate, hope, love, and sadness. Others had their own variations on the total number of emotions, as well as the particular identification of emotions. Disney·Pixar has recognized that another theorist identified 27 emotions. Disney·Pixar's own consultant for *Inside Out*, Keltner, believes there are 20 emotions. And Aristotle set forth his list of emotions in Book II of *Rhetoric*, in which he identified anger, mildness, love, emnity, fear, confidence, shame, shamelessness, benevolence, pity, indignation, envy, emulation, and contempt.

157.   Another option for selecting emotions as characters was one explained by Keltner. For instance, Keltner suggested that he hopes a sequel to *Inside Out* will feature Riley as an 18-year-old girl with the following emotions as characters: sexual desire, triumph, awe, and amusement. Such a suggestion further confirms that it was not indispensable or standard for a work about emotions to use happiness, sadness, anger, fear, and love as the emotions to serve as characters, as in *The Moodsters*.

### Selection and Expression of the Number of Emotions

158.   It was not indispensable or standard to an entertainment program with emotions as characters to select five emotions as the number of emotions

FIRST AMENDED COMPLAINT

to use as characters. For instance, Disney·Pixar considered a range of numbers of emotions for *Inside Out*, including upwards of at least 27 different emotions. And as set forth above, there is significant dispute and uncertainty as to how many emotions exist. It cannot be the case, therefore, that an entertainment program with emotions as characters would be naturally or inherently limited to five emotions.

### Use and Expression of a Core Color per Emotion

159.   It was not indispensable or standard to an entertainment program with emotions as characters to designate each character with a core color. For instance, emotions are frequently expressed in today's culture without *any* unique color associated with a particular emotion:

    

In July 2017, for instance, Sony Pictures Animation released *The Emoji Movie*, which featured emoticons as characters.

160.   Nor was it indispensable or standard for *The Moodsters* to select particular colors to correspond with particular emotions. Dr. Seuss' well-known and popular *My Many Colored Days* book is emblematic. Dr. Seuss wrote this book in 1973 about feelings and moods. Unlike *The Moodsters'* (and *Inside Out*'s) Anger character who is red, *My Many Colored Days* portrays a red horse to show how "good it feels" to be a horse. And blue does not portary sadness; purple does. Blue instead demonstrates optimism as a bird "flap[s] my wings." Happy days are not yellow but pink, and anger is depicted with a black bear. Dr. Seuss' book confirms that the particular selection of colors that match characters as in *The Moodsters* is not something that "must be done" or that which is indispensable or standard to the work.

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

161.   The particular expression of the idea in *The Moodsters* to assign core colors with single emotion characters (*i.e.*, yellow for happiness, blue for sadness, red for anger, green for fear, and pink for love) was not generic, indispensable, or standard, particularly because of the limited and particular emotions that were selected. For instance, red could be associated not only with anger, but also with love and lust. Blue could represent sadness, as well as trust and peace. And yellow can represent happiness, as well as cowardice which is a trait based on fear. The originality of the selection of particular colors, therefore, must be considered in connection with the use of a core color per emotion as well as the original selection of a limited, specific set of emotions. For instance, if Disney·Pixar had used 27 different emotions as characters (as it had considered), then it would be unable to represent each of those characters by a core, distinctive color.

**The Selection, Coordination, and Arrangement of**

**Unique Expressive Elements**

162.   The unique expressive elements within the characters of *The Moodsters*, set forth above, are each independently original and not *scènes à faire*. The combination of these unique expressive elements, moreover, is original and anything but indispensable and standard for an entertainment program with emotions as characters. The originality of such elements is reflected in the fact that before *Inside Out*, Disney·Pixar had never before released a film with these combination of elements.

**Disney·Pixar's *Inside Out* Copied *The Moodsters'* Ensemble of Characters**

163.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in *The Moodsters*, including the ensemble of characters. Disney·Pixar's *Inside Out*, for instance, includes a collection of five anthropomorphized color-coded, single emotion characters, which include Joy (designated by the color yellow); Sadness (designated by the color blue); Anger

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

(designated by the color red); and Fear (designated by the color purple). This ensemble of characters, as set forth herein and in the paragraphs above, is substantially similar to the protectable components of the collection of characters in *The Moodsters*.

164.   Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in *The Moodsters*.

165.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copright Act.

## Count 3

### Copyright Infringement (the Happy character)

166.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-165 as if they were stated in full and incorporated herein.

167.   One protectable component within The Moodsters Company's copyright in *The Moodsters* is the Happy character. The Moodsters Company is the exclusive owner to all rights in the copyright to the Happy character of *The Moodsters*.

