GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
ERIN J. COX (State Bar No. 267954)
erin.cox@mto.com
KENNETH M. TRUJILLO-JAMISON (State Bar No. 280212)
kenneth.trujillo-jamison@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE DANIELS and THE MOODSTERS COMPANY,<br><br>              Plaintiffs,<br><br>       vs.<br><br>THE WALT DISNEY COMPANY; DISNEY ENTERPRISES, INC.; DISNEY CONSUMER PRODUCTS AND INTERACTIVE MEDIA INC.; DISNEY INTERACTIVE STUDIOS, INC.; DISNEY SHOPPING, INC.; PIXAR,<br><br>              Defendants. | Case No. 2:17-cv-04527-PSG-SK<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>**[Request for Judicial Notice filed concurrently herewith]**<br><br>**Judge**: Hon. Philip S. Gutierrez<br><br>**Date**:   January 29, 2018<br>**Time**:   1:30 p.m.<br>**Place**:  Courtroom 6A<br><br>**Action Filing Date**: June 19, 2017 |

TO PLAINTIFFS DENISE DANIELS AND THE MOODSTERS
COMPANY, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on January 29, 2018, at 1:30 p.m., or as soon
thereafter as the matter may be heard, in Courtroom 6A of this Court, located at 350
West 1st Street, Los Angeles, California 90012-4565, defendants The Walt Disney
Company; Disney Enterprises, Inc.; Disney Consumer Products and Interactive
Media Inc.; Disney Interactive Studios, Inc.; Disney Shopping, Inc.; and Pixar
(collectively, "Defendants") will and hereby do move pursuant to Federal Rule of
Civil Procedure 12(b)(6) for an order dismissing with prejudice the First Amended
Complaint of plaintiffs Denise Daniels and The Moodsters Company ("Plaintiffs")
on the ground that it fails to state any claim upon which relief can be granted.

This Motion is made following the conference of counsel pursuant to Central
District Local Civil Rule 7-3, which took place on October 27, 2017.  This Motion is
based on the files, records, and proceedings in this action, this Notice, the following
Memorandum of Points and Authorities, Defendants' Request for Judicial Notice
(filed concurrently herewith), the reply memorandum that Defendants intend to file,
the arguments of counsel, and such other matters as may be presented at the hearing
on this Motion or prior to the Court's decision.

DATED:  November 17, 2017         MUNGER, TOLLES & OLSON LLP
                                  GLENN D. POMERANTZ
                                  ERIN J. COX
                                  KENNETH M. TRUJILLO-JAMISON


                                  By:      /s/ Glenn D. Pomerantz
                                       GLENN D. POMERANTZ
                                  Attorneys for Defendants

# TABLE OF CONTENTS

I.    Introduction .................................................................................................1

II.   Background..................................................................................................2

      A.    *The Moodsters* ..................................................................................2

      B.    *Inside Out* .......................................................................................4

      C.    Plaintiffs' Lawsuit ...........................................................................6

III.  Argument .....................................................................................................8

      A.    Plaintiffs' Copyright Infringement Claims Fail...........................8

            1.    *The Moodsters* Characters Are Not Independently
                  Copyrightable. .......................................................................8

                  (a)    The Moodsters Are Not Sufficiently Delineated and
                         Widely Recognizable, Nor Especially Distinctive............9

                  (b)    Plaintiffs Cannot Claim Copyright Protection For
                         An Ensemble of Unprotectable Characters. ....................11

            2.    *The Moodsters* Characters and the *Inside Out* Characters
                  Are Not Substantially Similar.......................................11

                  (a)    Asserted Similarities Between the Characters are
                         Based on Unprotectable Elements, and Must Be
                         Filtered Out.......................................................................12

                  (b)    Differences Between the Characters Also Precludes
                         a Finding of Substantial Similarity..................................19

      B.    Plaintiffs' Breach of Implied-in-Fact Contract Claim Fails as a
            Matter of Law.................................................................................20

            1.    The Implied-in-Fact Contract Claim Is Time-Barred................20

            2.    Plaintiffs' Voluntary, Unconditional Publication of *The
                  Moodsters* Bible and Pilot Prevented the Formation of an
                  Implied-in-Fact Contract. ..................................................22

            3.    *The Moodsters* and *Inside Out* Are Not Substantially
                  Similar..................................................................................25

IV.   Conclusion..................................................................................................25

-ii-

# TABLE OF AUTHORITIES

<u>**Page**</u>

**FEDERAL CASES**

*Benay v. Warner Bros. Entm't, Inc.*,
    607 F.3d 620 (9th Cir. 2010) ....................................................... 12, 19, 25

*Blizzard Entm't, Inc. v. Lilith Games (Shanghai) Co.*,
    149 F. Supp. 3d 1167 (N.D. Cal. 2015) ................................................ 8

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) ....................................................... 12

*Cory Van Rijn, Inc. v. California Raisin Advisory Bd.*,
    697 F. Supp. 1136 (E.D. Cal. 1987) ............................................ 13

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) ............................................. 8, 9, 10, 11

*Dreiling v. Am. Express Co.*,
    458 F.3d 942 (9th Cir. 2006) ....................................................... 14

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ................................................................ 15

*Fun With Phonics, LLC v. LeapFrog Enterprises, Inc.*,
    2010 WL 11404474 (C.D. Cal. Sept. 10, 2010) ............................. 10, 11

*Gallagher v. Lions Gate Entm't Inc.*,
    2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) ................................ 12

*Gibson v. CBS, Inc.*,
    491 F. Supp. 583 (S.D.N.Y. 1980) ............................................... 13

*Green v. Proctor & Gamble, Inc.*,
    709 F. Supp. 418 (S.D.N.Y. 1989) .............................................. 13

*Hogan v. DC Comics*,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999) .......................................... 18, 19

*J.C. ex rel R.C. v. Beverly Hills Unified School Dist.*,
    711 F. Supp. 2d 1094 (C.D. Cal. 2010) ........................................ 22

-iii-

*Jones v. CBS, Inc.*,
   733 F. Supp. 748 (S.D.N.Y. 1990) ...................................................................... 11

*Madrid v. Chronicle Books*,
   209 F. Supp. 2d 1227 (D. Wyo. 2002) ............................................................. 14

*Marcus v. ABC Signature Studios, Inc.*,
   2017 WL 4081885 (C.D. Cal. Sept. 13, 2017) ................................................ 15

*McCormick v. Sony Pictures Entm't*,
   2009 WL 10672263 (C.D. Cal. July 20, 2009), *aff'd*, 411 F. App'x
   122 (9th Cir. 2011) .......................................................................................... 11

*McGee v. Benjamin*,
   2012 WL 959377 (D. Mass. Mar. 20, 2012) ................................................... 15

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*,
   900 F. Supp. 1287 (C.D. Cal. 1995) ................................................................. 9

*Olson v. Nat'l Broad. Co.*,
   855 F.2d 1446 (9th Cir. 1988) ......................................................................... 11

*Quirk v. Sony Pictures Entm't, Inc.*,
   2013 WL 1345075 (N.D. Cal. Apr. 2, 2013) .............................................. 24, 25

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) .................................................................... 10, 11

*Sapon v. DC Comics*,
   2002 WL 485730 (S.D.N.Y. Mar. 29, 2002) .................................................... 9

*Shame on You Prods., Inc. v. Banks*,
   120 F. Supp. 3d 1123, 1163–64 (C.D. Cal. 2015), *aff'd sub nom.*
   690 F. App'x 519 (9th Cir. 2017) .................................................................... 12

