RONALD J. SCHUTZ (admitted *pro hac vice*)
Email: rschutz@robinskaplan.com
PATRICK M. ARENZ (admitted *pro hac vice*)
Email: parenz@robinskaplan.com
RUTH L. OKEDIJI (admitted pro *hac vice*)
Email: rokediji@robinskaplan.com
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612–349–8500
Facsimile:   612–339–4181

MICHAEL A. GEIBELSON (STATE BAR NO. 179970)
Email: mgeibelson@robinskaplan.com
**ROBINS KAPLAN LLP**
2049 Century Park E., Suite 3400
Los Angeles, CA 90067
Telephone: 310-552-0130
Facsimile:   310-229-5800

Attorneys for Plaintiffs Denise Daniels and
The Moodsters Company

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Denise Daniels and<br>The Moodsters Company;<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>The Walt Disney Company;<br>Disney Enterprises, Inc.;<br>Disney Consumer Products<br>and Interactive Media, Inc.;<br>Disney Interactive Studios, Inc.;<br>Disney Shopping, Inc.; and<br>Pixar<br><br>　　　　　Defendants. | Case No. 2:17–cv–04527–PSG–SK<br><br>**Second Amended Complaint**<br><br>**Jury Trial Demanded** |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Introduction**

1.      Disney·Pixar released *Inside Out* in 2015 to rave reviews. *Inside Out* was later nominated for two Academy Awards and won the Academy Award for Best Original Screenplay. Critics continue to applaud Disney·Pixar for the inventiveness, creativity, and novelty in the fundamental premise of *Inside Out*: the use of anthropomorphized emotions Joy, Sadness, Anger, Fear, and Disgust as individual characters within an 11-year old girl.

2.      In June 2017, in fact, the *New York Times* ranked *Inside Out* as the seventh best movie in the 21st century so far. The article explained, "The personification of abstract concepts and the visual rendering of human consciousness from the inside are astonishing feats, executed with unparalleled inventiveness."

3.      But Disney·Pixar was not the first to conceive of the idea of anthropomorphized, color-coded characters inside a child each of which represents a single emotion, as depicted in *Inside Out*.

4.      Denise Daniels has dedicated her career over the last four decades to help children better recognize, understand, and manage their emotions. As part of her distinguished efforts, Daniels conceived of—and developed—a children's program called *The Moodsters*.

5.      *The Moodsters* live "deep down inside every child," and features five main characters. Each character is an animated, anthropomorphized figure representing a single emotion with a single corresponding body color, specifically, happiness (yellow), sadness (blue), anger (red), fear (green), and love (pink).

6.      From 2005 through 2009, and every year in between, Daniels, along with her industry-leading team, approached and pitched Disney·Pixar to partner on a project relating to *The Moodsters*.

7.      The individuals at Disney·Pixar who had access to materials and

SECOND AMENDED COMPLAINT

descriptions of *The Moodsters* include Thomas Staggs, then CFO of The Walt Disney Corporation; Pete Docter, of Pixar; Rich Ross, then President of Disney Channels Worldwide, and later Chairman of Walt Disney Studios; Nancy Kanter, of Playhouse Disney (now referred to as Disney Junior); Paula Rosenthal, of Playhouse Disney; and Roy E. Disney, who was the son and nephew of the founders of The Walt Disney Company.

8.     Daniels and her team pitched and disclosed the idea underlying the *The Moodsters* to Disney·Pixar with the understanding, as is custom in the entertainment and motion picture industry, that Daniels would be compensated if Disney·Pixar used the idea. Disney·Pixar accepted these disclosures under these circumstances.

9.     Disney·Pixar has used Daniels' idea in the animated motion picture *Inside Out* and its related merchandise. Disney·Pixar has not compensated Daniels.

10.     Disney·Pixar has also infringed copyrights owned by Daniels' company, The Moodsters Company, through the release and sales associated with *Inside Out*.

11.     This suit seeks to hold Disney·Pixar accountable for its unauthorized use of The Moodsters Company's intellectual property. In fact, such unauthorized use in the entertainment industry is a problem that Disney·Pixar recently expressed concern to its inventors about: "The unauthorized use of intellectual property in the entertainment industry generally continues to be a significant challenge for intellectual property rights holders." The Walt Disney Co., Annual Report (Form 10-K) (Nov. 23, 2016). As set forth below, Disney·Pixar is part of this problem, and should compensate The Moodsters Company for its infringement.

### The Parties

12.     Plaintiff Denise Daniels is a citizen and resident of the State of

SECOND AMENDED COMPLAINT

Minnesota.

13.    Plaintiff The Moodsters Company is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Daniels is the sole shareholder and CEO of The Moodsters Company.

14.    Defendant The Walt Disney Company is a Delaware corporation with its principal place of business in Burbank, California.

15.    Defendant Disney Enterprises, Inc. is a Delaware corporation with its principal place of business in Burbank, California.

16.    Defendant Disney Consumer Products and Interactive Media, Inc. is a California corporation with its principal place of business in Burbank, California. Disney Consumer Products and Interactive Media, Inc. is a subsdiary of Disney Enterprises, Inc.

17.    Defendant Disney Interactive Studios, Inc. is a California corporation with its principal place of business in Burbank, California. Disney Interactive Studios, Inc. is a subsidiary of Disney Enterprises, Inc.

18.    Defendant Disney Shopping, Inc. is a Delaware corporation with its principal place of business in Burbank, California. Disney Shopping, Inc. is a subsidiary of Disney Enterprises Inc.

19.    Defendant Pixar is a California corporation with its principal place of business in Emeryville, CA 94608.

20.    The Defendants are collectively referred to in this Complaint as Disney·Pixar.

### Jurisdiction and Venue

21.    This action arises under the copyright laws of the United States and California law.

22.    This Court has original subject matter jurisdiction over the claims for copyright infringement (Counts 2-6) under 17 U.S.C. §501, 28 U.S.C. §1331, and 28 U.S.C. §1338(a); and supplemental jurisdiction over the related

SECOND AMENDED COMPLAINT

1  state law claim (Count 1) under 28 U.S.C. §1367.

2      23.    This Court also has diversity jurisdiction over the state law claim

3  (Count 1) under 28 U.S.C. §1332. The amount in controversy exceeds the sum

4  or value of $75,000, exclusive of interest and costs. Daniels and The Moodsters

5  Company, on one hand, and Disney·Pixar, on the other hand, are citizens of

6  different states within the meaning of 28 U.S.C. §1332.

7      24.    This Court has personal jurisdiction over Disney·Pixar because all

8  Defendants reside in the State of California.

9      25.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)

10  because The Walt Disney Company, Disney Enterprises, Inc., Disney

11  Consumer Products and Interactive Media, Inc., Disney Interactive Studios,

12  Inc., Disney Shopping, Inc., reside in this District, and Pixar is a resident of

13  California; and a substantial part of the events and omissions giving rise to The

14  Moodsters Company's claims occurred in this District.

15  **Factual Background**

16  **Denise Daniels is a nationally recognized child development expert**

17      26.    Daniels has over 40 years of experience in promoting children's

18  social and emotional development.

19      27.    In 1986, with a background in Pediatric Oncology Nursing,

20  Childhood Bereavement, and Crisis Intervention, Daniels co-founded the

21  national non-profit National Childhood Grief Institute.

22      28.    In Daniels' role as Executive Director, she traveled across the U.S.

23  and around the globe providing direct services for schools, Minnesota's judicial

24  system, and for children in refugee camps who had experienced grief and loss.

25  During Operation Desert Storm, she had the distinction of working with

26  military families at the request of Four Star General William Vessey, Chairman

27  of the Joint Chiefs of Staff for the U.S. Pentagon. At the request of the U.S.

28  State Department, Daniels and her team traveled to devastated areas to provide

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

grief counseling and crisis intervention for young victims, such as in the aftermath of Hurricane Katrina, and the 2004 tsunami in Southeast Asia. She was called upon to help children and families cope with the Oklahoma City Bombing, the shooting at Columbine High School, and the terror attacks on September 11 in New York City. In the aftermath of September 11, Daniels authored a children's grief workbook called *First Aid for Feelings*. Ex. 1. Fifteen million copies were distributed to school children across the country.

29.     Daniels shared her expertise through broadcast television as the first parenting expert for NBC's Today show in 1991. In 1995, she co-hosted her own daily, nationally syndicated, parenting show on NBC's America's Talking Network.

30.     Daniels and her team won a Peabody Award for her work on a PBS television special helping children understand and cope with war.

31.     Daniels has also appeared on Oprah, Dateline, The View, CNN, NBC's Nightly News, Larry King Live, Good Morning America, and Fox News. Daniels has also been featured in the *Wall Street Journal*, the *New York Times*, the *Washington Post*, *Inc.*, *Redbook*, *U.S. News & World Report*, and *Parents*, *Parenting*, *People*, and *Newsweek* magazines.

32.     Fortune 500 companies have recognized Daniels as a leader in the area of children's social and emotional development. In 1998, for instance, Pfizer Pediatrics retained Daniels as a consultant to develop a program to help pediatric residents better communicate and emotionally connect with their young pediatric patients. The *First Aid for Feelings* Health Care Initiative included the creation of a children's Feeling Thermometer. Pfizer Pediatrics distributed this thermometer to 40,000 children undergoing counseling at Ground Zero and throughout New York City. Research has since shown that pediatric patients whose physicians implemented Daniels' *First Aid for Feelings* program required less pain medication and sustained shorter hospitalizations.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

These results were the impetus for Daniels to continue her work in children's emotional intelligence.

33.     Also through her partnership with Pfizer, Daniels developed a program to help pediatric patients cope with emotional issues surrounding hospitalization. This program has been used in over 200 pediatric units across the country, and integrated into ten U.S. medical school training programs.

34.     While consulting for Pfizer Pediatrics, Daniels had the privilege of collaborating with the late Dr. Candace Pert of the National Institutes of Health and Georgetown University School of Medicine. Dr. Pert was an internationally recognized neuroscientist and pharmacologist. She served as a mentor to Daniels, and influenced Daniels' strong belief in implementing integrative medicine to improve patient outcomes.

35.     In total, Daniels is a published author of nine children's self-help books.

### The Conception and Development of *The Moodsters*

36.     Daniels wanted to expand on her idea of using color-coded illustrations to help children with their social and emotional development.

37.     Daniels conceived of *The Moodsters*, a children's animated television pilot ("*The Moodsters* Pilot") starring five color-coded anthropomorphic characters, each individually representing a single emotion: happiness, sadness, anger, fear, and love. Ex. 2.

38.     These characters live in an abstract world inside a child. For instance, early materials about *The Moodsters* explain that "[s]omewhere deep down inside every child is a wonderous world where The Moodsters™ live." Ex. 3 at 1.

39.     Daniels recruited a high-profile and accomplished team to execute on her vision for *The Moodsters* and formed The Moodsters Company. This team included, among others, Lisa Simon, Louise Gikow, Marc Brackett,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Ph.D., and A.J. Dewey.

### Lisa Simon

40.     The late Lisa Simon served as co-executive producer for *The Moodsters*. Simon was a former Assistant Vice President of Sesame Street. She was a producer and director of "Sesame Street" for over fourteen years, where she brought new life and direction to what had already become a benchmark for quality educational television for pre-school children. She won 15 Emmy Awards, as well as a Peabody Award, for her work as a producer and director. She worked on several animation projects for Little Airplane Productions, Nick Jr., and PBS. Simon also operated her own company, simon-sez productions, and worked with major corporate, film, and video production companies. Among Simon's clients were PBS, the Discovery Network, Sony, and Disney.

### Louise Gikow

41.     Louise Gikow served as co-executive producer for *The Moodsters*, along with Simon. Gikow is an Emmy Award-winning author and composer of over 150 scripts, books, and songs. She was a consulting producer and staff writer for the PBS series "Between the Lions." She was the co-creator and head writer of Playhouse Disney's hit show, "Johnny and the Sprites." And Gikow was the co-creator of "Lomax: The Hound of Music," a music education show for children on PBS Kids. Gikow was head writer for numerous international projects, including the Middle Eastern co-production of "Sesame Stories."

### A.J. Dewey

42.     A.J. Dewey served as the creative director for *The Moodsters*. Dewey is an award-winning illustrator and designer whose work spans a broad range of mediums and whose clients include Sesame Street, Disney, IBM, AT&T, Marvel, Nascar and Pepsi Cola. His illustrations can be seen in several children's book series and hundreds of retail products. Dewey's television work includes "Animal Planet," "Video Buddy," "Once Upon a Tree" and "Dr.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Seuss's My Many Colored Days," a symphonic animated version of the popular children's book. From 2004 to 2007, Dewey was the Senior Designer at Manhattan Toy, where he designed a broad list of toy products, including the 2006 launches of Groovy Girls' Petrageous and Cirque du Soleil's premier line of children's products and textiles.

### Marc Brackett

43.     Marc Brackett, Ph.D. served as a curriculum advisor on *The Moodsters*. He is currently Director of the Yale Center for Emotional Intelligence and a professor in the Child Study Center at Yale University. He has published over 100 scholarly articles and is the recipient of numerous awards, including the Joseph E. Zins Award for his research on emotional intelligence in schools. His research has been featured in the *New York Times*, *Time* Magazine, and National Public Radio. He co-developed the RULER model of emotional literacy, which stands for five skills of emotional intelligence: **R**ecognizing, **U**nderstanding, **L**abeling, **E**xpressing, and **R**egulating emotions. This model was adopted by over 1,000 public, charter, and private schools across the United States and in other countries.