168.   The Happy character is an anthropomorphized animated character that represents the single emotion of happiness, and that is designated by the core color of yellow.

169.   The Happy character is quite optimistic and enthusiastic. The other Moodsters depend on him when things get tough. The Happy character is the leader of *The Moodsters*.

170.   The unique expressive elements of the Happy character include but

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

are not limited to: an anthropomorphized single-emotion animated character with human traits and characteristics that is not androgynous, and which is not an animal or object; the application of happiness as its core emotion; the leadership role that she maintains within four other single-emotion characters as a group; and the application of yellow as the Happy character's core color.

 

171.  These elements, individually and as a selection, coordination, and arrangement, are protectable elements of The Moodsters Company's copyright in *The Moodsters*, as set forth in the Happy character. Specifically, these elements establish that the the Happy character is protectable by copyright. For instance, the Happy character in *The Moodsters* both (1) describes and reflects conceptual characteristics and (2) is depicted graphically, which reflects physical as well as conceptual qualities. The Happy character in *The Moodsters* is also sufficiently delineated, as described for example through the elements in paragraphs 168-70, such that the character is recognized at each appearance, and those elements also make the character especially distinctive. And the elements in totality establish agency for the Happy character to engage and drive a narrative or story among the other Moodsters characters.

172.  These elements, individually or in combination, are not *scènes à faire*.

173.  Disney·Pixar had access to *The Moodsters*, including the Happy character, before Disney·Pixar started to work on *Inside Out* in 2010.

FIRST AMENDED COMPLAINT

174.   Disney·Pixar's *Inside Out* infringes The Moodsters Company's protectable components of *The Moodsters*, and specifically the Happy character.

175.   Before *Inside Out*, Disney had never before released a film with an anthropomorphized character that represented the single emotion of happiness/joy, and that was designated by the core color of yellow.

176.   *Inside Out*'s Joy character is colored yellow, and one of five main characters in the movie. Joy's goal has always been to make sure Riley stays happy. She sees life's challenges as opportunities, and the sad bits as hiccups on the way back to something great. Hope and optimism dictate all of her decisions. Joy is the leader of the other emotions in *Inside Out*, as the other emotions rely on Joy when things get tough.

177.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in the Happy character in *The Moodsters*. The Joy character in Disney·Pixar's *Inside Out*, as set forth herein and in the paragraphs above, is substantially similar to the protectable components of the Happy character in *The Moodsters*.



178.   Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in *The Moodsters*, including the Happy character.

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

179.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copyright Act.

## Count 4

### Copyright Infringement (the Sadness character)

180.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-179 as if they were stated in full and incorporated herein.

181.   One protectable component within The Moodsters Company's copyright in *The Moodsters* is the Sadness character. The Moodsters Company is the exclusive owner to all rights in the copyright to the Sadness character of *The Moodsters*.

182.   The Sadness character is an anthropomorphized animated character that represents the single emotion of sadness, and is designated by the core color of blue.

183.   The Sadness character is melancholy, and known to weep copiously. But that's okay, because he knows that it sometimes takes courage to cry.

//
//
//
//
//
//
//
//
//

FIRST AMENDED COMPLAINT






184. The unique expressive elements of the Sadness character include but are not limited to: an anthropomorphized single-emotion animated character with human traits and characteristics that is not androgynous, and which is not an animal or object; the application of sadness as its core emotion; the role that the Sadness character maintains within four other single-emotion characters as a group; the application of a core color for the Sadness character which is blue; and characteristics and expressions, such as his tendency to cry, slump down on the ground, and maintain a gloomy, pessimistic attitude.

185. These elements, individually and as a selection, coordination, and arrangement, are protectable elements of The Moodsters Company's copyright in *The Moodsters*, as set forth in the Sadness character. Specifically, these elements establish that the Sadnesss character of *The Moodsters* is protectable by copyright. For instance, the Sadness character in *The Moodsters* both (1) describes and reflects conceptual characteristics and (2) is depicted graphically,

FIRST AMENDED COMPLAINT

which reflects physical as well as conceptual qualities. The Sadness character in *The Moodsters* is also sufficiently delineated, as described for example through the elements in paragraphs 182-84, such that the character is sufficiently delineated to be recognized at each appearance, and those elements also make the Sadness character specially distinctive. And the elements in totality establish agency for the Sadness character to engage and drive a narrative or story among the other Moodsters characters.

186.   These elements of expression, individually or in combination, are not *scènes à faire*.

187.   Disney·Pixar had access to *The Moodsters*, including the Sadness character, before Disney·Pixar started to work on *Inside Out* in 2010.