*Sheldon Abend Revocable Tr. v. Spielberg*,
   748 F. Supp. 2d 200 (S.D.N.Y. 2010) ............................................................ 18

*Smart Inventions, Inc. v. Allied Cmcn's Corp.*,
   94 F. Supp. 2d 1060 (C.D. Cal. 2000) ............................................................ 15

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ......................................................................... 13

-iv-

*Toho Co. v. William Morrow & Co.*,
   33 F. Supp. 2d 1206 (C.D. Cal. 1998)........................................................9

*UL LLC v. Space Chariot, Inc.*,
   250 F. Supp. 3d 596...............................................................................23

*Weiss v. DreamWorks SKG*,
   2015 WL 12711658 (C.D. Cal. Feb. 9, 2015) .......................................18

*Zella v. E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007).........................................13, 18

**STATE CASES**

*Desny v. Wilder*,
   46 Cal. 2d 715 (1956) ...................................................................23, 24, 25

*Donahue v. United Artists Corp.*,
   2 Cal. App. 3d 794 (1969) ........................................................................21

*Faris v. Enberg*,
   97 Cal. App. 3d 309 (1979) ......................................................................24

*Grosso v. Miramax Film Corp.*,
   2007 WL 2585053 (Cal. Ct. App. Sept. 10, 2007)................................24

*Henried v. Four Star Television*,
   266 Cal. App. 2d 435 (1968) ....................................................................25

*Kightlinger v. White*,
   2009 WL 4022193 (Cal. Ct. App. Nov. 23, 2009)................................25

*Minniear v. Tors*,
   266 Cal. App. 2d 495 (1968) ....................................................................25

*Pearl v. Deitch*,
   2009 WL 1040302 (Cal. Ct. App. Apr. 20, 2009)................................21

*Sutton v. Walt Disney Prods.*,
   118 Cal. App. 2d 598 (1953) ....................................................................25

*Thompson v. Cal. Brewing Co.*,
   191 Cal. App. 2d 506 (1961) ....................................................................20

-v-

**FEDERAL STATUTES**

17 U.S.C. § 101 ......................................................................................... 23

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1476 (1976) ................................................................... 23

**TREATISES**

3 Witkin, Cal. Procedure, 5th Actions, § 520 (5th ed. 2008) ..................... 21

**OTHER AUTHORITIES**

The Am. Heritage Dictionary of Idioms (2d ed.) ....................................... 16

DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:17-CV-04527-PSG-SK

# I.     __INTRODUCTION__

Although this lawsuit is styled as a copyright infringement case, Plaintiffs are not claiming that there is any copying, or even similarity, between the plot, dialogue, sequence of events, themes, pace, setting, or mood of Disney/Pixar's critically acclaimed motion picture, *Inside Out,* and those of "*The Moodsters*," Plaintiffs' concept for an educational television show.  Instead, Plaintiffs make the incredible claim that the creators of *Inside Out* copied the concept of the film's main characters, but nothing else.  There are two fundamental problems with that position—Plaintiffs' characters themselves are not copyrightable and, in any event, the characters in *Inside Out* and *The Moodsters* are not substantially similar.

*Inside Out* tells the story of an 11-year-old girl and her anthropomorphized emotions, who work through the challenges faced by the girl and compete for control of her reactions. This was hardly the first depiction of personified emotions by a Hollywood studio, let alone by Disney.  Disney's 1943 short *Reason and Emotion* depicted a man's mind as the battleground between the personified Reason and Emotion characters.  Even earlier, Donald Duck had grappled with an angel and a devil version of himself in the 1938 short *Donald's Better Self*.  Plaintiffs' spurious attempt to claim credit for a pre-existing concept used in *Inside Out* is just not plausible.

*First*, Plaintiffs have not claimed that *Inside Out* infringed their registered copyrights in *The Moodsters* promotional materials and pilot episode—an implicit concession that the structural and thematic elements of *Inside Out* find no parallel in Plaintiffs' works.  Rather, Plaintiffs attempt to rely on a niche of copyright law which, under exceptional circumstances, provides protection for a character independent of the underlying works in which the character appears.  The bar is set by the likes of James Bond and Batman—characters whose distinctive attributes have been cemented in the public imagination through well-distributed works over the course of decades—and it is not cleared in this case.  Plaintiffs simply are not

1    entitled to independent copyright protection for the lightly-sketched characters in

2    *The Moodsters* promotional materials and a single pilot episode.

3          *Second*, Plaintiffs cannot show the requisite high degree of substantial

4    similarity between protectable elements of *The Moodsters* characters and the *Inside*

5    *Out* characters.  There are an overwhelming number of differences between the two

6    sets of characters, beginning with the visual: the Moodsters are all furry creatures,

7    whereas most of the *Inside Out* characters are humanoids (think Tinker Bell).  More

8    fundamentally, none of the asserted similarities between the Moodsters and the

9    *Inside Out* characters is the kind of expression protected by copyright.  Plaintiffs

10   cannot claim a monopoly on the idea to anthropomorphize emotions (even if that

11   were an accurate description of *The Moodsters* characters), or on the depiction of the

12   most basic of human emotions.  Likewise, Plaintiffs are not the first to associate

13   particular colors with particular emotions.  The fact that the typically "sad"

14   Moodster and *Inside Out*'s Sadness are both colored blue, and the typically "angry"

15   Moodster and *Inside Out*'s Anger are both colored red, is attributable to a linguistic

16   and cultural association between these concepts, not copying.

17         Plaintiffs' claim for breach of an implied-in-fact contract, purportedly reached

18   when Plaintiffs pitched the idea for *The Moodsters* to Disney affiliates, is also a

19   non-starter. The claim is barred by a two-year statute of limitations and, in any

20   event, Plaintiffs' publication of *The Moodsters* bible in 2005 and the pilot in 2007

21   prevented the formation of any implied agreement. The lack of substantial similarity

22   between *The Moodsters* works and *Inside Out* also dooms this claim.

23   ## II.   BACKGROUND

24         ### A.   *The Moodsters*

25         In November 2005, Plaintiffs published a "bible" for *The Moodsters*, a

26   contemplated "animated TV show for preschoolers."  (First Am. Compl. ("FAC"),

27   Ex. 3 at 69; RJN, Ex. B-2 (copyright registration).)  Each of the Moodsters lives in

28   its own house, and "ha[s] extensive family groups."  (FAC, Ex. 3 at 78-79, 70.)

-2-

According to the *Moodsters* bible, the setting is "a lush backdrop of furry palm trees, sloping hillsides, brilliant blankets of sunflowers, blazing amber pumpkin patches, and twinkling rainbow-colored waterfalls." (*Id.* at 78.) There is a single, vague reference to this "wondrous world where the Moodsters live" being "[s]omewhere deep down inside every child." (*Id.* at 69.)

Each of the five main characters—"Zip (happy/optimistic)," "Roary (angry)," "Olovia (loving)," "Sniff (sad)," and "Shake (scared)"—feels a range of emotions, but is identifiable by a predominant character trait, not unlike the Seven Dwarfs or the Care Bears. For instance, the *Moodsters* bible introduces "Zip" as a yellow Moodster whose "predominating emotion is happy," but "even Zip needs some help figuring out his own emotions." (*Id.* at 71.) The *Moodsters* bible lays out a sample show idea, where Sniff feels left out when his friends hang out without him; though he initially thinks he's sad, it turns out that he is actually "very angry" and "lets his anger out—big-time." (*Id.* at 82.)