***

44.     Emotional intelligence played a preeminent role in the creation and development of *The Moodsters*. *The Moodsters'* mission is to help children recognize, understand, and regulate their emotions in a healthy and socially acceptable manner.

45.     The role of emotional intelligence skills in children is of paramount importance in their growth and development. Research shows that children who learn emotional intelligence skills have less anxiety and depression; have fewer attention, learning, and behavior problems; are better problem-solvers; display greater social and leadership skills; and perform better

SECOND AMENDED COMPLAINT

academically.

46.    Dr. Brackett, as an advisor on *The Moodsters*, co-wrote the *Emotional Literary Currriculum* with Dr. Susan E. Rivers, which laid out the educational objectives needed to develop episodes of *The Moodsters*. *The Moodsters*' animated show was designed to provide children with an opportunity to learn "emotional literacy" using the RULER method. Daniels and her team, therefore, designed *The Moodsters* to help children "acquire the critical emotional knowledge and important life skills to succeed."

47.    In particular, *The Moodsters* teaches children to recognize and understand their emotions; develop the vocabulary to express those feelings; and practice simple strategies that help them manage their emotions and tackle the everyday challenges of growing up.

48.    Daniels and her team created pitch materials, along with an evidence-based curriculum, to substantiate particularized expressions of her idea behind *The Moodsters*. Specifically, they prepared "a bible" for *The Moodsters*, which is commonly referred to in the entertainment industry as an outline of a television series' characters, settings, and other elements ("*The Moodsters* Bible"). Ex. 3.

49.    Daniels and her team completed the animated pilot episode for *The Moodsters*, titled "The Amoodsment Mixup," in 2007. Ex. 2, 4.

50.    Both *The Moodsters* Bible and Pilot revolve around five color-coded main characters, each of which represents a single emotion. Because emotions are an abstract concept with no known physical features or visual qualities, these individual single-emotion characters are visually represented as anthropomorphic figures with human characteristics, including expressive body language, vocal characteristics, and facial expressions.

SECOND AMENDED COMPLAINT

51.    *The Moodsters* was designed and developed to foster emotional intelligence in children.

52.    These five characters each individually represent one of the following single emotions: happiness, sadness, anger, fear, and love.

53.    Each of the five characters is designed with a core body color: (from top to bottom, left to right) happiness (yellow), sadness (blue), anger (red), fear (green), and love (pink).



SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



54.    The Happy character of *The Moodsters* is Zazz.[1] The Happy character is an anthropomorphized animated character that represents the single emotion of happiness, designated by the core body color of yellow. The Happy character in *The Moodsters* is "quite optimistic and enthusiastic," and the leader of the Moodsters. Ex. 3 at 3. The other Moodsters depend on the Happy character "whenever the going gets tough." *Id.*

---

[1]    The initial version of *The Moodsters* Bible listed the Happy character as Zip.

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



55.     The Sadness character is Snorf.[2] The Sadness character is an anthropomorphized animated character that represents the single emotion of sadness, and is designated by the core body color of blue. The Sadness character is melancholy, and known to "weep copiously." *Id.* at  6. "But that's okay, because he knows that it sometimes takes courage to cry." *Id.*

---

[2]     The initial version of *The Moodsters* Bible listed the Sadness character as Sniff.

1
2
3
4
5
6
7
8
9
10
11
12
13

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



14    56.    The Anger character is Rizzi.[3] The Anger character is an

15  anthropomorphized animated character that represents the emotion of anger,

16  and is designated by the core body color of red. The Anger character is the

17  Moodster "most likely to blow her top." *Id.* at  4. In fact, when she becomes

18  furious, lightening bolts appear and explode with sparks from her head. *Id.*

19
20
21
22
23
24
25
26
27

---

[3]     The initial version of *The Moodsters* Bible listed the Anger character as
28  Roary.

1
2
3
4
5
6
7
8
9
10
11

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



12   57.   The Fear character is Scootz.[4] The Fear character is an

13   anthropomorphized animated character that represents the single emotion of

14   fear, and is designated by the core body color of green. The Fear character is a

15   nervous nellie. "Everything frightens him." *Id.* at 7.

16
17
18
19
20
21
22
23
24
25
26



27
28

_____

[4]   The initial version of *The Moodsters* Bible listed the Fear character as Shake.

SECOND AMENDED COMPLAINT

58.     Love is represented by the character Oola.[5] The Love character is an anthropomorphized animated character that represents the single emotion of love, and is designated by the core body color of pink. The Love character "is full of love for the world." *Id.* at 5. "She is patient and nurturing and a very good listener." *Id.*



59.     These five characters live in a world deep inside every child.

**Daniels and *The Moodsters* Company Pitched *Moodsters***

**Disney·Pixar from 2005 through 2009**

60.     Daniels and her team sought to partner with a network or studio to produce *The Moodsters* on a national and international platform. Disney·Pixar, Nickelodeon Jr., and PBS were entertainment companies that Daniels wanted to partner with.

61.     Daniels and her team first contacted Disney·Pixar about *The Moodsters* in 2005. They then again contacted Disney·Pixar in 2006, 2007, 2008, and 2009 about *The Moodsters*.

---

[5]     The initial version of *The Moodsters* Bible listed the Love character as Oolvia.

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

62.     Daniels and her team contacted a number of different individuals at Disney·Pixar about *The Moodsters*.

63.     The following individuals at Disney·Pixar who received information about *The Moodsters* include Pete Docter, Thomas Staggs, Nancy Kanter, Paula Rosenthal, and Beth Gardiner.

64.     In addition to the individuals listed in paragraph 63, Roy E. Disney and Rich Ross had access to *The Moodsters*.

65.     In 2005, Gikow and Simon shared creative materials about *The Moodsters* with Paula Rosenthal, who worked for Playhouse Disney. Rosenthal then provided those materials about *The Moodsters* to Nancy Kanter, also of Playhouse Disney. Rosenthal requested an additional copy of *The Moodsters* materials for herself.

66.     Rosenthal and Kanter at Disney, and Gikow and Simon, at The Moodsters Company, continued to discuss and share materials about *The Moodsters* in 2006 and 2007.

67.     In 2008, a mutual friend put Daniels in touch with Staggs. Staggs was the CFO of The Walt Disney Company at the time. Daniels shared materials about *The Moodsters* with Staggs.

68.     In May 2008, Staggs informed Daniels that he would share materials about *The Moodsters* with Roy E. Disney. Roy E. Disney was the son and nephew of the founders of The Walt Disney Corporation.

69.     In June 2008, Staggs informed Daniels that he shared materials about *The Moodsters* with Rich Ross. At the time, Ross was the President of Disney Channels Worldwide. In 2009, Ross became Chairman of Walt Disney Studios.

70.     Walt Disney Studios distributes films under various banners, which include Walt Disney Pictures and Pixar.

71.     Daniels also called Docter to discuss *The Moodsters*. The two spoke

- 17 -

SECOND AMENDED COMPLAINT

1   on the phone for an extended period of time, and Daniels walked Docter

2   through in detail the characters, curriculum, and concept underlying *The*

3   *Moodsters*.

4        72.    In short, Disney·Pixar had access to *The Moodsters* well before 2010.

5            **Disney·Pixar Started Working on *Inside Out* in 2010**

6        73.    Disney·Pixar started working on *Inside Out* in 2010.

7        74.    Docter has explained that his motivation for the movie started

8   when his daughter, who was 11 at the time, went through changes in her

9   demeanor and how she managed her emotions.

10        75.    Also during his initial stage of work, he reportedly reflected and

11   wondered "what would be fun to see in animation, you know - what have I not

12   seen?," recognizing that Disney·Pixar had never before featured

13   anthropomorphic emotions as characters inside a child before. This thought

14   process purportedly led him "to have characters that represent emotions."

15        76.    Docter has explained the difficulty in taking *the idea* of characters

16   that represent emotions, and actually *expressing* that idea. For instance, Docter

17   has conceded that Disney·Pixar had never before expressed the idea of single

18   emotions as characters:

19        The idea [for Inside Out] was rather abstract, but in my enthusiasm

20        *I didn't realize just how **difficult** it would be to make it concrete*. Most of
our films had somewhere to start: bugs, fish, robots . . . even our

21        monsters were based on some combination of animals. *But what do*

22        ***emotions look** like*? Or abstract thought? Or the subconscious? Here
we had *nothing to measure against*, *nothing **concrete*** to tell us when

23        we'd got it right.

24   Daniels, however, had solved the problem of how to take the abstract idea of

25   emotions and make them concrete when she created *The Moodsters*. And she

26   shared that idea with Disney·Pixar.

27        77.    Docter, and his team at Disney·Pixar, also struggled to identify

28   which emotions to include as characters, and how many emotions to feature.

      SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

78.     For example, Docter and Disney·Pixar have maintained that they researched the issue of how many emotions exist, and determined that there is no consensus in the scientific community on that issue. Some scientists told Docter and Disney·Pixar that there were only three basic main emotions. Others maintained there were 16 emotions.

79.     At various points in the development of the script, Disney·Pixar included more than five emotions. For instance, Disney·Pixar considered using at least pride, hope, envy, ennui, schadenfreude, awe, surprise, amusement, and compassion. At one point, Disney·Pixar considered having 27 different emotions.

80.     Disney·Pixar ultimately settled on five emotions as characters—the same number of emotions as characters in *The Moodsters*.

81.     Four of the five emotions as characters in *Inside Out* are identical to the characters in *The Moodsters*: Happy/Joy, Sadness, Fear, and Anger.

### Disney·Pixar Released *Inside Out* in 2015

82.     Disney·Pixar released *Inside Out* in the United States on June 19, 2015.

83.     *Inside Out* is a movie that primarily takes place deep down inside an 11-year old girl, named Riley.

84.     The five main characters in *Inside Out* are based on the following single emotions: joy/happiness; sadness, anger; fear; and disgust.

85.     Each of these main characters is an anthropomorphic, color-coded animated character representing a single emotion.

86.     The Joy character is reflected in the color yellow. "Hope and optimism dictate all of her decisions."

SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7



8   87.   The Sadness character is reflected in the color blue. "Sometimes it
9   seems like the best thing to do is just lie on the floor and have a good cry."

10
11
12
13
14
15
16



17   88.   The Anger character is reflected in the color red. "He has a fiery
18   spirit and tends to explode (literally) when things don't go as planned." He is
19   quick to overreact and has little patience for life's imperfections.

20
21
22
23
24
25
26



27   89.   The Fear character is reflected in the color purple. "He is
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

constantly on the lookout for potential disasters." "There are very few activities and events that Fear does not find to be dangerous and possibly fatal."



90.    The Disgust character is reflected in the color green. "Her job is to keep Riley from being poisoned, physically or socially."



91.    Disney·Pixar invested significant resources into the development of *Inside Out*. The production budget for *Inside Out* was over $170,000,000.

92.    This investment has paid off for Disney·Pixar. *Inside Out* was a huge success at the box office.

93.    Disney·Pixar generated gross revenue at the box office for *Inside Out* of over $350,000,000 domestically and over $850,000,000 worldwide. Total domestic and international ticket and DVD sales exceed $950 million.

94.    *Inside Out* was also lauded by critics. Some film critics praised *Inside Out* for its novelty and originality. Anthony Lane of the *New Yorker*, for

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

instance, wrote "On the scale of inventiveness, 'Inside Out' will be hard to top this year."

95.    Disney·Pixar continues to promote *Inside Out* as an "inventive" and "groundbreaking" animated film.

96.    One reason *Inside Out* is considered so novel, creative, and inventive is because Disney·Pixar had never before released an animated feature that anthropomorphized emotions as individual characters.

97.    None of the three *Toy Story* movies, for instance, incorporate anthropomorphized emotions. Nor do any characters in that trilogy represent a single emotion which corresponds to a single color.

98.    *Cars* and *Cars 2* are the same in this regard. None of the characters in these movies feature anthropomorphized emotions. And none of the characters represents a single emotion which corresponds to a single color.

99.    *Monsters Inc.* was the first major motion picture that Docter directed. The characters in that movie, along with *Monsters University*, do not include anthropomorphized emotions. Nor does any single character represent a single emotion which corresponds to a single color.

100.   The remainder of Pixar's movies that pre-date *Inside Out* are no different. *A Bug's Life*, *Finding Nemo*, *The Incredibles*, *Ratatouille*, *WALL-E*, *Brave*, and *Up*, are movies that do not include anthropomorphized emotions, nor characters that represent a single emotion which correspond to a single color.

101.   The Walt Disney Company, including through Walt Disney Studios, has released over 75 animated films since *Snow White and the Seven Dwarfs* in 1938.

102.   The Walt Disney Company, including through Walt Disney Studios, has never released an animated feature film that anthropomorphized emotions as characters.

103.   The Walt Disney Company, including through Walt Disney

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Studios, has never distributed a film with a main character that represented a single emotion which corresponds to a single color.