188.   Disney·Pixar's *Inside Out* infringes The Moodsters Company's protectable components of *The Moodsters*, and specifically the Sadness character.

189.   *Inside Out*'s Sadness character is colored blue, and one of five main characters in the movie. Sadness finds it so hard to be positive. Sometimes it seems like the best thing to do is just lie on the floor and have a good cry.



190.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in the Sadness character in *The Moodsters*. The Sadness character in Disney·Pixar's *Inside Out*, as set forth herein and in the paragraphs above, is substantially similar to the protectable components of the Sadness character in *The Moodsters*.

191.   Through the release of *Inside Out*, and the sales of *Inside Out*

FIRST AMENDED COMPLAINT

merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in the Sadness character of *The Moodsters*.

192.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copyright Act.

## Count 5

### Copyright Infringement (the Anger character)

193.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-192 as if they were stated in full and incorporated herein.

194.   One protectable component within The Moodsters Company's copyright in *The Moodsters* is the Anger character. The Moodsters Company is the exclusive owner to all rights in the copyright to the Anger character of *The Moodsters*.

195.   The Anger character in *The Moodsters* is an anthropomorphized animated character that represents the emotion of anger, and is designated with the core color of red.

 

//
//

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES




196. The Anger character is most likely to blow her top. In fact, when she becomes furious, lightning bolts appear and explode with sparks from her head.

197. The Anger character expresses the single emotion character of anger.

198. The Anger character's unique expressive elements include but are not limited to: an anthropomorphized single-emotion animated character with human traits and characteristics that is not androgynous, and which is not an animal or object; the application of anger as its core emotion; the role that this character maintains within four other single-emotion characters as a group; the application of a core color which is red; and characteristics and expressions, such as explosions from the character's head.

199. These elements, individually and as a selection, coordination, and arrangement, are protectable elements of The Moodsters Company's copyright in *The Moodsters*, as set forth in the Anger character. Specifically, these elements establish that the the Anger character is protectable by copyright. For instance, the Anger character in *The Moodsters* both (1) describes and reflects conceptual characteristics, and (2) is depicted graphically, and therefore reflects physical as well as conceptual qualities. The Anger character in *The Moodsters* is also sufficiently delineated, as described for example by the elements in paragraphs 195-98, such that the character is recognized at each appearance, and those

FIRST AMENDED COMPLAINT

elements also make the character especially distinctive. And the elements in totality establish agency for the Anger character to engage and drive a narrative or story among the other Moodsters characters.

200.   These elements of expression, individually or in combination, are not *scènes à faire*.

201.   Disney·Pixar had access to *The Moodsters*, including the Anger character, before Disney·Pixar started working on *Inside Out* in 2010.

202.   Before *Inside Out*, Disney·Pixar had never before released a film with an anthropomorphized character that represented the single emotion of anger, that was designated by the core color of red, and that exploded from the head.

203.   The character Anger in *Inside Out* is one of five main characters in the movie.

204.   *Inside Out*'s Anger character is colored red, has a fiery spirit, and tends to explode (literally) when things don't go as planned. The character displays fire exploding from its head at such times.



205.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in the Anger character in *The Moodsters*. The Anger character in Disney·Pixar's *Inside Out*, as set forth herein and in the paragraphs above, is substantially similar to the protectable components of the

FIRST AMENDED COMPLAINT

1    Anger character in *The Moodsters*.

2    206.   Through the release of *Inside Out*, and the sales of *Inside Out*

3    merchandise, Disney·Pixar has directly, contributorily, and vicariously

4    infringed The Moodsters Company's protectable components of its copyright in

5    *The Moodsters*, including the Anger character.

6    207.   By virtue of Disney·Pixar's infringement, The Moodsters Company

7    is entitled to recover its actual damages and Disney·Pixar's profits in an amount

8    to be proved at trial (or in the alternative statutory damages), its attorneys' fees

9    and costs, and all other relief allowed under the Copyright Act.

10   ## Count 6

11   ## Copyright Infringement (the Fear character)

12   208.   The Moodsters Company repeats and realleges all allegations set

13   forth above in paragraphs 1-207 as if they were stated in full and incorporated

14   herein.

15   209.   One protectable component within The Moodsters Company's

16   copyright in *The Moodsters* is the Fear character (Scootz). The Moodsters

17   Company is the exclusive owner to all rights in the copyright to the Fear

18   character of *The Moodsters*.

19   210.   The Fear character is an anthropomorphized animated character

20   that represents the single emotion of fear, and that is designated by the core

21   color of green. He is a nervous Nellie. Everything frightens him.