In 2007, Plaintiffs published the pilot episode for *The Moodsters*, including by posting it to YouTube. (FAC, Ex. 4 (2007 pilot); RJN, Ex. B-1 (2007 copyright registration); *id.*, Ex. E-1 (archived webpage showing posting of pilot to YouTube in 2007).) All scenes in the pilot are set in a whimsical world with grassy knolls, giant mushrooms, butterflies, and an "Amoodsment Park." There is no reference to this world being literally located within the body of a child. The 2007 pilot uses different names for the characters than those in the 2005 *Moodsters* bible: Zip, Roary, Olovia, Sniff, and Shake are now known as Zazz, Rizzi, Oola, Snorf, and Scootz. The pilot repeatedly confirms that each of the Moodsters feels a range of emotions: Snorf (née Sniff) is quite happy when he realizes his catching skills are improving (FAC, Ex. 4 at 4:40), and Scootz (née Shake) overcomes his fears—"I'm really not afraid anymore! . . . I'm feeling kind of brave!"—both of which are causes for celebration. (*Id.* at 7:10-7:30.) Rizzi (née Roary) declares at the end of the pilot, "Hey, I'm not angry anymore, not one bit!" (*Id.* at 20:40.)

**B.**   *__Inside Out__*

In May 2014, Pixar released a synopsis about its next feature film, *Inside Out*; the media took notice of the parallels between *Inside Out* and the premise of Disney's 1943 film *Reason and Emotion*.  (RJN, Exs. D-6 to D-20; *id.*, Exs. D-148, D-220 to D-222.) Over the course of the following year, articles frequently discussed the "distinct color-coded characters" at the heart of the film—Joy, Fear, Sadness, Disgust, and Anger—referenced as "a crew of anthropomorphized emotions." (*Id.*, Exs. D-22, D-24; *see generally, id.*, Exs. D-1 to D-222 (examples of articles regarding *Inside Out* and its anthropomorphized emotions as characters, published between March 26, 2014 and June 18, 2015.)

*Inside Out*'s general plot points and characters were nicely summarized by a review in *Variety* in May 2015, after the film was screened at Cannes.  (*Id.*, Ex. A (DVD of *Inside Out*); Ex. D-148.)  "'Inside Out' takes place almost entirely in Riley's head"—an 11-year-old girl—and focuses on "a group of five Emotions assigned to Headquarters: the place in Riley's brain where all her thoughts and feelings originate" which is outfitted with "an instruments panel of what looks like an air-traffic control tower inside [Riley's] head." (*Id.*)  Riley's dominant emotion is Joy, "a radioactive-yellow gal" who "superficially resembles Disney's favorite fairy, Tinkerbell, minus the wings," and "serves alongside blue Sadness," "violet Fear," "fiery red Anger," and "green Disgust . . . to manage memories, generate ideas and otherwise help Riley deal with life's challenges." (*Id.*)  When Riley's parents decide to move across the country, Riley and her Emotions struggle to make new friends and deal with tensions at home. (*Id.*)

Riley's "[i]ncoming memories are stored in bright glowing orbs, color-coded according to whatever Emotion was dominant at the time she experienced it. . . ." (*Id.*) In a pivotal moment in the film, Sadness infects Riley's core memories— golden happy memories—causing them to turn a bluish hue.  (*Id., Ex. A.*)  Riley's mind flushes out Sadness and Joy, and "Riley's mental state begins to unravel

-4-

1   with Fear, Anger and Disgust left in control, unwisely deciding that the best idea is

2   for Riley to run away." (*Id.*, Ex. D-148.)  The film ends with Riley having a more

3   sophisticated understanding of her emotions.  (*Id.*)

4         Pete Docter, the writer and director of *Inside Out*, has told the press that he

5   came up with the idea for *Inside Out* when he observed his own daughter "beginning

6   a painful transition to adolescence," leaving her "natural childhood exuberance"

7   behind.  (*Id.,* Ex. D-220.)  Curious about what was really going on inside his

8   daughter's head, Docter pitched an idea for a movie to help him figure that out.

9   (*Id.*) Docter and his team at Pixar worked closely with Dr. Paul Ekman, a pioneer in

10  the study of emotions, and his protégé Dacher Keltner, "to get the 'science' of their

11  animated emotions just right."  (*Id.*, Exs. D-218, D-220.)  Dr. Ekman subscribed to

12  the dominant theory of emotions, which "posits that certain emotions are universal,

13  evolutionarily determined, and functionally discrete."  (*Id.,* Ex. D-220.)  In an NPR

14  article published on June 10, 2015, Docter noted that Dr. Ekman had identified six

15  emotions—"a nice, manageable number of guys to design and write for."  (*Id.,* Ex.

16  D-218.) Anger, fear, sadness, disgust, and joy made the cut; surprise was merged

17  into fear.  (*Id.*)

18        An article in *USA Today* published on June 18, 2015, reflecting another

19  interview with Docter, provides some insight on the visual design of the characters.

20  (*Id.*, Ex. D-219.)  Joy was created to be "sprite-like and golden," and was given blue

21  hair to distinguish her from Tinker Bell.  (*Id.*)  The article stated that "[s]ome

22  character colors were obvious: Sadness is literally blue. She's shaped like a teardrop

23  and even her hair evokes water." (*Id.*)  Anger was envisioned as a "square brick" in

24  office attire with short fingers "to make it feel like he's this uncomfortable guy who

25  is always pent-up and ready to explode." (*Id.*)  Fear, with the wide eyes of shock,

26  was a natural amalgam of surprise.  Disgust, as an emotion, "evolved from the need

27  to avoid eating poisoned food, which explains . . . Disgust's green skin." (*Id.*)  Rave

28  reviews and in-depth articles on the *Inside Out* characters followed the film's United

-5-

States premiere on June 8, 2015, up through the film's nationwide release on June 19, 2015.  (*Id.,* Exs. D-200 to D-219.)

### C.    Plaintiffs' Lawsuit

Plaintiff Denise Daniels filed this lawsuit on June 19, 2017, asserting a single claim for breach of implied-in-fact contract.  (Dkt. No. 1.)  Daniels and another plaintiff, The Moodsters Company, filed an amended complaint on September 20, 2017.  (FAC, Dkt. No. 27.)  The amended complaint continues to assert the implied contract claim, and adds five copyright infringement claims.  Plaintiffs do not allege that *Inside Out* infringed either the *Moodsters* bible or the pilot when considered as a whole, but rather contend that *Inside Out* infringed protected elements in Zip/Zazz ("happy"), Sniff/Snorf ("sad"), Roary/Rizzi ("angry"), and Shake/Scootz ("scared"), as well as the collective ensemble of the Moodsters, which encompasses Olovia/Oola ("loving").  Plaintiffs assert that the "expressive elements" of the Moodsters characters include:

> anthropomorphized single-emotion animated characters that are not human but have traits and characteristics that are not androgynous, and which are not animals or objects, the application of the emotions, including happiness, sadness, anger, and fear as characters; the number of emotions identified as characters (5); the application of a core color for each character; the use of yellow for happiness, blue for sadness, and red for anger; and that these characters reside inside a child.

(*Id.* ¶ 146.)  In this allegation and throughout the amended complaint, Plaintiffs erroneously contend that each of *The Moodsters* characters is *literally* an anthropomorphized single emotion.  There is no acknowledgement that each of the Moodsters actually feels a range of emotions; that the characters react to stimuli experienced in the Moodster world, not external stimuli experienced by a human; or that the *Moodsters* bible describes each character's predominant trait with an adjective (that is, "happy/optimistic," "angry," "loving," "sad," "scared") rather than defining each character as a single emotion (that is, happiness, anger, love, sadness, fear). (*Id.* ¶¶ 5, 37, 50, 54-58, 145.)