104.   Disney·Pixar's single-emotion characters diverged from what made The Walt Disney Company so acclaimed. In its beginning, The Walt Disney Company established a new form of art through its early efforts at animation, which focused on bringing to life cartoon characters. As explained in Disney's *The Illusions of Life, Disney Animation*, by Frank Thomas and Ollie Johnson, "this new art of animation had the power to make the audience actually feel *the emotions* of a cartoon figure," with each character "thinking his own thoughts, and *experiencing his own emotions.*" The well-rounded and multi-dimensional nature of Disney's characters was foundational to what made Disney so famous and successful: "From the beginning, it was obvious that *the feelings of the characters* would be the heart and soul of the Disney pictures."

105.   Disney·Pixar's single-emotion, color-coded characters in *Inside Out*, therefore, was not something that Disney·Pixar had done before.

106.   Disney·Pixar continues to enjoy the success of *Inside Out*.

107.   For instance, Disney·Pixar has generated gross revenue in excess of $100,000,000 for DVD and Blu-ray sales of *Inside Out*. And *Inside Out* was the fourth most downloaded film on iTunes in 2015. Disney·Pixar has distributed, and continues to distribute, *Inside Out* by DVD, Blu-ray, and Internet-based downloads and streams.

108.   Disney·Pixar also generates significant revenue from *Inside Out* toys, books, and other merchandise.

109.   Some of this merchandise attempts to capitalize on the perception that *Inside Out* teaches kids about emotional intelligence. For example:

SECOND AMENDED COMPLAINT

  

110.   Disney·Pixar would not have enjoyed the extreme success it has had from *Inside Out* without its use of anthropomorphized emotions as its main characters. Specifically, as is the case with *Inside Out*, characters are the most valuable part of an animation property, as they drive the story and become merchandisable entities.

## Count 1

## Breach of Implied-in-Fact Contract

111.   Daniels repeats and reallege all allegations set forth above in paragraphs 1-110 as if they were stated in full and incorporated herein.[6]

112.   Daniels is the exclusive owner of the original idea underlying *The Moodsters*.

113.   Daniels was aware and relied on customs and practices in the entertainment industry when she approached Disney·Pixar about a partnership. Specifically, it is common and custom in the entertainment industry for creators to provide ideas and materials to producers and studios in exchange for

---

[6] Plaintiff recognizes that the Court has dismissed this claim without leave to amend. Dkt. #47. Plaintiff includes this claim and the allegations (as pleaded in the First Amended Complaint) in order to preserve the claim for appellate review, and to ensure that there is no basis for a claim of waiver.

SECOND AMENDED COMPLAINT

compensation and credit if such ideas or materials are later used.

114. Under the circumstances, Daniels disclosed her ideas regarding *The Moodsters* to Disney·Pixar, as is custom and common in the entertainment industry, with a reasonable expectation that Disney·Pixar would compensate Daniels if Disney·Pixar used their ideas. Thus, Daniels, individually and through her team at The Moodsters Company, provided ideas and materials to Disney·Pixar for sale in exchange for compensation and credit if Disney·Pixar used such ideas or materials.

115. Under the circumstances, and consistent with the custom and common practice in the entertainment industry, Disney·Pixar accepted the disclosure of the ideas in *The Moodsters* with an expectation that it would have to compensate Daniels and The Moodsters Company if Disney·Pixar used this idea in any television, motion picture, merchandise, or otherwise.

116. Neither before nor after any disclosure of ideas and materials did Disney·Pixar ever tell Daniels, or anyone with her team at The Moodsters Company, that it may use the ideas and materials provided to Disney·Pixar without compensation to Daniels and The Moodsters Company.

117. Nor did Disney·Pixar ask or require Daniels or her team at The Moodsters Company to sign a release before accepting the disclosure of ideas and materials about *The Moodsters*. And yet Disney·Pixar does so in other circumstances. For instance, Disney hosts a writing program that solicits original pilot scripts from aspiring writers. One of the requirements for the program includes a release form that the applicant must sign and attest that "I waive any right I may have to assert against [Program Writers on Disney |ABC Television Group (DATG)] and/or the DATG Entities any claim based on *copyright*, trademark, infringement, confidential relationship, *implied contract*, unfair competition, *idea theft* or otherwise arising out of any alleged use by DATG and/or the DATG Entities of the Project, or any element thereof."

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Daniels and her team at The Moodsters Company were not asked to sign such a release, and would not have signed such a release (or any comparable one) as a precondition for the disclosure of ideas and materials about *The Moodsters*.

118.   Based on the circumstances described above, Daniels, and Disney·Pixar have an implied-in-fact contract that requires Disney·Pixar to compensate and credit Daniels and The Moodsters Company for the use of any ideas or materials that Daniels and her team disclosed to Disney·Pixar.

119.   Disney·Pixar has used Daniels' ideas as shown in *The Moodsters*, which includes a collection of anthropomorphized, color-coded, single-emotion characters through the release and sale of *Inside Out*, and the sale of *Inside Out* merchandise. Disney·Pixar has not compensated Daniels for this use.

120.   As a result, Disney·Pixar has materially breached, and continues to materially breach, this implied-in-fact contract.

121.   Daniels has sustained, and continues to sustain, damages as a result of Disney·Pixar's material breach. Damages for this harm will be in an amount proven at trial.

### Count 2

### Copyright Infringement (Ensemble of Characters)

122.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-121 as if they were stated in full and incorporated herein.

123.   Congress enacted the Copyright Act to stimulate artistic creativity for the general public good. To achieve this goal, the Copyright Act grants artists the exclusive right to the original expression in their works, which provides them a financial incentive to create works that enrich our culture.

124.   Disney·Pixar recognizes the importance of copyrights to its business. In its 2016 Annual Report to investors, for instance, Disney·Pixar explains that "[t]he success of our businesses is highly dependent on the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   existence and maintenance of intellectual property rights in the entertainment

2   products and services we create."

3       125.   Disney·Pixar is famous for aggressively protecting its works—and

4   specifically its animated characters—by copyright.

5       126.   In 1998, for instance, Disney lobbied heavily for an act—which is

6   often referred to as the Mickey Mouse Protection Act—that extends the term of

7   copyright protection. Professor Thomas Bell's chart shows "the Mickey Mouse

8   curve," which reflects Disney's efforts to extend the duration of copyright terms

9   every time Disney's copyright on Mickey Mouse is near expiration:



22      127.   Disney·Pixar has also sought to protect the five-color coded, single

23  emotion characters in *Inside Out* by copyright.

24      128.   Disney·Pixar, for example, sells merchandise with the *Inside Out*

25  characters, and provides notice to the world that these characters are protected

26  by copyright:

SECOND AMENDED COMPLAINT






129.   But the Copyright Act does not discriminate between large and small artists. Copyright law applies equally to large companies, like Disney·Pixar, and smaller ones, like The Moodsters Company.

130.   The Moodsters Company, therefore, brings Count 2, along with Counts 3-6, to hold Disney·Pixar accountable for its copyright infringement of *The Moodsters* characters.

**The Moodsters Company's Ownership of the Copyrights in *The Moodsters***

131.   The Moodsters Company registered the pilot episode of *The Moodsters* with the United States Copyright Office on July 27, 2007 (registration number PA 1-394-057). *See* Ex. 4.

132.   The Moodsters Company registered an initial version of *The Moodsters'* Bible with the United States Copyright Office (registration number TX 8-389-829) as well.[7]

133.   *The Moodsters*, as reflected in *The Moodsters'* Bible and Pilot, is an original work of authorship fixed in a tangible means of expression that is

---

[7]   The Moodsters Company revised and updated *The Moodsters* Bible from 2005-2008. *See, e.g.,* Exs. 5-7.

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

subject to copyright protection under the Copyright Act.

134.   The Moodsters Company is the exclusive owner of all copyrights in *The Moodsters* Bible and *The Moodsters* Pilot.

135.   The Moodsters Company's exclusive rights extend to all protectable components of *The Moodsters* described above, which includes the characters (and the ensemble of characters) in *The Moodsters*.

136.   The Moodsters Company's exclusive rights in *The Moodsters* includes the right to create derivative works.

137.   The characters in *The Moodsters* express the idea of using single emotions as characters in an entertainment program.

**The Ensemble of Moodsters Characters is Protected by Copyright**

138.   The ensemble of Moodsters characters is protected by copyright. This group of characters is fundamentally original—the *sine qua non* of copyright law.

139.   While Daniels conceived of *The Moodsters* in the early 2000s, the ensemble of Moodsters characters was created, for purposes of copyright law, no later than 2005 when they appeared and were described in *The Moodsters* Bible. Those characters were further refined and developed in *The Moodsters* Pilot episode in 2007. In both *The Moodsters* Pilot and Bible, the ensemble of characters was fixed in a tangible medium of expression.

140.   The ensemble of Moodsters characters is protected by copyright under either the three-part test applied for animated characters, or the "story being told" standard.

141.   Under the Ninth Circuit's three-part test, characters are protected by copyright if they (1) have physical as well as conceptual qualities; (2) are sufficiently delineated to be recognizable as the same character whenever they appear; and (3) are especially distinctive and contain some unique elements of expression.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Moodsters characters have physical and conceptual qualities**

142.   The ensemble of Moodsters characters is not a set of mere literary characters. Rather, the ensemble describes and reflects conceptual characteristics of the characters, as set forth and described in this Second Amended Complaint, and the characters are depicted graphically as well. They demonstrate physical as well as conceptual qualities as a result.

**Moodsters characters are sufficiently delineated**

143.   The traits and attributes of the ensemble of Moodsters characters, as reflected in *The Moodsters* Bible and Pilot, sufficiently delineate these characters so that they are recognizable whenever they appear. These traits and attributes include: a collection of five anthropomorphic animated characters; each character designated by a single emotion, and those emotions being happiness, sadness, anger, fear, and love; each character designated by a core body color, with those colors being yellow, blue, red, green, and pink; each character represented by a single emotion is paired with a single color, including yellow and happiness, blue and sadness, red and anger, green and fear, and pink and love; the collection of characters generally interact as a cohesive group together; the characters are not human but have traits and characteristics of human, are not androgynous, and are not animals or objects; this ensemble of characters reside inside a child; and the traits and attributes of each individual character as set forth throughout this Second Amended Complaint, and the paragraphs below in ¶¶179-92. Based on the expression of these traits and attributes and as they are depicted graphically, the ensemble of Moodsters characters is recognized wherever they appear.

144.   The traits in the paragraph above have persisted through—and after—the pilot episode in 2007.

145.   The ensemble of Moodsters characters is not lightly sketched in the Bible or the Pilot episode. The graphical depictions of the characters are custom

SECOND AMENDED COMPLAINT

designs based on Daniels' conceptualization. These designs were further refined in the two-dimensional drawings in the Bible, and then further detailed through a professional production of the Pilot featuring three-dimensional computer-generated imagery (CGI).

146.   Substantial resources were devoted to *The Moodsters* characters. For instance, over $3.3M was invested in Moodsters Co. The primary business focus of Moodsters Co. was the development and licensing of an entertainment program, toys, books, and other items centered on the ensemble of Moodsters characters, in order to build a multi-media educational and entertainment platform for children.

147.   The characters in *The Moodsters* Pilot episode were further refined through the professional and academic guidance and analysis from Professor Bracket and his colleague, Professor Susan E. Rivers. Through their work, as preeminent experts in the field of emotional intelligence and co-founders of the Yale Center for Emotional Intelligence, they advised Moodsters Co. about the script and attributes and traits of the characters, including suggesting facial expressions and dialogue for particular characters based on their review and interpretation of scientific research on emotions.

148.   Part of their work included focus groups with children and their parents, across socioeconomic backgrounds, who watched a version of the Pilot. The results demonstrated that children understood and enjoyed the show. 96% of children liked the show, and 82% said they wanted to watch more shows about *The Moodsters*. Parents liked *The Moodsters* as well.

149.   The focus groups demonstrated that the children liked *The Moodsters* characters. Specifically, 100% of respondents liked the Fear character; 92% liked the Happy character; 88% liked the Anger character; 88% liked the Sadness character; and 88% liked the Love character.

150.   Professor Brackett later wrote a letter of support for the *The*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

1   *Moodsters* because he believed that *The Moodsters* had the potential to make a

2   significant difference in the personal and social lives of millions of children. Ex.

3   8.

4      151.   Unlike lightly sketched characters in a literary screenplay, *The*

5   *Moodsters* characters were assessed and tested by preeminent experts at Yale

6   University.

7      152.   The late Dr. Pert, the internationally recognized neuroscientist and

8   author of the book *Molecules of Emotion*, reviewed materials about the *The*

9   *Moodsters* characters, and concluded that "The Moodsters are literally teaching

10  children to control their own brain chemistries."

11     153.   Moodsters Co. also discussed *The Moodsters* characters, including

12  the merchandising potential of *The Moodsters* characters, with a number of

13  major entertainment, toy, and publishing companies. These companies

14  included Disney, PBS, Toys "R" Us, Nickelodeon, Scholastic Publishing,

15  Manhattan Toy Company, among others. Internal research conducted at the

16  Moodsters Company in 2007 demonstrated that the licensing industry

17  accounted for approximately $180 billion in worldwide retail sales, of which

18  character licensing accounted for $41 billion of those sales. Nonetheless, the

19  dominance of Disney and Nickelodeon in media for the relevant demographic

20  affected the ability of other market entrants, such as the Moodsters Co., to

21  place products at retail. Moodsters Co., therefore, sought a partnership with the

22  companies above to bring *The Moodsters* characters to market.