22   //

23   //

24   //

25   //

26   //

27   //

28   //

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

 

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

9    211.   The unique expressive elements of the Fear character include but

10  are not limited to: an anthropomorphized single-emotion animated character

11  with human traits and characteristics that is not androgynous, and which is not

12  an animal or object; the application of fear as its core emotion; the role that the

13  Fear character maintains within four other single-emotion characters as a

14  group; the application of a core color for the Fear character; and characteristics

15  and expressions, such as raising his arms to cover and protect his body, and

16  hide or shut his eyes in fear.

17  212.   These elements, individually and as a selection, coordination, and

18  arrangement, are protectable elements of The Moodsters Company's copyright

19  in *The Moodsters*, as set forth in Fear character. Specifically, these elements

20  establish that the the Fear character is protectable by copyright. For instance,

21  the Scootz character in *The Moodsters* both (1) describes and reflects conceptual

22  characteristics and (2) is depicted graphically, which reflects physical as well as

23  conceptual qualities. The Fear character in *The Moodsters* is also sufficiently

24  delineated, as described for example through the elements in paragraphs 210-

25  11, such that the Fear character is sufficiently delineated to be recognized at

26  each appearance, and those elements also make the character especially

27  distinctive. And the elements in totality establish agency for the Fear character

28  to engage and drive a narrative or story among the other Moodsters characters.

213.   These elements of expression, individually or in combination, are not *scènes à faire*.

214.   Disney·Pixar had access to *The Moodsters*, including the Fear character, before Disney·Pixar started to work on *Inside Out* in 2010.

215.   Disney·Pixar's *Inside Out* infringes The Moodsters Company's protectable components of the copyright in the Fear character of *The Moodsters*.

216.   Before *Inside Out*, Disney·Pixar had never before released a film with an anthropomorphized character that represented the single emotion of fear, and that was designated by a single core color.

217.   *Inside Out*'s Fear character has a core color (purple), and is one of five main characters in the movie.



218.   The Fear character is constantly on the lookout for potential disasters. There are very few activities and events that Fear does not find to be dangerous and possibly fatal.

219.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in the Fear character in *The Moodsters*. The Fear character in Disney·Pixar's *Inside Out*, as set forth herein and in the

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

paragraphs above, is substantially similar to the protectable components of the Fear character in *The Moodsters*.

220.   Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in the Scootz character of *The Moodsters*.

221.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copyright Act.

**Prayer for Relief**

Daniels and The Moodsters Company request the following relief:

1.   Entry of judgment in favor of Daniels and against Disney·Pixar on Count 1 in this Complaint, in an amount to be determined at trial, but at least in an amount that exceeds the jurisdictional limits of this Court;

2.   An award of damages to Daniels for Disney·Pixar's breach of the parties' implied-in-fact contract;

3.   Entry of judgment in favor of The Moodsters Company and against Disney·Pixar on Counts 2-6 in this Complaint for infringement of The Moodsters Company's copyright in *The Moodsters*;

4.   An award of actual damages The Moodsters Company has incurred as a result of Disney·Pixar's copyright infringement;

5.   In the alternative to actual damages, an award of statutory damages to The Moodsters Company for some or all of Disney·Pixar's copyright infringement;

6.   An award of all Disney·Pixar's profits from and relating to *Inside Out* to The Moodsters Company;

7.   An award of attorneys' fees, costs, expenses, and disbursements;

FIRST AMENDED COMPLAINT

1    8.    An award of pre-judgment and post-judgment interest on all damages
2  owed to Daniels and The Moodsters Company;

3    9.    An order directing Disney·Pixar to add Daniels and her team to the
4  credits of *Inside Out*; and

5    10.   Such other and further relief as is just and proper.

6  Dated: September 20, 2017          Robins Kaplan LLP

7
8                                    By: /s/ Ronald J. Schutz
                                     RONALD J. SCHUTZ
9                                    MICHAEL A. GEIBELSON
                                     PATRICK M. ARENZ
10                                    RUTH L. OKEDIJI
                                     EUGENIA C. SRODOSKI
11                                    Attorneys for Plaintiffs Denise Daniels
                                     and The Moodsters Company
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

**Jury Trial Demand**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all claims so triable.

Dated: September 20, 2017          Robins Kaplan LLP


By: /s/ Ronald J. Schutz
RONALD J. SCHUTZ
MICHAEL A. GEIBELSON
PATRICK M. ARENZ
RUTH L. OKEDIJI
EUGENIA C. SRODOSKI

Attorneys for Plaintiffs Denise Daniels and The Moodsters Company

FIRST AMENDED COMPLAINT