-6-

Aside from the color selection for three characters, Plaintiffs do not contend that there are any visual similarities between *The Moodsters* and *Inside Out* characters.  Nor could they, given the drastic differences in visual appearance between the two sets of characters (*Id.* ¶¶ 54-58; RJN, Ex. A):

    

Roary (2005)/Rizzi (2007)  Olovia (2005)/Oola (2007)  Zip (2005)/Zazz (2007)  Shake (2005)/Scootz (2007) Sniff (2005)/Snorf (2007)
[female]                       [female]                      [male]                     [male]                    [male]



Anger [male]; Disgust [female]; Joy [female]; Fear [male]; Sadness [female]

*The Moodsters* are each furry creatures, roughly the same size, with antennae, tails, and dog-like ears, but not a stitch of clothing (or noses).  The *Inside Out* crew includes three characters who are clearly humanoids (Disgust, Joy, and Sadness) with human form and facial features, styled hair-dos, and their own fashion aesthetic. The squat Anger resembles an anthropomorphized brick—dressed for work in slacks and a tie—and the thin and wiry Fear with bulging eyes resembles an anthropomorphized bug or nerve ending.

Plaintiffs' implied-in-fact contract claim is based on the allegation that Daniels or her colleagues pitched the idea for *The Moodsters* to individuals associated with Disney-affiliated companies from 2005 to 2009, including by providing them unspecified "materials about *The Moodsters*" in 2005 through 2008. (FAC ¶¶ 61, 65, 66, 68.)  The amended complaint also alleges that Daniels talked to Docter on the phone about "the characters, curriculum, and concept underlying *The Moodsters*"; the complaint does not specify the date of this alleged conversation.

-7-

1  (*Id.* ¶¶ 61, 71.)

2  **III.    ARGUMENT**

3      **A.    Plaintiffs' Copyright Infringement Claims Fail.**

4      Plaintiffs do not claim infringement in their copyrighted works as a whole, a

5  tacit concession that there are no similarities in plot, dialogue, mood, theme, setting,

6  sequence of events, or pace—the factors a court typically considers in evaluating

7  substantial similarity between two works.  Plaintiffs instead invoke a niche of

8  copyright law that provides independent protection for the rare character who is

9  especially distinctive and widely recognizable.  Plaintiffs' characters are not

10  deserving of such exceptional treatment.

11      Even if the Court were to assume, *arguendo*, that the Moodsters are entitled to

12  copyright protection separate from the copyright in Plaintiffs' registered works, they

13  are not substantially similar to the *Inside Out* characters.  A substantial similarity

14  analysis must strip out the unprotectable elements of the characters—the *only*

15  elements that Plaintiffs claim to be similar here.  Plaintiffs also ignore the

16  overwhelming differences between the two sets of characters, often the decisive

17  consideration in a substantial similarity analysis.

18         **1.    *The Moodsters* Characters Are Not Independently Copyrightable.**

19      "Characters are not ordinarily entitled to copyright protection." *Blizzard*

20  *Entm't, Inc. v. Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1173–74 (N.D.

21  Cal. 2015).  The category of characters deserving of copyright protection

22  independent of the other elements in their underlying works consists of those who

23  have achieved notoriety in well-distributed works over the course of decades.  The

24  Ninth Circuit's three-part test guides the determination:  To be independently

25  copyrightable, a character must (1) have "physical as well as conceptual qualities,"

26  (2) be 'sufficiently delineated' to be recognizable as the same character whenever it

27  appears," and (3) be "'especially distinctive' and 'contain some unique elements of

28  expression.'"  *DC Comics v. Towle*, 802 F.3d 1012, 1020–21 (9th Cir. 2015).  The

-8-

1    Moodsters fail this test whether considered individually or as an ensemble.

2              (a)    *The Moodsters Are Not Sufficiently Delineated and Widely Recognizable, Nor Especially Distinctive.*

3          To meet the Ninth Circuit's test, a "character must be 'sufficiently delineated'

4    to be recognizable as the same character whenever it appears. Considering the

5    character as it has appeared in different productions, it must display consistent,

6    identifiable character traits and attributes[.]" *Id.* at 1020–21.  "[C]ourts have deemed

7    the *persistence* of a character's traits and attributes to be key to determining whether

8    the character qualifies for copyright protection." *Id.* (emphasis added).

9          A character worthy of independent copyright protection typically has decades

10   of works on its résumé, demonstrating consistent attributes and qualities which,

11   given their persistence over the long-haul, are widely recognizable.  For instance,

12   James Bond is one of those exceptional, independently copyrightable characters,

13   because "[l]ike Rocky, Sherlock Holmes, Tarzan, and Superman, James Bond has

14   certain character traits that have been developed over time through the sixteen films

15   in which he appears." *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F.

16   Supp. 1287, 1296 (C.D. Cal. 1995).  In determining that Batman was independently

17   deserving of copyright protection, a court detailed Batman's "63-year crime fighting

18   career" and noted that "while Batman's costume and character have evolved over

19   the years, he has retained unique, protectable characteristics, such as the

20   iconographic costume elements and his unique life story."  *Sapon v. DC Comics,*

21   2002 WL 485730, at *3–4 (S.D.N.Y. Mar. 29, 2002); *see also Towle,* 802 F.3d at

22   1021 (the Batmobile "has maintained distinct physical and conceptual qualities since

23   its first appearance in the comic books in 1941").  The same is true of Godzilla, who

24   appeared in 10 films over the decades. *Toho Co. v. William Morrow & Co.*, 33 F.

25   Supp. 2d 1206, 1215–16 (C.D. Cal. 1998).

26         It strains credulity to argue that *The Moodsters*—characters who appeared

27   only in promotional materials (the *Moodsters* bible) and a single pilot episode (two

28   works in which the characters have different names)—are widely recognizable due

to unique and *persistent* traits.  The two works asserted by Plaintiffs certainly do not supply the type of baseline needed to determine that each Moodster character is "recognizable as the same character whenever it appears."  *Towle,* 802 F.3d at 1020–21. The distribution of the copyrighted versions of *The Moodsters* (the 2005 bible and the 2007 pilot episode posted to YouTube) is only a fraction of the distribution of a video which the Ninth Circuit determined could not support independent copyrightability for a character.  In *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170 (9th Cir. 2003), the Ninth Circuit reasoned that "[c]haracters that have received copyright protection have displayed consistent, widely identifiable traits," such as Godzilla, James Bond, and Rocky Balboa, and "the magician depicted in [the plaintiff's] work has appeared in only one home video that sold approximately 17,000 copies."  *Id.* at 1175.

"In determining whether a character deserves copyright protection, courts look at the many elements of the character—visual depictions, name, dialogue, relationships with other characters, actions and conduct, personality traits, and written descriptions—to determine whether it is sufficiently delineated such that it is a unique expression."  *Fun With Phonics, LLC v. LeapFrog Enterprises, Inc.*, 2010 WL 11404474, at *5–6 (C.D. Cal. Sept. 10, 2010) (King, J.).  Plaintiffs have not identified any "especially distinctive" traits of the Moodsters that, even if they had been repeated in many successive works, would entitle the characters to independent copyright protection.  Plaintiffs rely heavily on visual depictions in asserting that the Moodsters are especially distinctive, but ignore the other elements which must be considered, including the characters' names (which changed between the two works at issue).  *Id.* As for the Moodsters' "personality traits," Plaintiffs have not identified any attribute that would distinguish their "scared" character (Shake/Scootz) from any other stock character that felt fearful. The same is true of their "happy/optimistic" character (Zip/Zazz), their "sad" character (Sniff/Snorf), and their "angry" character (Roary/Rizzi).  Characters are deemed "not particularly

-10-

1    distinctive" when they "fit general, stereotypical categories. . . .  Consequently,

2    these characters are not entitled to copyright protection." *McCormick v. Sony*

3    *Pictures Entm't*, 2009 WL 10672263, at \*14 (C.D. Cal. July 20, 2009), *aff'd,* 411 F.