23     154.   None of the companies listed above expressed critique or concern

24  that *The Moodsters* characters were generic, lightly sketched, lacked distinctive

25  qualities, or were otherwise not sufficiently delineated as a specific, unique, and

26  original group of characters. To the contrary, Moodsters Co. received positive

27  feedback about the uniqueness of *The Moodsters* characters.

28     155.   Moodsters Co. has also retained Professor Maureen Furniss to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

serve as an expert witness in connection with this matter. Professor Furniss is a senior faculty member and the program director of Experimental Animation at California Institute of the Arts (CalArts), where she teaches a range of animation history courses. Her curriculum vitae is attached as Exhibit 9. If given the opportunity to complete an analysis and testify in this action, Professor Furniss would expound on and opine that *The Moodsters* characters are sufficiently developed to establish the characters' agency to engage and drive a narrative or story.

156.   While Moodsters characters, along with their unique and original traits and attributes, were introduced in the Bible and Pilot, *The Moodsters* characters continue to this day. A second generation of *The Moodsters* characters were developed in the 2012-13 time frame. These characters are shown below:



SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Updated versions of animated characters is common in the industry; Mickey Mouse is a good example. By 2015, various products, including toys and books featuring *The Moodsters* characters, became available for sale at Target, and then later on national and international platforms such as Amazon.com, Toys "R" Us, Walmart, Barnes and Noble, AAFES (Army Air Force Exchanges), and JCPenney. For instance



Before these Moodsters character products were available for sale, moreover, thousands of Moodsters toys and books were donated to schools, disaster relief programs, NGOs, and children's hospitals.

157.   The second generation Moodsters characters above have been recognized with a number of awards and recognitions, such as through the Parents' Choice Foundation, the 2015 National Parenting Publications Awards

(Bronze Winner), The National Parenting Center Seal of Approval, and 2016 Dr. Toy 100 Best:

   

The second generation Moodsters characters above have also been featured by MSN.com, The Today Show, *The Huffington Post*, KTLA5, Macaroni Kid, and Latina.com, among other media outlets and organizations.

158.   The following traits and attributes from the first generation of Moodsters characters have persisted in the second generation: collection of five anthropomorphic animated characters; each character designated by a single emotion, and those emotions being happiness, sadness, anger, fear, and love; each character designated by a core body color, and those colors being yellow, blue, red, green, and pink; each character has a single-emotion paired with a single color, including yellow and happiness, blue and sadness, red and anger, green and fear, and pink and love; the collection of characters generally interact as a cohesive group together; the characters are not human but have traits and characteristics of humans, and which are not animals or objects; and the traits and attributes of each individual character as set forth throughout this Second Amended Complaint.

### The Ensemble of Moodsters Characters is Especially Distinctive

159.   The ensemble of Moodsters characters is not a collection of stock characters.

160.   Stock characters have an important historical background in animated films. If given the opportunity to complete an analysis and testify in

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

this action, Professor Furniss will provide this historical perspective of the role of the stock character. In short, in the earliest years of animation, it was common for films to have several groups of multiple characters, such as dogs and lions, which were not differentiated visually or otherwise. In other words, all dogs were identical. A well-known example of stock characters is from the Fleischer studio's production of *Snow White* in 1933. This version of *Snow White*, four years before Disney's version, featured Betty Boop in the role of *Snow White*. The film also included seven dwarfs. But unlike Disney's version of the dwarfs most people are familiar with today, these dwarfs were all identical looking. They had no original or unique traits or attributes. These dwarfs were stock characters.

161.   Disney was one of the first animation studios to break away from stock characters. In 1937, for instance, Disney released its version of *Snow White and Seven Dwarfs*. Unlike the Fleischer version, Disney made each dwarf its own distinctive character. While the dwarfs are similar in terms of size and shape, their personalities come through their named attributes; for example, the Sneezy dwarf is always sneezing and the Bashful dwarf is very shy. Notably, these individualized traits and characteristics come through in the movie. Nevertheless, the individual dwarfs are not always instantly recognizable to the ordinary observer, as some times in the film they looked indistinguishable, such as shown below:



162.   The seven dwarfs in Disney's *Snow White* are an example of animated characters protected by copyright.

163.   The ensemble of Moodsters characters is not a set of stock characters. Each character is unique and individual, and the ensemble of those characters is unique and individual as a group. As set forth above, Disney had never before distributed a film or show that featured a collection of five animated characters that each represented a single emotion, let alone a collection of single-emotion characters with the particular traits and attributes of *The Moodsters* characters.

164.   Moodsters Co. is not aware of any other previous animated works that featured a collection of five characters each represented by a single emotion. Nor is it aware of any previous animated works that featured five characters that each represented a single emotion that included the emotions of happiness, sadness, anger, fear, and love. Moodsters Co. is similarly unaware of any previous animated works that featured five characters each representing a single emotion and designated by core body colors linked to each emotion, including yellow for happiness, blue for sadness, red for anger, green for fear, and pink for love. Furthermore, as set forth in paragraphs 179-92 below, there are a range of options for expressing the idea of single emotion characters; the particular attributes and traits associated with *The Moodsters* characters underscore the uniqueness of these characters. For these reasons, among others, the ensemble of Moodsters characters are not general, stereotypical, or stock characters. To the contrary, the originality of these characters distinguish this ensemble from ensembles of characters outside of *The Moodsters*, which renders *The Moodsters* characters especially distinctive and containing unique elements of expression.

165.   Professor Furniss agrees with the allegations set forth in paragraph 164 based on her analysis to date. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will further analyze and opine on the history of animated works, and address the unique elements of

expression and especially distinctive characteristics of the collection of Moodsters characters compared to other characters in works that predated *The Moodsters*.

**The Ensemble of *The Moodsters* Characters is the Story Being Told**

166.   The ensemble of Moodsters characters is protected by copyright because the ensemble is the story being told.

167.   The story arc for Moodsters Co.'s episodes featuring *The Moodsters* characters, including in the Pilot and as set forth in the Bible, confirm that this ensemble is the story being told. The title of the program *is* the characters: *The Moodsters*. The story arc for each episode with *The Moodsters* ensemble involves some event, which causes emotional reactions to the event, and then an understanding of the emotion and how to manage that feeling. The "event" is collateral to the ensemble of characters. Neither the pilot episode, nor any of the proposed future episode story lines, would make sense without the ensemble of Moodsters characters. *The Moodsters only* exists because of *The Moodsters* characters.

**Disney·Pixar's *Inside Out* Infringes Moodsters Co.'s Copyright**

168.   Disney·Pixar had access to *The Moodsters* before it started working on the movie *Inside Out* in 2010.

169.   Nancy Kanter had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

170.   Paula Rosenthal had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

171.   Rich Ross had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

172.   Thomas Staggs had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

173.   Roy E. Disney had access to *The Moodsters* before Disney·Pixar

Robins Kaplan LLP
ATTORNEYS AT LAW
LOS ANGELES

started working on the movie *Inside Out* in 2010.

174.   Pete Docter had access to *The Moodsters* before Disney·Pixar started working on the movie *Inside Out* in 2010.

**Disney·Pixar's *Inside Out* Copied *The Moodsters* Ensemble of Characters**

175.   Disney·Pixar's *Inside Out* infringes protectable and original components of *The Moodsters*, including the expression of a collection of five, anthropomorphized, color-coded, single emotion characters as represented in *The Moodsters*, specifically, the ensemble of the Happy character, the Sadness character, the Anger character, the Fear character, and the Love character.

176.   The expressive elements of the ensemble of characters in *The Moodsters* include but are not limited to: a collection of anthropomorphized animated characters, with each character designated by a single emotion, and those emotions being happiness, sadness, anger, fear, and love; with each character desiganted by a core body color, and those colors being yellow, blue, red, green, and pink; with each character having a single emotion paired with a core body color, including characters pairing yellow and happiness, blue and sadness, red and anger; the collection of characters generally interact as a cohesive group; these characters are not human but have traits and characteristics of humans, they are not androgynous, and they are not animals or objects; the collection of characters reside inside a child; and the traits and attributes of each individual character as set forth throughout this Second Amended Complaint.

177.   These elements, individually and as a selection, coordination, and arrangement, are protectable and original elements of The Moodsters Company's copyright in *The Moodsters*, as set forth in the ensemble of characters.

178.   To be sure, neither these elements in paragraph 176—individually or as a combination—nor the ensemble of characters in full can be considered

SECOND AMENDED COMPLAINT

*scènes à faire. Scènes à faire* is a doctrine in copyright law that refers to the notion that less copyright protection is afforded to expressions that are practically indispensable or standard in the treatment of a topic. *Scènes à faire* is literally translated to "scenes which must be done."

### Anthropomorphic Emotions as Characters

179.   As a threshold matter, Disney·Pixar has never before anthropomorphized emotions as an ensemble of characters in any of its major motion pictures.

180.   Nor do Disney's short films serve as an example of anthropomorphizing emotions as characters. Disney's short film *Reason and Emotion* (1943) demonstrates an attempt at personifying abstractions, like the ability to think and feel, but it does not portray single emotions as characters. In this short film, the Reason character is defined as the ability to think, and the Emotion character is defined as the ability to feel.



Neither of the main characters represents a singular emotion. To the contrary, as the short film depicts Hitler in Nazi Germany, the Emotion character expresses at least the emotions of fear, pride, hate, and sympathy. Thus, while *Reason and Emotion* does not feature single emotion characters, it confirms that a variety of approaches and options exist to personify abstractions, as set forth

SECOND AMENDED COMPLAINT

further below.

181.   More fundamentally, however, that Disney·Pixar, the world's most recognized and successful company that makes and distributes animated films, had never before expressed the idea of an ensemble of single emotions as characters supports the conclusion that there is no indispensable or standard treatment of how these characters should be grouped, colored, located, or depicted.

182.   It was not indispensable or standard for an entertainment program about single-emotion characters to use *The Moodsters* anthropomorphic figures with human traits and characteristics. For instance, other artists had previously attempted to portray abstract concepts (although not emotions) through live-action (as opposed to animation) human characters inside a person's head. The television show *Herman's Head* (four human characters represented different aspects of the main character's personality); the 2015 Japanese movie, *Poison Berry in my Brain* (a 30-year-old woman had five different human characters in her head that governed her actions); and, Disney's *Cranium Command* ride at Epcot Theme Park (different parts of the body were represented by human characters) are examples:



183.   Nor was *The Moodsters* or Disney·Pixar limited to live-action

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

characters as a means to personify emotions. For instance, the characters representing emotions could have been depicted as animals:



| Happy | Sadness | Anger | Fear | Love |

Alternatively, *The Moodsters* or *Inside Out* characters could have been expressed as inanimate objects brought to life, as Disney·Pixar is famous for in its *Toy Story* and *Cars* series of movies. And yet another option would have been to express the emotions as some real-world phenomena or occurrence:



| Happy | Sadness | Anger | Fear | Love |

Emotions, as abstract concepts, are neither male nor female. Even Disney·Pixar's own consultant for *Inside Out*, Professor Dacher Keltner, acknowledged that Disney·Pixar considered androgynous characters, which Keltner considered more realistic. But Disney·Pixar decided to use male and female characters, as with *The Moodsters* characters.

184.   Docter's admission that expressing abstract emotions was challenging for him confirms that anthropomorphizing emotions as animated characters in *The Moodsters* was not standard or generic in any way.

**Selection and Expression of Particular Emotions**

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

185.   It was not indispensable or standard for an entertainment program with emotions as characters to use happiness, sadness, anger, fear, and love as the emotions to serve as characters, as in *The Moodsters*. For instance, Disney·Pixar considered a number of other emotions to select in *Inside Out*, including pride, hope, envy, ennui, schadenfreude, awe, surprise, confusion, among others.

186.   The scientific community, as acknowledged by Disney·Pixar, lacks a consensus on the identification of emotions. By way of example, Professors Andrew Ortony and Terence Turner compiled several different theorists' lists of emotions in their article *What's Basic About Basic Emotions?*, published in PSYCHOLOGICAL REVIEW in 1990. These lists varied widely. One theorist, for instance, identified only happiness and sadness. Another theorist listed anger, aversion, courage, dejection, desire, despair, fear, hate, hope, love, and sadness. Others had their own variations on the total number of emotions, as well as the particular identification of emotions. Disney·Pixar has recognized that another theorist identified 27 emotions. Disney·Pixar's own consultant for *Inside Out*, Keltner, believes there are 20 emotions. And Aristotle set forth his list of emotions in Book II of *Rhetoric*, in which he identified anger, mildness, love, emnity, fear, confidence, shame, shamelessness, benevolence, pity, indignation, envy, emulation, and contempt.

187.   Another option for selecting emotions as characters was one explained by Keltner. For instance, Keltner suggested that he hopes a sequel to *Inside Out* will feature Riley as an 18-year-old girl with the following emotions as characters: sexual desire, triumph, awe, and amusement. Such a suggestion further confirms that it was not indispensable or standard for a work about emotions to use happiness, sadness, anger, fear, and love as the emotions to serve as characters, as in *The Moodsters*.

**Selection and Expression of the Number of Emotions**

SECOND AMENDED COMPLAINT

188.   It was not indispensable or standard to an entertainment program with emotions as characters to select five emotions as the number of emotions to use as characters. For instance, Disney·Pixar considered a range of numbers of emotions for *Inside Out*, including upwards of at least 27 different emotions. And as set forth above, there is significant dispute and uncertainty as to how many emotions exist. It cannot be the case, therefore, that an entertainment program with emotions as characters would be naturally or inherently limited to five emotions.