4    App'x 122 (9th Cir. 2011).

5          The characters in *The Moodsters* are also lightly sketched, not "especially

6    distinctive" and "sufficiently delineated" characters deserving of copyright

7    protection.  *Towle,* 802 F.3d at 1020–21. We have only short descriptions of the

8    characters in the *Moodsters* bible, and what can be gleaned from the minimal

9    dialogue and events in the pilot episode.  "[C]haracters that are 'lightly sketched'

10   through only short summaries and 'whatever insight into their characters may be

11   derived from their dialogue and action' are not entitled to independent protection."

12   *Fun With Phonics*, 2010 WL 11404474, at \*5–6.[1]

13                    *(b)      Plaintiffs Cannot Claim Copyright Protection For An
                                Ensemble of Unprotectable Characters.*

14         Plaintiffs assert a claim for infringement of the *ensemble* of the five main

15   characters in *The Moodsters,* seemingly under the theory that the sum may be

16   greater than its constituent parts. (FAC ¶¶ 144-46, 163.)  Aggregating a collection of

17   lightly-sketched characters into an ensemble does not afford independent copyright

18   protection for these characters. The characters could of course be considered as a

19   factor in the extrinsic test comparing the works as a whole, but Plaintiffs have not

20   asserted such a claim.  *See Olson*, 855 F.2d at 1452–53.

21              **2.      *The Moodsters* Characters and the *Inside Out* Characters Are
                          Not Substantially Similar.**

22

23         Even if the Moodsters were independently copyrightable, the fact remains that

24   _____

25   [1] *See Olson v. Nat'l Broad. Co*., 855 F.2d 1446, 1452 (9th Cir. 1988) (same); *Rice*,
     330 F.3d at 1175–76 (magician who wore standard magician garb and revealed

26   magic tricks not protected under copyright); *Jones v. CBS, Inc*., 733 F. Supp. 748,
     753 (S.D.N.Y. 1990) (character in pilot script was "not one of those rare

27   copyrightable characters, largely because she [was] too undeveloped in the pilot

28   script . . . to be more than a stock character.").

-11-

they are not substantially similar to the *Inside Out* characters.  "In determining whether characters are similar, a court looks at the totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in [the plaintiff's work]." *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1163–64 (C.D. Cal. 2015), *aff'd sub nom.* 690 F. App'x 519 (9th Cir. 2017).  Courts "must take care to inquire only whether the protect[a]ble elements, standing alone, are substantially similar,"[2] and therefore "must be sure 'to slice or filter out the unprotectable elements' that arise from the embodiment of stock ideas in characters in a work.'" *Gallagher v. Lions Gate Entm't Inc.*, 2015 WL 12481504, at *3, *6–7 (C.D. Cal. Sept. 11, 2015).  It is also important to evaluate the differences between two characters, as noticeable differences between characters will preclude a finding of substantial similarity.  *See Benay v. Warner Bros. Entm't, Inc.,* 607 F.3d 620, 626 (9th Cir. 2010).  Put simply, "[t]he bar for substantial similarity in a character is set quite high." *Gallagher,* 2015 WL 12481504, at *7.

    (a)  *Asserted Similarities Between the Characters are Based on Unprotectable Elements, and Must Be Filtered Out.*

    The alleged similarities between *The Moodsters* characters and the *Inside Out* characters are not the type of protected expression that could support a finding of substantial similarity.

       **(i)  Anthropomorphizing Emotions Is Unprotectable.**

    Plaintiffs assert that "Disney-Pixar would not have enjoyed the extreme success it has had from *Inside Out* without its use of anthropomorphized emotions as its main characters," (FAC ¶ 110), and argue that the anthropomorphization of emotions as animated characters is itself protected expression.  (*Id.* ¶¶ 149-54.) As discussed, a review of Plaintiffs' copyrighted works makes clear that the Moodsters are characters exhibiting a predominant mood or attribute, similar to the Seven

---

[2] *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

Dwarfs, but are not literal anthropomorphized emotions belonging to a human being.  Plaintiffs' spin on the Moodsters for purposes of maintaining this lawsuit is akin to describing the Seven Dwarfs as the literal emotions of Snow White—it just does not hold up to scrutiny.  *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (emphasizing that courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint").  In any event, the idea of anthropomorphizing emotions as animated characters is not protectable expression.[3]

Other works show that the idea of housing anthropomorphized emotions, cognition, or personality traits inside a person's head is not something that Plaintiffs created.  The angel and devil on a person's shoulder is a well-trodden foil showing the interaction between a person's competing emotions or instincts, especially in the field of animation.  (*See, e.g.,* Fig. 1.) "In the context of copyright claims, the Court may take judicial notice of generic elements of creative works," including those that are "generally known and can be verified simply by watching television for any length of time." *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007).  The ubiquity of depicting the battling factions of a character's conscience can be verified just by spending a Saturday morning watching cartoons.



Fig. 1

---

[3] *See, e.g., Cory Van Rijn, Inc. v. California Raisin Advisory Bd.*, 697 F. Supp. 1136, 1144 (E.D. Cal. 1987) (holding that the idea of an anthropomorphic raisin is not subject to copyright protection); *Green v. Proctor & Gamble, Inc.,* 709 F. Supp. 418, 421 (S.D.N.Y. 1989) ("the idea of characterizing oral bacteria as humanoid 'cavity makers' is hardly protectible"); *Gibson v. CBS, Inc.*, 491 F. Supp. 583, 585 (S.D.N.Y. 1980) ("The attribution to an egg of the qualities normally possessed by human beings is of course an 'idea' and no more. The idea alone is not subject to copyright protection.").

1    The works referenced in the amended complaint, including Disney's *Reason*
2    *and Emotion* film from 1943 and its *Cranium Command* ride at Epcot, also establish
3    this. (FAC ¶¶ 149-52.)[4] Each of the referenced works represents competing aspects
4    of a person's psyche through characters housed in a human head—the same premise
5    of the *Inside Out* characters (though not *The Moodsters* characters). In *Reason and*
6    *Emotion,* Disney represented a man's Emotion as a caveman, and his Reason as a
7    professorial type, competing for control of the driver's seat and levers in a human
8    head. (Fig. 2.) The *Cranium Command* ride featured a pilot named Buzzy manning
9    the cortex of the brain in a command center, a setting evocative of the Headquarters
10   in *Inside Out.* (Fig. 3.) *Herman's Head* housed four characters personifying
11   Herman's intellect, fear, compassion, and lust. (Fig. 4.) Likewise, the protagonist
12   in *My Poison Berry Brain* had five different characters in her head governing her
13   actions. (Fig. 5.)