### Use and Expression of a Core Color per Emotion

189.   It was not indispensable or standard to an entertainment program with emotions as characters to designate each character with a core color. For instance, emotions are frequently expressed in today's culture without *any* unique color associated with a particular emotion:

    

In July 2017, for instance, Sony Pictures Animation released *The Emoji Movie*, which featured emoticons as characters.

190.   Nor was it indispensable or standard for *The Moodsters* to select particular colors to correspond with particular emotions. Dr. Seuss' well-known and popular *My Many Colored Days* book is emblematic. Dr. Seuss wrote this book in 1973 about feelings and moods. Unlike *The Moodsters'* (and *Inside Out*'s) Anger character who is red, *My Many Colored Days* portrays a red horse to show how "good it feels" to be a horse. And blue does not portray sadness; purple does. Blue instead demonstrates optimism as a bird "flap[s] my wings." Happy days are not yellow but pink, and anger is depicted with a black bear. Dr. Seuss' book confirms that the particular selection of colors that match

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

characters as in *The Moodsters* is not something that "must be done" or that which is indispensable or standard to the work.

191.   The particular expression of the idea in *The Moodsters* to assign core colors with single emotion characters (*i.e.*, yellow for happiness, blue for sadness, red for anger, green for fear, and pink for love) was not generic, indispensable, or standard, particularly because of the limited and particular emotions that were selected. For instance, red could be associated not only with anger, but also with love and lust. Blue could represent sadness, as well as trust and peace. And yellow can represent happiness, as well as cowardice which is a trait based on fear. The originality of the selection of particular colors, therefore, must be considered in connection with the use of a core color per emotion as well as the original selection of a limited, specific set of emotions. For instance, if Disney·Pixar had used 27 different emotions as characters (as it had considered), then it would be unable to represent each of those characters by a core, distinctive color.

### The Selection, Coordination, and Arrangement of
### Unique Expressive Elements

192.   The unique expressive elements within the characters of *The Moodsters*, set forth above, are each independently original and not *scènes à faire*. The combination of these unique expressive elements, moreover, is original and anything but indispensable and standard for an entertainment program with emotions as characters. The originality of such elements is reflected in the fact that before *Inside Out*, Disney·Pixar had never before released a film with these combination of elements.

*** 

193.   Disney·Pixar's *Inside Out* copied protectable and original components of The Moodsters Company's copyright in *The Moodsters*, including the ensemble of characters. Disney·Pixar's *Inside Out*, for instance,

SECOND AMENDED COMPLAINT

includes a collection of five anthropomorphized color-coded, single emotion characters, which include Joy (designated by the color yellow); Sadness (designated by the color blue); Anger (designated by the color red); and Fear (designated by the color purple). This ensemble of characters, as set forth herein and in the paragraphs above, is substantially similar to the protectable and original components of the collection of characters in *The Moodsters*.

194.   Third-party information on Amazon.com indicates an overlap in sales of *Moodsters* and *Inside Out* merchanidse. Customers who purchased *The Moodsters* Moodster Meter and Storybook, for example, also purchased the *Inside Out* Box of Mixed Emotions:



195.   Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in *The Moodsters*.

196.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copright Act.

## Count 3
## Copyright Infringement (the Happy character)

SECOND AMENDED COMPLAINT

197.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-196 as if they were stated in full and incorporated herein.

198.   One protectable component within The Moodsters Company's copyright in *The Moodsters* is the Happy character. The Moodsters Company is the exclusive owner to all rights in the copyright to the Happy character of *The Moodsters*, as described above.

199.   The Happy character is an anthropomorphized animated character that represents the single emotion of happiness, and that is designated by the core body color of yellow.

200.   The Happy character is quite optimistic and enthusiastic. The other Moodsters depend on him when things get tough. The Happy character is the leader of *The Moodsters*.

### The Happy Character is Protected by Copyright

201.   The Happy Character of *The Moodsters* is protected by copyright. The Happy character is fundamentally original—the *sine qua non* of copyright law.

202.   The Happy character of Moodsters was created, for purposes of copyright law, no later than 2005 when the character appeared and was described in *The Moodsters* Bible. The Happy character was further refined and developed in *The Moodsters* Pilot episode in 2007. In both *The Moodsters* Pilot and Bible, the Happy character was fixed in a tangible medium of expression.

203.   The Happy character is protected by copyright under both the three-part test applied for animated characters. Under the Ninth Circuit's three-part test, characters are protected by copyright if they (1) have physical as well as conceptual qualities; (2) are sufficiently delineated to be recognizable as the same character whenever they appear; and (3) are especially distinctive and contain some unique elements of expression.

SECOND AMENDED COMPLAINT

**The Happy character from *The Moodsters* has**

**physical and conceptual qualities**

204.   The Happy character of Moodsters is not a mere literary character. Rather, the Happy character describes and reflects conceptual characteristics of the character, as set forth and described in this Second Amended Complaint, and the character is depicted graphically as well. The Happy character demonstrates physical as well as conceptual qualities as a result.

**The Happy character is sufficiently delineated**

205.   The traits and attributes for the Happy character, as reflected in *The Moodsters* Bible and Pilot, sufficiently delineate this character so that the character is recognizable whenever it appears. These traits and attributes include, but are not limited to, the Happy character is an anthropomorphic animated character represented by the single emotion of happiness; the application of yellow as the Happy character's core body color; the Happy character's optimistic and enthusiastic attitude; the leadership role that he maintains within the ensemble of four other characters each represented by the single emotions sadness, anger, fear, and love, and each which is rerpesented by a core body color of blue, red, green, and pink, respectively; that the Happy character is not human but has traits and characteristics of humans, is not androgynous, and is not an animal or object; that the Happy character resides inside a child, along with the other four characters represented by a single emotion and a core body color. Based on the expression of these traits and attributes, and as the Happy character is depicted graphically, the Happy character is recognized wherever it appears.

206.   The traits in the paragraph above have persisted from creation through the pilot episode in 2007.

207.   The Happy character of *The Moodsters* is not lightly sketched in the Bible or the Pilot episode. The graphical depictions of the Happy character are

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1 custom designs based on Daniels' conceptualization. These designs were

2 further refined in the two-dimensional drawings in the Bible, and then further

3 detailed through a professional production of the Pilot featuring three-

4 dimensional computer-generated imagery (CGI).

5     208. Substantial resources were devoted to *The Moodsters* characters,

6 including the Happy character. For instance, over $3.3M was invested in

7 Moodsters Co. The primary business focus of Moodsters Co. was the

8 development and licensing of an entertainment program, toys, books, and other

9 items centered on the ensemble of Moodsters characters, including the Happy

10 character, in order to build a multi-media educational and entertainment

11 platform for children.

12     209. The characters in *The Moodsters* Pilot episode, including the Happy

13 character, was further refined through the professional and academic guidance

14 and analysis from Professor Bracket and his colleague, Professor Susan E.

15 Rivers. Through their work, as preeminent experts in the field of emotional

16 intelligence and co-founders of the Yale Center for Emotional Intelligence, they

17 advised Moodsters Co. about the script and attributes and traits of the

18 characters, including suggesting facial expressions and dialogue for particular

19 characters based on their review and interpretation of scientific research on

20 emotions.

21     210. Part of their work included focus groups with children and their

22 parents who watched a version of the Pilot. The results demonstrated that

23 children understood and enjoyed the show. 96% of children liked the show, and

24 82% said they wanted to watch more shows about *The Moodsters*. Parents liked

25 *The Moodsters* as well.

26     211. The focus groups demonstrated that the children liked *The*

27 *Moodsters* characters. Specifically, 92% liked the Happy character.

28     212. Unlike lightly sketched characters in a literary screenplay, *The*

SECOND AMENDED COMPLAINT

*Moodsters* characters, including the Happy character, was assessed and tested by preeminent experts at Yale University.

213.   Moodsters Co. also discussed *The Moodsters* characters, including the merchandising potential of *The Moodsters* characters, with a number of major entertainment, toy, and publishing companies. These companies included Disney, PBS, Nickelodeon, Scholastic Publishing, Manhattan Toy Company, among others. Internal research conducted at *The Moodsters* Company in 2007 demonstrated that the licensing industry accounted for approximately $180 billion in worldwide retail sales, of which character licensing accounted for $41 billion of those sales. Nonetheless, the dominance of Disney and Nickelodeon in media for the relevant demographic affected the ability of other market entrants to place products at retail. Moodsters Co., therefore, sought a partnership to bring *The Moodsters* characters to market.

214.   None of the companies listed above expressed critique or concern that *The Moodsters* characters in general, or the Happy character specifically, were generic, lightly sketched, lacked distinctive qualities, or were otherwise not sufficiently delineated as a specific, unique, and original group of characters. To the contrary, Moodsters Co. received positive feedback about the uniqueness of *The Moodsters* characters, which included the Happy character.

215.   Moodsters Co. has also retained Professor Maureen Furniss to serve as an expert witness in connection with this matter. If given the opportunity to complete an analysis and testify in this action, Professor Furniss would expound on and opine that the Happy character is sufficiently developed to establish the character's agency to engage and drive a narrative or story.

216.   While Happy character in *The Moodsters* characters, along with his unique and original traits and attributes, was introduced in the Bible and Pilot, the Happy character continues to this day. A second generation of *The Moodsters* characters were developed in the 2012-13 time frame. The Happy

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

character is shown below:



By 2015, various products, including toys and books featuring the Happy character, became available for sale—and were sold—at Target, and then later on national and international platforms such as Amazon.com, Toys "R" Us, Walmart, Barnes and Noble, AAFES (Army Air Force Exchanges), and JCPenney. For instance



Before these Moodsters character products were available for sale, moreover, thousands of Moodsters toys and books, which included the Happy character, were donated to schools, disaster relief programs, NGOs, and children's hospitals

    217.   The following traits and attributes from the first generation of Moodsters characters have persisted in the second generation: the Happy

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

character is an animated character represented by the single emotion of happiness; the application of yellow as the Happy character's core body color; the leadership role that he maintains within the ensemble of four other characters each represented by the single emotions of sadness, anger, fear, and love, and each which is represented by a core body color of blue, red, green, and pink, respectively; that the Happy character is not human but has traits and characteristics of humans, is not androgynous, and is not an animal or object.

### The Happy Character is especially distinctive

218.   The Happy Character in *The Moodsters* is not a stock character.

219.   Stock characters have an important historical background in animated films. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will provide this historical perspective of the role of the stock character. In short, in the earliest years of animation, it was common for films to have several groups of multiple characters, such as dogs and lions, which were not differentiated visually or otherwise. In other words, all dogs were identical. A well-known example of stock characters is from the Fleischer studio's production of *Snow White* in 1933. This version of *Snow White*, four years before Disney's version, featured Betty Boop in the role of *Snow White*. The film also included seven dwarfs. But unlike Disney's version of the dwarfs most people are familiar with today, these dwarfs were all identical looking. They had no original or unique traits or attributes. These dwarfs were stock characters.

220.   Disney was one of the first animation studios to break away from stock characters. In 1937, for instance, Disney released its version of *Snow White and Seven Dwarfs*. Unlike the Fleischer version, Disney made each dwarf its own distinctive character. While the dwarfs are similar in terms of size and shape, their personalities come through their named attributes; for example, the Sneezy dwarf is always sneezing and the Bashful dwarf is very shy. Notably,

SECOND AMENDED COMPLAINT

1    these individualized traits and characteristics come through in the movie.

2    Nevertheless, the individual dwarfs are not always instantly recognizable to the

3    ordinary observer, as some times in the film they looked indistinguishable, such

4    as shown below:



10       221.   The Happy character is not a stock character. The Happy character

11   is unique and individual, and maintains a specific role within the ensemble of

12   Moodsters characters. As set forth above, Disney had never before distributed a

13   film or show that featured a collection of five single-emotion characters, which

14   included a Happy character with the particular traits and attributes of the

15   Happy character in *The Moodsters*.

16       222.   Moodsters Co. is not aware of any other previous animated works

17   that featured a collection of five characters each represented by a single

18   emotion, which included a character represented by the single emotion of

19   happiness. Moodsters Co. is similarly unaware of any previous animated works

20   that featured five characters each represented by a single emotion and

21   designated by core body colors linked to each emotion, of which the Happy

22   character designated by the core body color yellow, interacts cohesively with

23   four other characters each respresented by a single emotion and corresponding

24   core body color. Furthermore, as set forth in paragraphs 179-92 above, there

25   are a range of options for expressing the idea of single emotion characters,

26   including a Happy character; the particular attributes and traits expressed in the

27   Happy character underscore the uniqueness of this character. For these reasons,

28   among others, the Happy character of *The Moodsters* is not a general,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

1   stereotypical, or stock character. To the contrary, the originality of this

2   character distinguishes the Happy character from animated characters outside

3   of *The Moodsters*, which renders the Happy character especially distinctive and

4   containing unique elements of expression.

5      223.   Professor Furniss agrees with the allegations set forth in paragraph

6   222 based on her analysis to date. If given the opportunity to complete an

7   analysis and testify in this action, Professor Furniss will further analyze and

8   opine on the history of animated works, and address the unique elements of

9   expression and especially distinctive characteristics of the collection of

10   Moodsters characters compared to other characters in works that predated *The*

11   *Moodsters*.