Fig. 2                          Fig. 3                          Fig. 4          Fig. 5

19   "Generalized themes and ideas," like the idea of representing competing aspects of a
20   person's psyche or personality as characters residing in the person's head, "lie in the
21   public domain and are not copyrightable." *Madrid v. Chronicle Books*, 209 F. Supp.
22   2d 1227, 1241 (D. Wyo. 2002).[5]

---

[4] The Court may take judicial notice of all of the works referenced in the complaint.
*Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (*See* FAC
¶¶ 149-52; RJN, Exs. C-1 – C-4, D-223.)
[5] *See Madrid,* 209 F. Supp. 2d at 1241 ("a big, fat, furry monster with horns on its
head, a small, thin child, monsters in children's bedroom closets and vice versa at
night, monsters who are afraid of children—are not original, as they appear in many
children's stories and are generally known in the public sphere").

**(ii)** **The Selection of Core Human Emotions and the Traits Associated with Those Emotions Are Unprotectable.**

Plaintiffs ground their infringement claim, in part, on the selection of a total of five emotions as characters in *Inside Out,* and that four of these emotions are the "same" as those in *The Moodsters.*  (FAC ¶¶ 155-58.)  Plaintiffs did not "invent" the basic, universal emotions of happiness, fear, anger, and sadness.  The presence of these emotions in children transcends cultural boundaries, and is the type of universal truth akin to scientific facts, which are not copyrightable because they are not "created," they are "discovered" and "are part of the public domain available to every person." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347-48 (1991).  Plaintiffs here "fail[] to understand the fundamental difference between idea and expression.  Plaintiff[s] would ask this Court to grant [them] a monopoly on unprotected elements, such as themes, emotions, and attitudes on which [cartoons] commonly rely." *McGee v. Benjamin*, 2012 WL 959377, at *10 (D. Mass. Mar. 20, 2012).

Nor can Plaintiffs claim to have a monopoly on showing a sad character crying, a fearful character quivering, or any other trait that is a standard manifestation of a human emotion.  "[B]asic human traits . . . 'are too general or too common to deserve copyright protection.'" *Marcus v. ABC Signature Studios, Inc.*, 2017 WL 4081885, at *10 (C.D. Cal. Sept. 13, 2017).  The "*scenes a faire*" doctrine also excludes from copyright protection material that is "standard," stock, or common to a particular topic, or that "necessarily follows from a common theme or setting." *Smart Inventions, Inc. v. Allied Cmcn's Corp.,* 94 F. Supp. 2d 1060, 1067 (C.D. Cal. 2000) (quoting 4 Nimmer § 13.03[B][4]).  Whether under the doctrine of *scenes a faire* or merger, any asserted similarities between the expression of a particular emotion must be filtered out.

**(iii)** **The Association of Red With Anger, Blue With Sadness, and Yellow With Joy Is Unprotectable.**

Plaintiffs claim copyright protection over "designat[ing] each character with a

-15-

core color."  (FAC ¶ 159.)  They also claim copyright protection over "select[ing] particular colors to correspond with particular emotions," (*id.* ¶ 160), namely, red for anger, blue for sadness, and yellow for happiness.  The idea of associating colors with emotions (including the association of red with anger, blue with sadness, and yellow with happiness) is a linguistic and cultural staple, not an invention of Plaintiffs.  Color-coding a character to designate that character's emotional state is also a common extension of this natural association.

The specific association of anger with the color red, as well as elements of heat or fire, is a common trope.  The same is true of the connections between blue and sadness, and yellow and happiness.  Our language is infused with these associations through metaphorical expressions:  An angry person is said to be seeing red, hot-blooded, hot under the collar, red with rage, burning with anger, breathing fire, smoldering, fuming, or have a short fuse. "Blue" is *literally* a synonym for "sad," and has been since the middle ages.  (*See* The Am. Heritage Dictionary of Idioms, at 142 (2d ed.) ("The use of *blue* to mean 'sad' dates from the late 1300s.").) Someone who is sad is also said to have the blues, be feeling blue, or singing the blues.  Another metaphorical staple in our language is the association of happiness and sunshine, a yellow glow:  A happy person is a ray of sunshine, lights up the room, radiates joy, has a sunny smile, or is beaming.  Plaintiffs' complaint even concedes that red is associated with anger, blue with sadness, and yellow with happiness, but notes that these colors can also be associated with other concepts (such as red and lust, blue and peace, and yellow and cowardice).  (FAC ¶ 161.) Plaintiffs therefore recognize that there is a cultural connection between specific colors and specific emotions, and that their own selection of colors for the Moodsters was consistent with convention.

Daniels's original complaint noted that she had previously created a pediatric health care assessment program for Pfizer, which used "color coded symbols and illustrations to express different emotions,"  (Compl. ¶ 25), and that she "wanted to

1  expand on her idea of using color-coded illustrations of emotions to help children

2  with their social and emotional development." (*Id.* ¶ 27.)  However, just as Daniels

3  was not the first to associate colors with emotions, she was not the first to employ

4  this device as an educational tool for children or in creating characters.  A color-

5  coded "Wheel of Emotions" was created by Robert Plutchik in 1980—it associates

6  yellow with joy, blue with sadness, and red with anger.  (Fig. 6; *see* Plutchik, R.,

7  "The Nature of Emotions," *American Scientist* (July 16, 2001) at Fig. 6.)[6]   A similar

8  palette of colors, titled "The Color of Feelings," was copyrighted in 2001 by Jim

9  Velez.  (Fig. 7, *available at* http://feelingsunlimited.com/feelingspalette; Reg. No.

10  VAu00054440.)  Color-coding emotions has also been deployed in many

11  educational and therapeutic aids for children as a means to help them label their

12  feelings.  The "Feelings Frogs" are color-coded bean-bag frogs, each labeled with a

13  specific emotion (including yellow for happy, blue for sad, and red for angry).  (Fig.

14  8.)  The children's book "Glad Monster, Sad Monster: A Book About Feelings,"

15  featuring on its cover a yellow monster with a smile and a blue monster with a

16  frown, was first published in 1997. (Fig. 9.)[7] The second edition of "Feelings

17  Book," which helps children identify feelings and associates emotions with colors

18  (including yellow for happy, blue for sad, and red for mad), was published in 2002.

19  (Fig. 10.)[8]



Fig. 6          Fig. 7          Fig. 8          Fig. 9          Fig. 10

25  [6] *See* RJN, Ex. E-8 (archived webpage from *American Scientist*).  *Also available at*

26  https://en.wikipedia.org/wiki/Contrasting_and_categorization_of_emotions#Plutchik

.27s_wheel_of_emotions.

27  [7] https://www.amazon.com/Glad-Monster-Sad-Ed-Emberley/dp/0316573957.

28  [8] https://www.amazon.com/Feelings-Book-Emily-Rubin/dp/0974934305.

The association of colors with emotions is also a common trope in visual creative works—so much so, that there is an entire entry on the trope of "Colour-Coded Emotions" at tvtropes.org.[9]  And, consistent with the cultural association between anger and the color red and heat, cartoons routinely demonstrate a character's emotional reaction of anger by having the character turn red, and even burst into flames.  (*See, e.g.,* Fig. 11.)



Fig. 11

"The Court may take judicial notice of generic elements of creative works," which also includes the color-emotion pairings that Plaintiffs utilized in *The Moodsters. Zella*, 529 F. Supp. 2d at 1129; *see also Weiss v. DreamWorks SKG*, 2015 WL 12711658, at *3-4 (C.D. Cal. Feb. 9, 2015) (taking "judicial notice of the fact that Marilyn Monroe is frequently the subject of creative works," which "one simply has to watch television or movies or read books to know").