12      **Disney·Pixar's *Inside Out* Copied *The Moodsters* Happy Character**

13      224.   Disney·Pixar had access to *The Moodsters*, including the Happy

14   character, before Disney·Pixar started to work on *Inside Out* in 2010.

15      225.   Disney·Pixar's *Inside Out* infringes The Moodsters Company's

16   protectable components of *The Moodsters*, and specifically the Happy character.

17      226.   The unique expressive elements of the Happy character include but

18   are not limited to: an anthropomorphized animated character represented by

19   the single emotion of happiness; the application of yellow as the Happy

20   character's core body color; an expressive optimistic and enthusiastic attitude;

21   the leadership role that he maintains within the ensenble of four other

22   characters, each of which is represented by a single emotion, including sadness,

23   anger, fear and love, and each of which is represented by a core body colore of

24   blue, red, green, and pink, respectively; that the Happy character is not human

25   but has traits and characteristics of humans, is not androgynous, and is not an

26   animal or object; that the Happy character resides inside a child along with the

27   other four characters represented by a single emotion and color.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

 

227.   These elements, individually and as a selection, coordination, and arrangement, are protectable and original elements of The Moodsters Company's copyright in *The Moodsters*, as set forth in the Happy character.

228.   These elements, individually or in combination, are not scènes à faire.

229.   Before *Inside Out*, Disney had never before released a film with an anthropomorphized character that represented the single emotion of happiness/joy, and that was designated by the core body color of yellow.

230.   *Inside Out*'s Joy character is colored yellow, and one of five main characters in the movie. Joy's goal has always been to make sure Riley stays happy. She sees life's challenges as opportunities, and the sad bits as hiccups on the way back to something great. Hope and optimism dictate all of her decisions. Joy is the leader of the other emotions in *Inside Out*, as the other



SECOND AMENDED COMPLAINT

emotions rely on Joy when things get tough.

231.   Disney·Pixar's *Inside Out* copied protectable and original components of The Moodsters Company's copyright in the Happy character in *The Moodsters*. The Joy character in Disney·Pixar's *Inside Out*, as set forth herein and in the paragraphs above, is substantially similar to the protectable and original components of the Happy character in *The Moodsters*.

  

232.   Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable and original components of its copyright in *The Moodsters*, including the Happy character.

233.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copyright Act.

**Count 4**

**Copyright Infringement (the Sadness character)**

234.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-233 as if they were stated in full and incorporated herein.

235.   One protectable component within The Moodsters Company's

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

copyright in *The Moodsters* is the Sadness character. The Moodsters Company is the exclusive owner to all rights in the copyright to the Sadness character of *The Moodsters*, as described above.

236. The Sadness character is an anthropomorphized animated character that represents the single emotion of sadness, and is designated by the core body color of blue.

237. The Sadness character is melancholy, and known to weep copiously. But that's okay, because he knows that it sometimes takes courage to cry.

 

 

**The Sadness Character is Protected by Copyright**

238. The Sadness Character of *The Moodsters* is protected by copyright. The Sadness character is fundamentally original—the *sine qua non* of copyright

SECOND AMENDED COMPLAINT

law.

239.   The Sadness character of Moodsters was created, for purposes of copyright law, no later than 2005 when the character appeared and was described in *The Moodsters* Bible. The Sadness character was further refined and developed in *The Moodsters* Pilot episode in 2007. In both *The Moodsters* Pilot and Bible, the Sadness character was fixed in a tangible medium of expression.

240.   The Sadness character is protected by copyright under both the three-part test applied for animated characters. Under the Ninth Circuit's three-part test, characters are protected by copyright if they (1) have physical as well as conceptual qualities; (2) are sufficiently delineated to be recognizable as the same character whenever they appear; and (3) are especially distinctive and contain some unique elements of expression.

**The Sadness character from *The Moodsters* has**

**physical and conceptual qualities**

241.   The Sadness character of Moodsters is not a mere literary character. Rather, the Sadness character describes and reflects conceptual characteristics of the character, as set forth and described in this Second Amended Complaint, and the character is depicted graphically as well. The Sadness character demonstrates physical as well as conceptual qualities as a result.

**The Sadness character is sufficiently delineated**

242.   The traits and attributes of the Sadness character, as reflected in *The Moodsters* Bible and Pilot, sufficiently delineate this character so that the character is recognizable whenever it appears. These traits and attributes include, but are not limited to, the Sadness character is an anthropomorphic animated character represented by the single emotion of sadness; the application of blue as the Sadness character's core body color; the tendency to cry, slump down on the ground, and maintain a gloomy, pessimistic attitude;

SECOND AMENDED COMPLAINT

the role the Sadness character maintains within the ensemble of four other characters each represented by the single emotions happiness, anger, fear, and love, and each which is rerpesented by a core body color of yellow, red, green, and pink, respectively; that the Sadness character is not human but has traits and characteristics of humans, is not androgynous, and is not an animal or object; that the Sadness character resides inside a child, along with the other four characters represented by a single emotion and a core body color. Based on the expression of these traits and attributes, and as the Sadness character is depicted graphically, the Sadness character is recognized wherever it appears.

243.   The traits in the paragraph above have persisted from creation through—and beyond—the pilot episode in 2007.

244.   The Sadness character of *The Moodsters* is not lightly sketched in the Bible or the Pilot episode. The graphical depictions of the Sadness character are custom designs based on Daniels' conceptualization. These designs were further refined in the two-dimensional drawings in the Bible, and then further detailed through a professional production of the Pilot featuring three-dimensional computer-generated imagery (CGI).

245.   Substantial resources were devoted to *The Moodsters* characters, including the Sadness character. For instance, over $3.3M was invested in Moodsters Co. The primary business focus of Moodsters Co. was the development and licensing of an entertainment program, toys, books, and other items centered on the ensemble of Moodsters characters, including the Sadness character, including the Happy character, in order to build a multi-media educational and entertainment platform for children.

246.   The characters in *The Moodsters* Pilot episode, including the Sadness character, was further refined through the professional and academic guidance and analysis from Professor Bracket and his colleague, Professor Susan E. Rivers. Through their work, as preeminent experts in the field of

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

emotional intelligence and co-founders of the Yale Center for Emotional Intelligence, they advised Moodsters Co. about the script and attributes and traits of the characters, including suggesting facial expressions and dialogue for particular characters based on their review and interpretation of scientific research on emotions.

247.   Part of their work included focus groups with children and their parents who watched a version of the Pilot. The results demonstrated that children understood and enjoyed the show. 96% of children liked the show, and 82% said they wanted to watch more shows about *The Moodsters*. Parents liked *The Moodsters* as well.

248.   The focus groups demonstrated that the children liked *The Moodsters* characters. Specifically, 88% liked the Sadness character.

249.   Unlike lightly sketched characters in a literary screenplay, *The Moodsters* characters, including the Sadness character, was assessed and tested by preeminent experts at Yale University.

250.   Moodsters Co. also discussed *The Moodsters* characters, including the merchandising potential of *The Moodsters* characters,  with a number of major entertainment, toy, and publishing companies. These companies included Disney, PBS, Toys "R" Us, Nickelodeon, Scholastic Publishing, Manhattan Toy Company, among others. Internal research conducted at the Moodsters Company in 2007 demonstrated that the licensing industry accounted for approximately $180 billion in worldwide retail sales, of which character licensing accounted for $41 billion of those sales. Nonetheless, the dominance of Disney and Nickelodeon in media for the relevant demographic affected the ability of other market entrants to place products at retail. Moodsters Co., therefore, sought a partnership to bring *The Moodsters* characters to market.

251.   None of the companies listed above expressed critique or concern

SECOND AMENDED COMPLAINT

that *The Moodsters* characters in general, or the Sadness character specifically, were generic, lightly sketched, lacked distinctive qualities, or were otherwise not sufficiently delineated as a specific, unique, and original group of characters. To the contrary, Moodsters Co. received positive feedback about the uniqueness of *The Moodsters* characters, which included the Sadness character.

252.   Moodsters Co. has also retained Professor Maureen Furniss to serve as an expert witness in connection with this matter. If given the opportunity to complete an analysis and testify in this action, Professor Furniss would expound on and opine that the Sadness character is sufficiently developed to establish the character's agency to engage and drive a narrative or story.

253.   While Sadness character in *The Moodsters* characters, along with his unique and original traits and attributes, was introduced in the Bible and Pilot, the Sadness character continues to this day. A second generation of *The Moodsters* characters were developed in the 2012-13 time frame. The updated Sadness character is shown below:

   

By 2015, various products, including toys and books featuring the Sadness character, became available for sale at Target, and then later on national and international platforms such as Amazon.com, Toys "R" Us, Walmart, Barnes and Noble, AAFES (Army Air Force Exchanges), and JCPenney. For instance

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



Before these Moodsters character products were available for sale, moreover, thousands of Moodsters toys and books, which included the Sadness character, were donated to schools, disaster relief programs, NGOs, and children's hospitals

254.    The following traits and attributes from the first generation Sadness character has persisted in the second generation: the Sadness character is an anthropomorphic animated character represented by the single emotion of sadness; the application of blue as the Sadness character's core body color; the tendency to cry, slump down on the ground, and maintain a gloomy, pessimistic attitude; the role the Sadness character maintains within the ensemble of four other characters each represented by the single emotions happiness, anger, fear, and love, and each which is represented by a core body color of yellow, red, green, and pink, respectively; that the Sadness character is not human but has traits and characteristics of humans, is not androgynous, and is not an animal or object.

### The Sadness Character is Especially Distinctive

255.    The Sadness Character in *The Moodsters* is not a stock character.

256.    Stock characters have an important historical background in animated films. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will provide this historical perspective of the role

SECOND AMENDED COMPLAINT

of the stock character. In short, in the earliest years of animation, it was common for films to have several groups of multiple characters, such as dogs and lions, which were not differentiated visually or otherwise. In other words, all dogs were identical. A well-known example of stock characters is from the Fleischer studio's production of *Snow White* in 1933. This version of *Snow White*, four years before Disney's version, featured Betty Boop in the role of *Snow White*. The film also included seven dwarfs. But unlike Disney's version of the dwarfs most people are familiar with today, these dwarfs were all identical looking. They had no original or unique traits or attributes. These dwarfs were stock characters.

257.   Disney was one of the first animation studios to break away from stock characters. In 1937, for instance, Disney released its version of *Snow White and Seven Dwarfs*. Unlike the Fleischer version, Disney made each dwarf its own distinctive character. While the dwarfs are similar in terms of size and shape, their personalities come through their named attributes; for example, the Sneezy dwarf is always sneezing and the Bashful dwarf is very shy. Notably, these individualized traits and characteristics come through in the movie. Nevertheless, the individual dwarfs are not always instantly recognizable to the ordinary observer, as some times in the film they looked indistinguishable, such as shown below:



258.   The Sadness character is not a stock character. The Sadness character is unique and individual, and maintains a specific role within the ensemble of Moodsters characters. As set forth above, Disney had never before

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

distributed a film or show that featured a collection of five single-emotion characters, which included a Sadness character with the particular traits and attributes of the Sadness character in *The Moodsters*.

259. Moodsters Co. is not aware of any other previous animated works that featured a collection of five characters each represented by a single emotion, which included a character represented by the single emotion of sadness. Moodsters Co. is similarly unaware of any previous animated works that featured five characters each represented by a single emotion and designated by core body colors linked to each emotion, of which the Sadness character designated by the core body color blue, interacts cohesively with four other characters each respresented by a single emotion and corresponding core body color. Furthermore, as set forth in paragraphs 179-92 above, there are a range of options for expressing the idea of single emotion characters, including a Sadness character; the particular attributes and traits expressed in the Sadness character underscore the uniqueness of this character. For these reasons, among others, the Sadness character of *The Moodsters* is not a general, stereotypical, or stock character. To the contrary, the originality of this character distinguishes the Sadness character from animated characters outside of *The Moodsters*, which renders the Sadness character especially distinctive and containing unique elements of expression.

260. Professor Furniss agrees with the allegations set forth in paragraph 259 based on her analysis to date. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will further analyze and opine on the history of animated works, and address the unique elements of expression and especially distinctive characteristics of the collection of Moodsters characters compared to other characters in works that predated *The Moodsters*.

**Disney·Pixar's *Inside Out* Copied *The Moodsters* Sadness Character**

SECOND AMENDED COMPLAINT

261.   Disney·Pixar had access to *The Moodsters*, including the Sadness character, before Disney·Pixar started to work on *Inside Out* in 2010.

262.   Disney·Pixar's *Inside Out* infringes The Moodsters Company's protectable and original components of *The Moodsters*, and specifically the Sadness character.

263.   The unique and original expressive elements of the Sadness character include but are not limited to: an anthropomorphic animated character represented by the single emotion of sadness; the application of blue as the Sadness character's core body color; the tendency to cry, slump down on the ground, and maintain a gloomy, pessimistic attitude; the role that the Sadness character maintains within the ensemble of four other characters each represented by a single emotion, including happiness, anger, and fear, and each of which is represented by a core body color, including yellow, red, and green; that the Sadness character is not human but has traits and charactertistics of humans, is not androgynous, and is not an animal or object; that the Sadness character resides inside a child along with the other four characters represented by a single emotion and a core body color.