Plaintiffs' asserted similarities between *The Moodsters* and *Inside Out* characters do not clear "[t]he bar for substantial similarity in a character [which] is set quite high." *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208–09 (S.D.N.Y.  2010).  In *Hogan v. DC Comics,* 48 F. Supp. 2d 298 (S.D.N.Y. 1999), for instance, "the two main characters were both half-human, half-vampires named Nicholas Gaunt; both were young white males with pale skin, a medium build, dark, tired eyes, and dark, scraggly hair; both sought to learn the truth about their origins; both learned about their origins through flashbacks or memories; both faced the choice of pursuing good or evil; and both were indoctrinated into the forces of evil. The *Hogan* Court nonetheless found that the two Nicholas Gaunts were not substantially similar because the similarities were among 'unprotectable

---

[9] http://tvtropes.org/pmwiki/pmwiki.php/Main/ColourCodedEmotions.

ideas and themes that do not represent any original elements of plaintiffs' work.'" *Id*. at 310.  The same result is compelled here.

### (b)   *Differences Between the Characters Also Precludes a Finding of Substantial Similarity.*

Plaintiffs' claim of substantial similarity also fails on account of the many differences between *The Moodsters* and *Inside Out.  See, e.g., Benay*, 607 F.3d at 626–27 (finding that differences between two characters' traits including marital status, job, dreams/nightmares, and ideology prevented a finding of substantial similarity).

Here, differences can be found even in the elements that Plaintiffs assert as infringed.  *Inside Out*'s ensemble of characters includes a green-skinned Disgust, not present in *The Moodsters* character line-up, and likewise *The Moodsters* ensemble includes a pink-furred Olovia/Oola (the "loving" character) without an analogue from the *Inside Out* characters.  And while *Inside Out*'s Fear is purple, Plaintiffs' Shake/Scootz (the "scared" character) is green.  Three of the *Inside Out* characters are humanoids with human features, skin, and hair, whereas all of the Moodsters appear to be some species of furry alien animal with antennae and tails.  Nor do the brick-like Anger or bug-like Fear approximate any visual depiction of the Moodsters.  The *Inside Out* characters all wear clothes, in their own personal style; *The Moodsters* characters are au naturel.  Whereas the Moodsters all have tiny, childlike voices, the *Inside Out* characters have distinct, adult vocal patterns and pitches.

Plaintiffs point out that the *Inside Out* characters are not androgynous, claiming that as a point of similarity.  While it is debatable whether *The Moodsters* pilot communicates a gender for each Moodster, the *Moodsters* bible does explicitly assign genders—most of which are the opposite of those in *Inside Out.*  (Zip/Zazz is supposedly male; Joy is female.  Roary/Rizzi is female; Anger is male.  Sniff/Snorf is male; Sadness is female.)  And in terms of the more granular analysis of dialogue and relationships with other characters (including, of course, the *Inside Out*

characters' relationship with Riley, the 11-year-old girl whom they are steering) there are no comparisons to be made between the works.

In light of the unprotectable superficial similiarities between the characters, and the overwhelming differences, Plaintiffs fall short of the very high bar for legally actionable substantial similarity in this context.

### B.   Plaintiffs' Breach of Implied-in-Fact Contract Claim Fails as a Matter of Law.

Plaintiffs' breach of implied-in-fact contract claim alleges that Defendants used Plaintiffs' ideas from *The Moodsters* in creating *Inside Out* without compensating Plaintiffs for the use.  (FAC ¶¶ 112–121.)  This claim is a non-starter as a matter of law.  First, the claim is clearly barred by a two-year statute of limitations.  Second, Plaintiffs' unconditional disclosure of the *Moodsters* bible in 2005 and the pilot in 2007 precluded the formation of any purported implied-in-fact contract, given that the consideration of such a contract—an undisclosed idea—was destroyed.  And Plaintiffs do not even attempt to show substantial similarity between *The Moodsters* and *Inside Out* from a holistic perspective, as required in the context of an implied-in-fact contract claim.

### 1.   The Implied-in-Fact Contract Claim Is Time-Barred.

The limitations period to bring a claim for breach of an implied-in-fact contract is two years, measured from the point that the defendant breaches the implied promise to pay for use of the plaintiff's idea by disclosing the idea to a "substantial segment of the public"   Cal. Civ. Proc. § 339(1); *Thompson v. Cal. Brewing Co.*, 191 Cal. App. 2d 506, 510 (1961).  In *Thompson,* for instance, the California Court of Appeals held that extensive "test" advertising in San Diego and Sacramento using the plaintiff's claimed idea started the running of the statute of limitations because it "immediately disclosed the idea to a substantial segment of the public," which "would certainly destroy any further marketability of the idea.'" *Thompson*, 191 Cal. App. 2d at 510. The claim accrues and the statute of limitations begins to run at that point, regardless whether the plaintiff is aware of the disclosure,

-20-

given that "a cause of action for breach of contract ordinarily accrues at the time of breach even though the injured party is unaware of his right to sue." *Donahue v. United Artists Corp.*, 2 Cal. App. 3d 794, 801–02 (1969) (rejecting argument that plaintiff must be aware of defendant's use of the idea for the limitations period on implied contract claim to begin to run).[10]

Here, Plaintiffs allege that "Disney-Pixar released *Inside Out* in the United States on June 19, 2015"—exactly 2 years before their original complaint was filed. However, the film premiered internationally at the Cannes Film Festival on May 18, 2015, generating buzz in the media and articles describing and picturing the color-coded anthropomorphized emotions at the heart of the film. (RJN, Exs. D-116, D-118 to D-126, D-129 to D-138.) *Inside Out*'s United States premiere occurred on June 8, 2015 to much fanfare and media attention, resulting in yet more articles discussing the movie and its characters. (*See* RJN, Exs. D-200 to D-219.)[11] And long before that point, beginning in March of 2014 (more than 3 years before this lawsuit was filed), articles about the movie made abundantly clear that each of *Inside Out*'s five main characters was, in the words of Plaintiffs, "an anthropomorphic, color-coded animated character representing a single emotion" (FAC ¶ 85) who lived in the mind of an 11-year-old girl. (RJN, Exs. D-1 to D-222.)

This slew of news articles, published in widely distributed periodicals like the *New York Times*, *USA Today,* the *Los Angeles Times*, *Variety*—even the *Star Tribune,* the local newspaper in Plaintiffs' hometown—disclosed Defendants'

---

[10] *See also Pearl v. Deitch*, 2009 WL 1040302, at *5 (Cal. Ct. App. Apr. 20, 2009) ("Pearl's contract claims accrued regardless of whether he was cognizant of them," as the claim accrues at breach even if plaintiff is unaware of the right to sue; citing *Donahue*); 3 Witkin, Cal. Procedure, 5th Actions, § 520 (5th ed. 2008) ("a cause of action for breach of contract ordinarily accrues at the time of breach, and the statute begins to run at that time regardless of whether any damage is apparent.").

[11] The release dates for *Inside Out*, beginning with the Cannes Film Festival on May 18, 2015, are available at http://www.imdb.com/title/tt2096673/releaseinfo.

-21-

alleged use of Plaintiffs' ideas to the broad public more than two years before Plaintiffs filed this lawsuit. [12]  This disclosure to a "substantial segment of the public" "destroy[ed] further marketability" of the idea for Plaintiffs and triggered the statute of limitations.