264.   These elements, individually and as a selection, coordination, and arrangement, are protectable and original elements of *The Moodsters* Company's copyright in *The Moodsters*, as set forth in the Sadness character.

265.   These elements of expression, individually or in combination, are not *scènes à faire*.

266.   *Inside Out*'s Sadness character is colored blue, and one of five main characters in the movie. Sadness finds it so hard to be positive. Sometimes it seems like the best thing to do is just lie on the floor and have a good cry.

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



267.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in the Sadness character in *The Moodsters*. The Sadness character in Disney·Pixar's *Inside Out*, as set forth herein and in the paragraphs above, is substantially similar to the protectable components of the Sadness character in *The Moodsters*.





268.   Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in the Sadness character of *The Moodsters*.

269.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copyright Act.

**Count 5**

**Copyright Infringement (the Anger character)**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

270.   The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-269 as if they were stated in full and incorporated herein.

271.   One protectable component within The Moodsters Company's copyright in *The Moodsters* is the Anger character. The Moodsters Company is the exclusive owner to all rights in the copyright to the Anger character of *The Moodsters*, as described above.

272.   The Anger character in *The Moodsters* is an anthropomorphized animated character that represents the emotion of anger, and is designated with the core body color of red.

 

 

273.   The Anger character is most likely to blow her top. In fact, when she becomes furious, lightning bolts appear and explode with sparks from her head.

274.   The Anger character expresses the single emotion character of anger.

## The Anger Character is Protected by Copyright

275.   The Anger Character of *The Moodsters* is protected by copyright. The Anger character is fundamentally original—the *sine qua non* of copyright law.

276.   The Anger character of Moodsters was created, for purposes of copyright law, no later than 2005 when the character appeared and was described in *The Moodsters* Bible. The Anger character was further refined and developed in *The Moodsters* Pilot episode in 2007. In both *The Moodsters* Pilot and Bible, the Anger character was fixed in a tangible medium of expression.

277.   The Anger character is protected by copyright under both the three-part test applied for animated characters. Under the Ninth Circuit's three-part test, characters are protected by copyright if they (1) have physical as well as conceptual qualities; (2) are sufficiently delineated to be recognizable as the same character whenever they appear; and (3) are especially distinctive and contain some unique elements of expression.

## The Anger character from *The Moodsters* has physical and conceptual qualities

278.   The Anger character of Moodsters is not a mere literary character. Rather, the Anger character describes and reflects conceptual characteristics of the character, as set forth and described in this Second Amended Complaint, and the character is depicted graphically as well. The Anger character demonstrates physical as well as conceptual qualities as a result.

## The Anger character is sufficiently delineated

279.   The traits and attributes for the Anger character, as reflected in *The Moodsters* Bible and Pilot, sufficiently delineate this character so that the character is recognizable whenever it appears. These traits and attributes

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

include, but are not limited to, the Anger character is an anthropomorphic animated character represented by the single emotion of anger; the application of red as the Anger character's core body color; the tendency to literally explode from the head when most angry; the role the Anger character maintains within the ensemble of four other characters each represented by the single emotions happiness, sadness, fear, and love, and each which is rerpesented by a core body color of yellow, blue, green, and pink, respectively; that the Anger character is not human but has traits and characteristics of humans, is not androgynous, and is not an animal or object; that the Anger character resides inside a child, along with the other four characters represented by a single emotion and a core body color. Based on the expression of these traits and attributes, and as the Anger character is depicted graphically, the Anger character is recognized wherever it appears.

280.   The traits in the paragraph above have persisted from creation through the pilot episode in 2007.

281.   The Anger character of *The Moodsters* is not lightly sketched in the Bible or the Pilot episode. The graphical depictions of the Anger character are custom designs based on Daniels' conceptualization. These designs were further refined in the two-dimensional drawings in the Bible, and then further detailed through a professional production of the Pilot featuring three-dimensional computer-generated imagery (CGI).

282.   Substantial resources were devoted to *The Moodsters* characters, including the Anger character. For instance, over $3.3M was invested in Moodsters Co. The primary business focus of Moodsters Co. was the development and licensing of an entertainment program, toys, books, and other items centered on the ensemble of Moodsters characters, including the Anger character, in order to build a multi-media educational and entertainment platform for children.

SECOND AMENDED COMPLAINT

283.   The characters in *The Moodsters* Pilot episode, including the Anger character, was further refined through the professional and academic guidance and analysis from Professor Bracket and his colleague, Professor Susan E. Rivers. Through their work, as preeminent experts in the field of emotional intelligence and co-founders of the Yale Center for Emotional Intelligence, they advised Moodsters Co. about the script and attributes and traits of the characters, including suggesting facial expressions and dialogue for particular characters based on their review and interpretation of scientific research on emotions.

284.   Part of their work included focus groups with children and their parents who watched a version of the Pilot. The results demonstrated that children understood and enjoyed the show. 96% of children liked the show, and 82% said they wanted to watch more shows about *The Moodsters*. Parents liked *The Moodsters* as well.

285.   The focus groups demonstrated that the children liked *The Moodsters* characters. Specifically, 88% liked the Anger character.

286.   Unlike lightly sketched characters in a literary screenplay, *The Moodsters* characters, including the Anger character, was assessed and tested by preeminent experts at Yale University.

287.   Moodsters Co. also discussed *The Moodsters* characters, including the merchandising potential of *The Moodsters* characters,  with a number of major entertainment, toy, and publishing companies. These companies included Disney, PBS, Toys "R" Us, Nickelodeon, Scholastic Publishing, Manhattan Toy Company, among others. Internal research conducted at the Moodsters Company in 2007 demonstrated that the licensing industry accounted for approximately $180 billion in worldwide retail sales, of which character licensing accounted for $41 billion of those sales. Nonetheless, the dominance of Disney and Nickelodeon in media for the relevant demographic

SECOND AMENDED COMPLAINT

affected the ability of other market entrants to place products at retail. Moodsters Co., therefore, sought a partnership to bring *The Moodsters* characters to market.

288.   None of the companies listed above expressed critique or concern that *The Moodsters* characters in general, or the Anger character specifically, were generic, lightly sketched, lacked distinctive qualities, or were otherwise not sufficiently delineated as a specific, unique, and original group of characters. To the contrary, Moodsters Co. received positive feedback about the uniqueness of *The Moodsters* characters, which included the Anger character.

289.   Moodsters Co. has also retained Professor Maureen Furniss to serve as an expert witness in connection with this matter. If given the opportunity to complete an analysis and testify in this action, Professor Furniss would expound on and opine that the Anger character is sufficiently developed to establish the character's agency to engage and drive a narrative or story.

290.   While Anger character in *The Moodsters* characters, along with her unique and original traits and attributes, was introduced in the Bible and Pilot, the Anger character continues to this day. A second generation of *The Moodsters* characters were developed in the 2012-13 time frame. The updated Anger character is shown below:



ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

By 2015, various products, including toys and books featuring the Anger character, became available for sale at Target, and then later on national and international platforms such as Amazon.com, Toys "R" Us, Walmart, Barnes and Noble, AAFES (Army Air Force Exchanges), and JCPenney. For instance



Before these Moodsters character products were available for sale, moreover, thousands of Moodsters toys and books, which included the Anger character, were donated to schools, disaster relief programs, NGOs, and children's hospitals.

291.   The following traits and attributes from the first generation Anger character has persisted in the second generation: the Anger character being an anthropomorphic animated character represented by the single emotion of anger; the application of red as the Anger character's core body color; the tendency to literally explode from the head when most angry; the role the Anger character maintains within the ensemble of four other characters each represented by the single emotions happiness, sadness, fear, and love, and each which is represented by a core body color of yellow, blue, green, and pink, respectively; that the Anger character is animated, not human but has traits and characteristics that are, not androgynous, and not an animal or object.

**The Anger Character is Especially Distinctive**

292.   The Anger character in *The Moodsters* is not a stock character.

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

293.   Stock characters have an important historical background in animated films. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will provide this historical perspective of the role of the stock character. In short, in the earliest years of animation, it was common for films to have several groups of multiple characters, such as dogs and lions, which were not differentiated visually or otherwise. In other words, all dogs were identical. A well-known example of stock characters is from the Fleischer studio's production of *Snow White* in 1933. This version of *Snow White*, four years before Disney's version, featured Betty Boop in the role of *Snow White*. The film also included seven dwarfs. But unlike Disney's version of the dwarfs most people are familiar with today, these dwarfs were all identical looking. They had no original or unique traits or attributes. These dwarfs were stock characters.

294.   Disney was one of the first animation studios to break away from stock characters. In 1937, for instance, Disney released its version of *Snow White and Seven Dwarfs*. Unlike the Fleischer version, Disney made each dwarf its own distinctive character. While the dwarfs are similar in terms of size and shape, their personalities come through their named attributes; for example, the Sneezy dwarf is always sneezing and the Bashful dwarf is very shy. Notably, these individualized traits and characteristics come through in the movie. Nevertheless, the individual dwarfs are not always instantly recognizable to the ordinary observer, as some times in the film they looked indistinguishable, such as shown below:



SECOND AMENDED COMPLAINT

295.   The Anger character is not a stock character. The Anger character is unique and individual, and maintains a specific role within the ensemble of Moodsters characters. As set forth above, Disney had never before distributed a film or show that featured a collection of five single-emotion characters, which included an Anger character with the particular traits and attributes of the Anger character in *The Moodsters*.

296.   Moodsters Co. is not aware of any other previous animated works that featured a collection of five characters each represented by a single emotion, which included a character represented by the single emotion of anger. Moodsters Co. is similarly unaware of any previous animated works that featured five characters each represented by a single emotion and designated by core body colors linked to each emotion, of which the anger character designated by the core body color red, interacts cohesively with four other characters each respresented by a single emotion and corresponding core body color. Furthermore, as set forth in paragraphs 179-92 above, there are a range of options for expressing the idea of single emotion characters, including an Anger character; the particular attributes and traits expressed in the Anger character underscore the uniqueness of this character. For these reasons, among others, the Anger character of *The Moodsters* is not a general, stereotypical, or stock character. To the contrary, the originality of this character distinguishes the Anger character from animated characters outside of *The Moodsters*, which renders the Anger character especially distinctive and containing unique elements of expression.

297.   Professor Furniss agrees with the allegations set forth in paragraph 296 based on her analysis to date. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will further analyze and opine on the history of animated works, and address the unique elements of expression and especially distinctive characteristics of the collection of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Moodsters characters compared to other characters in works that predated *The Moodsters*.

### Disney·Pixar's *Inside Out* Copied *The Moodsters* Anger Character

298.   Disney·Pixar had access to *The Moodsters*, including the Anger character, before Disney·Pixar started working on *Inside Out* in 2010.

299.   The Anger character's unique expressive elements include but are not limited to: an anthropomorphic animated character represented by the single emotion of anger; the application of red as the character's core body color; the tendency to literally explode from the head when most angry; the role the Anger character maintains within the ensemble of four other characters each represented by a single emotion, including happiness, sadness, and fear, and each character represented by a core body color, including yellow and blue; the character is not human but has traits and characteristics that are, is not androgynous, and not an animal or object; the Anger character resides inside a child, along with the other four characters represented by a single emotion and core body color.

300.   These elements, individually and as a selection, coordination, and arrangement, are protectable and original elements of The Moodsters Company's copyright in *The Moodsters*, as set forth in the Anger character.

301.   These elements of expression, individually or in combination, are not *scènes à faire*.

302.   Before *Inside Out*, Disney·Pixar had never before released a film with an anthropomorphized character that represented the single emotion of anger, that was designated by the core body color of red, and that exploded from the head.

303.   The character Anger in *Inside Out* is one of five main characters in the movie.

304.   *Inside Out*'s Anger character is colored red, has a fiery spirit, and

SECOND AMENDED COMPLAINT

tends to explode (literally) when things don't go as planned. The character displays fire exploding from its head at such times.



305.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in the Anger character in *The Moodsters*. The Anger character in Disney·Pixar's *Inside Out*, as set forth herein and in the paragraphs above, is substantially similar to the protectable components of the Anger character in *The Moodsters*.









ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

306.    Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in *The Moodsters*, including the Anger character.

307.    By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copyright Act.

**Count 6**

**Copyright Infringement (the Fear character)**

308.    The Moodsters Company repeats and realleges all allegations set forth above in paragraphs 1-307 as if they were stated in full and incorporated herein.

309.    One protectable component within The Moodsters Company's copyright in *The Moodsters* is the Fear character (Scootz). The Moodsters Company is the exclusive owner to all rights in the copyright to the Fear character of *The Moodsters*.

310.    The Fear character is an anthropomorphized animated character that represents the single emotion of fear, and that is designated by the core body color of green. He is a nervous Nellie. Everything frightens him.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES




SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

### The Fear Character is Protected by Copyright

311.   The Fear character of *The Moodsters* is protected by copyright. The Fear character is fundamentally original—the *sine qua non* of copyright law.

312.   The Fear character of Moodsters was created, for purposes of copyright law, no later than 2005 when the character appeared and was described in *The Moodsters* Bible. The Fear character was further refined and developed in *The Moodsters* Pilot episode in 2007. In both *The Moodsters* Pilot and Bible, the Fear character was fixed in a tangible medium of expression.