Many articles discussed and circulated the trailers for *Inside Out*, which also highlighted the very aspects of the *Inside Out* characters that Plaintiffs contend constituted use of their idea. The trailers, which were posted on YouTube and available to anyone with an internet connection starting in December 2014, would be sufficient standing alone to trigger the statute of limitations in this case.  *J.C. ex rel R.C. v. Beverly Hills Unified School Dist.*, 711 F. Supp. 2d 1094, 1098 (C.D. Cal. 2010) ("YouTube is a publicly-available website where persons can post video clips for viewing by the general public.").  The first trailer, posted to YouTube on December 12, 2014, featured each of the five color-coded emotions inside Riley's mind.  (RJN, Ex. E-5.)  As of June 18, 2015, more than two years before Plaintiffs filed the original complaint, the trailer had been viewed almost 4 million times. (*Id.*) The second trailer, posted to YouTube on March 10, 2015, also introduced each of the five characters by name; it had been viewed over 4.5 million times as of June 18, 2015.  (*Id.,* Ex. E-6.)

In sum, Defendants' use of Plaintiffs' alleged idea of color-coded anthropomorphized emotions was disclosed to a "substantial segment of the public" without compensation to Plaintiffs more than two years before they filed suit, rendering their implied contract claim time-barred.

### 2.   Plaintiffs' Voluntary, Unconditional Publication of *The Moodsters* Bible and Pilot Prevented the Formation of an Implied-in-Fact Contract.

The California Supreme Court has acknowledged that "[t]he general rule of law is that the noblest of human productions—knowledge, truths ascertained,

---

[12] FAC ¶¶ 12-13; RJN, Exs. D-98, D-154, D-213, D-214 (articles in *Star Tribune*).

conceptions, and ideas—become, after voluntary communication to others, free as the air to common use." *Desny v. Wilder,* 46 Cal. 2d 715, 731–732 (1956).  By voluntarily publishing the *Moodsters* bible and the pilot, Plaintiffs destroyed any potential consideration for the formation of an implied-in-fact contract, providing another basis for dismissal of this claim.

Plaintiffs' registration with the Copyright Office for the 2005 version of the *Moodsters* bible (Reg. No. TX 8-389-829, FAC ¶ 132), asserts that the "date of publication" of the *Moodsters* bible was November 8, 2005.  (RJN, Ex. B-2.) Plaintiffs' copyright registration for the pilot episode of *The Moodsters* (Reg. No. PA 1-394-057, FAC ¶ 131), asserts that the "date of publication" of the pilot was June 1, 2007. (RJN, Ex. B-1.)  This is consistent with archival records showing the posting of the pilot to YouTube on *The Moodsters*' webpage in 2007.  (*Id.,* Ex. E-1 ("Our pilot episode, 'The Amoodsment Mixup' was completed this summer.  We would appreciate as much feedback as we can get!!!!"; showing 1,087 views of the pilot as of December 9, 2007); Ex. E-7 (1,147 views as of March 16, 2008).)[13] "Publication" has a defined meaning within copyright law: it is "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," as well as "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution . . . ." 17 U.S.C. § 101.  The legislative history explains that "a work is 'published' if one or more copies or phonorecords embodying [the work] are distributed to the public" with "no explicit or implicit restrictions with respect to [the] disclosure of [the] contents" of that work.  H.R. Rep. No. 94-1476 at 138 (1976).

---

[13] This Court may take judicial notice of content contained in archived webpages, because "the contents of web pages available through the Wayback Machine are facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *UL LLC v. Space Chariot, Inc.*, 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017).

1    Plaintiffs' publication of the *Moodsters* bible in 2005, and the pilot episode of

2    *The Moodsters* in 2007, with "no explicit or implicit restrictions" with respect to the

3    disclosure of the contents of these works, dooms their implied-in-fact contract

4    claim. The "touchstone" of a *Desny* claim is "whether the plaintiff can be said to be

5    disclosing something that is not otherwise freely available to the defendant.  Indeed,

6    it is the *disclosure* of ideas, not protectable under copyright law, but of potential

7    value to the defendants, that serves as the consideration for the implied promise to

8    pay." *Quirk v. Sony Pictures Entm't, Inc.*, 2013 WL 1345075, at *12 (N.D. Cal.

9    Apr. 2, 2013) (emphasis added).  The court's decision in *Quirk* illustrates this

10   principle.  In that case, the plaintiff asserted a breach of implied-in-fact contract

11   claim alleging that the defendants failed to compensate him for the adaptation of his

12   novel in making a motion picture.  *Id.* at *11. The district court dismissed the claim

13   at the pleadings stage, stating that "regardless of the precise circumstances"

14   surrounding the defendant's acquisition of the plaintiff's ideas, the plaintiff's

15   "voluntary wide public distribution of [his] ideas years before defendants ever began

16   working on their movie" doomed the claim.  *Id.*  Citing *Desny*, the district court held

17   that the plaintiff's publication of the novel was an "unconditioned disclosure" of all

18   of his ideas, and that after the unconditional disclosure, no implied promise to pay

19   for freely available ideas could be implied.  *Id.* at *11–12.[14]

20   Here, Plaintiffs' copyright registrations and archived webpages establish that

21   Plaintiffs made unconditional disclosures of their ideas through publication of the

22   *Moodsters* bible in 2005, and the pilot in 2007.  After that point, the ideas embodied

23   in these works were "freely available," and no obligation to pay may be implied.

24   *See Quirk*, 2013 WL 1345075, at *11–12; *Desny*, 46 Cal. 2d at 739.

25   _____

26   [14] *See also Faris v. Enberg*, 97 Cal. App. 3d 309, 318–19 (1979) (implied-in-fact
     contract claim dismissed where plaintiff unconditionally disclosed his idea to

27   defendants); *Grosso v. Miramax Film Corp.*, 2007 WL 2585053, at *7 (Cal. Ct.

28   App. Sept. 10, 2007) (same).

-24-

**3.** ***The Moodsters* and *Inside Out* Are Not Substantially Similar.**

To prevail on a claim for breach of implied-in-fact contract, a plaintiff must also show "substantial similarity between plaintiff's idea and defendant's production." *Benay*, 607 F.3d at 631.  In deciding whether two works are substantially similar, courts analyze similarities between creative elements such as "plot, motivation, subject matter, milieu, and characterization."  *Henried v. Four Star Television*, 266 Cal. App. 2d 435, 436 (1968); *see also Minniear v. Tors*, 266 Cal. App. 2d 495, 505 (1968) (comparing "basic plot ideas, themes, sequences and dramatic gimmicks"); *Kightlinger v. White*, 2009 WL 4022193, at *3–8 (Cal. Ct. App. Nov. 23, 2009) (comparing subject matter, themes, sequence of events, plot, milieu, characters, and motivation).  Courts routinely reject implied-in-fact contract claims where plaintiffs are unable to show substantial similarity across the range of the elements being compared.[15]  Here, Plaintiffs fail to allege *any* similarities across plot, themes, sequences, motivation, subject matter, milieu, dramatic gimmicks, or any other element apart from the characters.  As Plaintiffs effectively concede, *The Moodsters* and *Inside Out* are not substantially similar; without use of Plaintiffs' idea, there is no basis for the asserted breach of implied contract claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendants request this Court dismiss each of Plaintiffs' claims with prejudice.

DATED:  November 17, 2017

MUNGER, TOLLES & OLSON LLP
GLENN D. POMERANTZ
ERIN J. COX
KENNETH M. TRUJILLO-JAMISON

By:  _____*/s/ Glenn D. Pomerantz*_____
GLENN D. POMERANTZ

Attorneys for Defendants

---

[15] *See, e.g., Henried*, 266 Cal. App. 2d at 436; *Kightlinger*, 2009 WL 4022193, at *9; *Sutton v. Walt Disney Prods.*, 118 Cal. App. 2d 598, 603–04 (1953).

-25-