313.   The Fear character is protected by copyright under both the three-part test applied for animated characters. Under the Ninth Circuit's three-part test, characters are protected by copyright if they (1) have physical as well as conceptual qualities; (2) are sufficiently delineated to be recognizable as the same character whenever they appear; and (3) are especially distinctive and contain some unique elements of expression.

### The Fear character from *The Moodsters* has physical and conceptual qualities

314.   The Fear character of Moodsters is not a mere literary character. Rather, the Fear character describes and reflects conceptual characteristics of the character, as set forth and described in this Second Amended Complaint, and the character is depicted graphically as well. The Fear character demonstrates physical as well as conceptual qualities as a result.

### The Fear character is sufficiently delineated

315.   The traits and attributes for the Fear character, as reflected in *The Moodsters* Bible and Pilot, sufficiently delineate this character so that the character is recognizable whenever it appears. These traits and attributes include, but are not limited to, the Fear character is an anthropomorphic animated character represented by the single emotion of fear; the application of green as the Fear character's core body color; the tendency to shield and cover his body, and hide or shut his eyes in fear; the role the Fear character maintains

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

within the ensemble of four other characters each represented by one of the single emotions of happiness, sadness, anger, and love, and each which is rerpesented by a core body color of yellow, blue, red, and pink, respectively; that the Fear character is not human but has traits and characteristics of humans, is not androgynous, and is not an animal or object; that the Fear character resides inside a child, along with the other four characters represented by a single emotion and a core body color. Based on the expression of these traits and attributes, and as the Fear character is depicted graphically, the Fear character is recognized wherever it appears.

316.   The traits in the paragraph above have persisted from creation through—and beyond—the pilot episode in 2007.

317.   The Fear character of *The Moodsters* is not lightly sketched in the Bible or the Pilot episode. The graphical depictions of the Fear character are custom designs based on Daniels' conceptualization. These designs were further refined in the two-dimensional drawings in the Bible, and then further detailed through a professional production of the Pilot featuring three-dimensional computer-generated imagery (CGI).

318.   Substantial resources were devoted to *The Moodsters* characters, including the Fear character. For instance, over $3.3M was invested in Moodsters Co. The primary business focus of Moodsters Co. was the development and licensing of an entertainment program, toys, books, and other items centered on the ensemble of Moodsters characters, including the Fear character, in order to build a multi-media educational and entertainment platform for children.

319.   The characters in *The Moodsters* Pilot episode, including the Fear character, was further refined through the professional and academic guidance and analysis from Professor Bracket and his colleague, Professor Susan E. Rivers. Through their work, as preeminent experts in the field of emotional

SECOND AMENDED COMPLAINT

intelligence and co-founders of the Yale Center for Emotional Intelligence, they advised Moodsters Co. about the script and attributes and traits of the characters, including suggesting facial expressions and dialogue for particular characters based on their review and interpretation of scientific research on emotions.

320.   Part of their work included focus groups with children and their parents who watched a version of the Pilot. The results demonstrated that children understood and enjoyed the show. 96% of children liked the show, and 82% said they wanted to watch more shows about *The Moodsters*. Parents liked *The Moodsters* as well.

321.   The focus groups demonstrated that the children liked *The Moodsters* characters. Specifically, 100% liked the Fear character.

322.   Unlike lightly sketched characters in a literary screenplay, *The Moodsters* characters, including the Fear character, was assessed and tested by preeminent experts at Yale University.

323.   Moodsters Co. also discussed *The Moodsters* characters, including the merchandising potential of *The Moodsters* characters, with a number of major entertainment, toy, and publishing companies. These companies included Disney, PBS, Nickelodeon, Scholastic Publishing, Manhattan Toy Company, among others. Internal research conducted at the Moodsters Company in 2007 demonstrated that the licensing industry accounted for approximately $180 billion in worldwide retail sales, of which character licensing accounted for $41 billion of those sales. Nonetheless, the dominance of Disney and Nickelodeon in media for the relevant demographic affected the ability of other market entrants to place products at retail. Moodsters Co., therefore, sought a partnership to bring *The Moodsters* characters to market.

324.   None of the companies listed above expressed critique or concern that *The Moodsters* characters in general, or the Fear character specifically, were

SECOND AMENDED COMPLAINT

generic, lightly sketched, lacked distinctive qualities, or were otherwise not sufficiently delineated as a specific, unique, and original group of characters. To the contrary, Moodsters Co. received positive feedback about the uniqueness of *The Moodsters* characters, which included the Fear character.

325.   Moodsters Co. has also retained Professor Maureen Furniss to serve as an expert witness in connection with this matter. If given the opportunity to complete an analysis and testify in this action, Professor Furniss would expound on and opine that the Fear character is sufficiently developed to establish the character's agency to engage and drive a narrative or story.

326.   While Fear character in *The Moodsters* characters, along with his unique and original traits and attributes, was introduced in the Bible and Pilot, the Fear character continues to this day. A second generation of *The Moodsters* characters were developed in the 2012-13 time frame. The updated Fear character is shown below:



By 2015, various products, including toys and books featuring the Fear character, became available for sale at Target, and then later on national and international platforms such as Amazon.com, Toys "R" Us, Walmart, Barnes and Noble, AAFES (Army Air Force Exchanges), and JCPenney. For instance

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT



Before these Moodsters character products were available for sale, moreover, thousands of Moodsters toys and books, which included the Fear character, were donated to schools, disaster relief programs, NGOs, and children's hospitals.

327.   The following traits and attributes from the first generation Fear character has persisted in the second generation: the Fear character is an anthropomorphic animated character represented by the single emotion of fear; the application of green as the Fear character's core body color; the tendency to shield and cover his body, and hide or shut his eyes in fear; the role the Fear character maintains within the ensemble of four other characters each represented by the single emotions happiness, sadness, anger, and love, and each which is rerpesented by a core body color of yellow, blue, red, and pink, respectively; that the Fear character is not human but has traits and characteristics that are human, is not androgynous, and is not an animal or object.

### The Fear Character is Especially Distinctive

328.   The Fear character in *The Moodsters* is not a stock character.

329.   Stock characters have an important historical background in animated films. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will provide this historical perspective of the role of the stock character. In short, in the earliest years of animation, it was

SECOND AMENDED COMPLAINT

common for films to have several groups of multiple characters, such as dogs and lions, which were not differentiated visually or otherwise. In other words, all dogs were identical. A well-known example of stock characters is from the Fleischer studio's production of *Snow White* in 1933. This version of *Snow White*, four years before Disney's version, featured Betty Boop in the role of *Snow White*. The film also included seven dwarfs. But unlike Disney's version of the dwarfs most people are familiar with today, these dwarfs were all identical looking. They had no original or unique traits or attributes. These dwarfs were stock characters.

330.   Disney was one of the first animation studios to break away from stock characters. In 1937, for instance, Disney released its version of *Snow White and Seven Dwarfs*. Unlike the Fleischer version, Disney made each dwarf its own distinctive character. While the dwarfs are similar in terms of size and shape, their personalities come through their named attributes; for example, the Sneezy dwarf is always sneezing and the Bashful dwarf is very shy. Notably, these individualized traits and characteristics come through in the movie. Nevertheless, the individual dwarfs are not always instantly recognizable to the ordinary observer, as some times in the film they looked indistinguishable, such as shown below:



331.   The Fear character is not a stock character. The Fear character is unique and individual, and maintains a specific role within the ensemble of Moodsters characters. As set forth above, Disney had never before distributed a film or show that featured a collection of five single-emotion characters, which

SECOND AMENDED COMPLAINT

included a Fear character with the particular traits and attributes of the Fear character in *The Moodsters*.

332.   Moodsters Co. is not aware of any other previous animated works that featured a collection of five characters each represented by a single emotion, which included a character represented by the single emotion of fear. Moodsters Co. is similarly unaware of any previous animated works that featured five characters each represented by a single emotion and designated by core body colors linked to each emotion, of which the fear character designated by the core body color green, interacts cohesively with four other characters each respresented by a single emotion and corresponding core body color. Furthermore, as set forth in paragraphs 179-92 above, there are a range of options for expressing the idea of single emotion characters, including a Fear character; the particular attributes and traits expressed in the Fear character underscore the uniqueness of this character. For these reasons, among others, the Fear character of *The Moodsters* is not a general, stereotypical, or stock character. To the contrary, the originality of this character distinguishes the Fear character from animated characters outside of *The Moodsters*, which renders the Fear character especially distinctive and containing unique elements of expression.

333.   Professor Furniss agrees with the allegations set forth in paragraph 332 based on her analysis to date. If given the opportunity to complete an analysis and testify in this action, Professor Furniss will further analyze and opine on the history of animated works, and address the unique elements of expression and especially distinctive characteristics of the collection of Moodsters characters compared to other characters in works that predated *The Moodsters*.

**Disney·Pixar's *Inside Out* Copied *The Moodsters* Fear Character**

334.   Disney·Pixar had access to *The Moodsters*, including the Fear

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT

character, before Disney·Pixar started to work on *Inside Out* in 2010.

335.   Disney·Pixar's *Inside Out* infringes The Moodsters Company's protectable and original components of the copyright in the Fear character of *The Moodsters*.

336.   The unique expressive elements of the Fear character include but are not limited to: an anthropomorphized animated character represented by the single emotion of fear; the application of a core body color for the character; the tendency to shield and cover his body, hide or shut his eyes out of fear; the role the Fear character maintains within the ensemble of four other characters each represented by a single emotion, including happiness, sadness, and anger, and each character represented by a core body color, including yellow, blue, and red; the character is not human but has traits and attributes of humans, is not androgynous, and is not an animal or object; that the Fear character resides inside a child, along with the other four characters each represented by a single emotion and a core body color.

337.   These elements, individually and as a selection, coordination, and arrangement, are protectable elements of The Moodsters Company's copyright in *The Moodsters*, as set forth in Fear character.

338.   These elements of expression, individually or in combination, are not *scènes à faire*.

339.    Before *Inside Out*, Disney·Pixar had never before released a film with an anthropomorphized character that represented the single emotion of fear, and that was designated by a core body color.

340.   *Inside Out*'s Fear character has a core body color (purple), and is one of five main characters in the movie.

SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

341.   The Fear character is constantly on the lookout for potential disasters. There are very few activities and events that Fear does not find to be dangerous and possibly fatal.

342.   Disney·Pixar's *Inside Out* copied protectable components of The Moodsters Company's copyright in the Fear character in *The Moodsters*. The Fear character in Disney·Pixar's *Inside Out*, as set forth herein and in the paragraphs above, is substantially similar to the protectable components of the Fear character in *The Moodsters*.

  

SECOND AMENDED COMPLAINT

343.   Through the release of *Inside Out*, and the sales of *Inside Out* merchandise, Disney·Pixar has directly, contributorily, and vicariously infringed The Moodsters Company's protectable components of its copyright in the Scootz character of *The Moodsters*.

344.   By virtue of Disney·Pixar's infringement, The Moodsters Company is entitled to recover its actual damages and Disney·Pixar's profits in an amount to be proved at trial (or in the alternative statutory damages), its attorneys' fees and costs, and all other relief allowed under the Copyright Act.

## Prayer for Relief

Daniels and The Moodsters Company request the following relief:

1.   Entry of judgment in favor of Daniels and against Disney·Pixar on Count 1 in this Complaint, in an amount to be determined at trial, but at least in an amount that exceeds the jurisdictional limits of this Court;

2.   An award of damages to Daniels for Disney·Pixar's breach of the parties' implied-in-fact contract;

3.   Entry of judgment in favor of The Moodsters Company and against Disney·Pixar on Counts 2-6 in this Complaint for infringement of The Moodsters Company's copyright in *The Moodsters*;

4.   An award of actual damages The Moodsters Company has incurred as a result of Disney·Pixar's copyright infringement;

5.   In the alternative to actual damages, an award of statutory damages to The Moodsters Company for some or all of Disney·Pixar's copyright infringement;

6.   An award of all Disney·Pixar's profits from and relating to *Inside Out* to The Moodsters Company;

7.   An award of attorneys' fees, costs, expenses, and disbursements;

8.   An award of pre-judgment and post-judgment interest on all damages owed to Daniels and The Moodsters Company;

SECOND AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1       9.    An order directing Disney·Pixar to add Daniels and her team to the

2    credits of *Inside Out*; and

3       10.  Such other and further relief as is just and proper.

4       Dated: March 1, 2018        Robins Kaplan LLP

5
                            By: */s/ Ronald J. Schutz*

6                                RONALD J. SCHUTZ
                            MICHAEL A. GEIBELSON

7                                PATRICK M. ARENZ
                            RUTH L. OKEDIJI

8

9                              Attorneys for Plaintiffs Denise Daniels and

10                             The Moodsters Company

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

      SECOND AMENDED COMPLAINT

1

**Jury Trial Demand**

2       Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial

3   by jury on all claims so triable.

4

5   Dated: March 1, 2018                    Robins Kaplan LLP

6

7                                           By: /s/ Ronald J. Schutz
                                            RONALD J. SCHUTZ
8                                           MICHAEL A. GEIBELSON
                                            PATRICK M. ARENZ
9                                           RUTH L. OKEDIJI

10

11                                          Attorneys for Denise Daniels and
                                            The Moodsters Company
12

13

14

15

16

17

18

19

20

21

22

23

24

25   88756936.1

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT